IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BURAK POWERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| BROKEN HILL PROPRIETARY (USA), | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Burak Powers ("Plaintiff" or "Mr. Powers"), files his Original Complaint against

Defendant Broken Hill Proprietary (USA), Inc. ("BHP," "the Company," or "Defendant").

**INTRODUCTION**

1.     In November 2018, BHP took Mr. Powers's job as Lead Principal (Manager),

Portfolio Strategy and Development away from him and gave it to a female who, unlike him, was

not deemed high-potential and was not a strong performer.  BHP told Mr. Powers that if he did not

obtain a job within the Company by June 30, 2020, he would be terminated.

2.     In an effort to find a new job within BHP, Mr. Powers applied for four openings

within the Company during 2019 and 2020, but all four were given to female employees who were

clearly less qualified than him.  BHP strategically hid another job from him, and awarded it to yet

another female.  As a result, Mr. Powers obtained no new job within BHP, and was terminated on

July 11, 2020, after BHP extended his previously scheduled termination date by twelve days.

3.     What happened to Mr. Powers was not coincidence.  Rather, it was the direct result

of BHP's publicly announced decision from its parent's headquarters in Australia to purposefully

systemically discriminate in favor of females (and against males), on a global basis, so that it can

achieve a 50% female workforce by 2025, from 17% in 2015 (Exs. A-8 to A-29 and Exs. D, G, H, O and P).  To achieve that corporate-wide mandate, BHP uses bonuses tied to specific sex-based targets to motivate its managers to make personnel decisions based on sex (Exs. A-10, A-27, A-28; Exs. D and G).  That is precisely what happened repeatedly here, resulting in Mr. Powers having his job taken from him and given to a clearly less qualified female, being passed over for four jobs given to clearly less qualified females, and ultimately terminated.  As such, Mr. Powers brings this sex discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000*e*.

4.      Mr. Powers also asserts claims for breach of contract and post-termination retaliation based on the fact that BHP impermissibly and unlawfully refused to pay him an incentive he was entitled to under the Company's Short Term Incentive Plan unless he first signed a release of all claims against BHP, which would have released BHP from any liability to Mr. Powers for the sex discrimination claims set forth in this lawsuit which were pending at the Equal Employment Opportunity Commission ("EEOC") at the time (Email from Kan to Powers of 08/04/20, Ex. N).

## THE PARTIES, JURISDICTION, AND VENUE

5.      The Plaintiff, Mr. Powers, is a natural person residing in Houston, Texas.  He has standing to file this lawsuit.

6.      Broken Hill Proprietary (USA), Inc. is headquartered at 1500 Post Oak Blvd, Houston, TX 77056, is a citizen of Texas, and may be served with process through its registered agent, CT Corp. System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.  During 2017, 2018, 2019, and 2020 Broken Hill Proprietary (USA), Inc. engaged in an industry affecting commerce and employed fifteen or more employees for each working day in each of twenty or more calendar weeks.

7.     The Court has personal jurisdiction over Defendant based on both general and specific jurisdiction.   Personal jurisdiction is proper because Defendant has continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

8.     Subject matter jurisdiction is proper because Mr. Powers brings claims under Title VII, which is a federal law.   The Court has supplemental jurisdiction over Mr. Powers's state law breach of contract claim.

9.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, and the unlawful employment practices alleged in this case occurred in the Southern District of Texas.

## FACTUAL BACKGROUND

### A.     BHP Billiton Ltd And BHP

10.     BHP Billiton Ltd. (now known as BHP Group Ltd., but referred to as BHP Billiton Ltd. herein) is an Anglo-Australian multinational mining, metals and petroleum company headquartered in Melbourne, Australia.   BHP Billiton Ltd. has approximately 30,000 employees (excluding contractors) in many countries throughout the world.   BHP Billiton Ltd. is the ultimate parent company and owner of its subsidiary and affiliate, BHP, the Defendant.   BHP is a petroleum company headquartered in Houston, Texas.   During 2017, 2018, 2019, and 2020, BHP employed 500 or more employees for each working day in each of twenty or more calendar weeks.

### B.     Mr. Powers Was A High Performing Manager Who Was Part of BHP's Elite Future Emerging Leaders Program

11.     In December 2013, Mr. Powers began working for BHP.   As of June 2017, he became the Manager, Portfolio Strategy and Development.   At the time, Mr. Powers received a double promotion, from Salary Grade 11 to 13, which is highly unusual.

12.     Mr.  Powers was a part of BHP Billiton Ltd.'s Future Emerging Leaders Program ("FELP").  Out of about 30,000 employees worldwide at BHP Billiton Ltd., only 16 are added to the FELP each year.  Mr. Powers had been nominated to the FELP in December 2017 (Ex. A-1), and accepted into the FELP in March 2018 (Ex. A-2).  This demonstrated that Mr. Powers was a very high performer.  Also, through this time, Mr. Powers had received uniformly positive performance reviews.

### C.     In Early And Mid-2018, Mr. Powers's Boss, Skip York, Admitted That BHP Was Systemically Favoring Females On A Global, Top-Down Basis

#### 1.     March 2018 Comments From Mr. York

13.     March 2018, Mr. Powers had a conversation with his boss, Skip York, Head of Strategy and Market Intelligence, about the selection process for the FELP.  That year, 32 employees were nominated for FELP from across BHP Billiton Ltd.  50% of these nominees were female, even though only about 20% of BHP Billiton Ltd.'s employees were female at the time.  All of the nominees were given objective aptitude tests concerning reading comprehension, math, critical reasoning, etc.  After that stage, 16 employees were selected into the program.  Of these 16, only 25% were female.  Mr. Powers remarked to Mr. York that the much higher initial selection of females than males, relative to their percentage of the workforce, and the much lower pass rates among the females on the aptitude tests, suggested that the scales had been unfairly tipped to favor female employees in the nomination process.  Mr. York agreed with Mr. Powers about that, but cautioned him strongly that there might be consequences, especially from higher-ups, if he voiced these concerns.

#### 2.     Summer 2018 Comments From Mr. York And Also Paul Perry

14.     During the summer of 2018, BHP was laying off about 1,000 of its employees, which was about half of its workforce in Houston.  The employees being let go were scrambling

to find a spot in other departments at BHP, and there was an opening on Mr. Powers's team, as a direct report to Mr. Powers.  Mr. York mentioned on many occasions the need to increase the female percentage and how the pressure from "Melbourne" (BHP Billiton Ltd.'s headquarters) was getting more intense. Mr. Powers pointed out to him that the work they do (strategy) was an extremely challenging area and that merit should determine who should be hired into his team.

15.     Mr. York did not include Mr. Powers in any of the hiring process, including the interviews, for the opening reporting to Mr. Powers.  Mr. Powers is not aware of any other instance at BHP where the direct supervisor was not involved in the hiring process.  Mr. Powers objected to Mr. York, who dismissed his concerns with inaccurate excuses.

16.     In October 2018, Elena Walker was announced as the new addition to Mr. Powers's team.  Unfortunately, Ms. Walker had no experience in strategy and few of the required skills. Although Mr. Powers knew Ms. Walker and her family and thought highly of her, he suspected that it would be a struggle to deliver the high-quality products expected of the team. Mr. Powers spent an inordinate amount of time bringing Ms. Walker up to speed, and even after that the quality of her work was not stellar.  Nevertheless, Mr. Powers never blamed Ms. Walker for the difficult position that she was put in, and Ms. Walker appreciated the extra assistance from Mr. Powers.

17.     After the announcement in October 2018, Mr. Powers arranged a phone call with Paul Perry (Mr. Powers's boss's boss), Vice President - Strategy at BHP Billiton Ltd., who works in Melbourne, Australia, and complained about the illegality of the hiring and promotion decisions and how one of his direct reports (Ms. Walker) was hired without him being involved at all.  It was clear from Mr. Perry's tone that he was upset and disappointed in Mr. Powers for making that complaint.

**D.**  **In November 2018, BHP Took Mr. Powers's Job From Him On The Pretext Of "Job Elimination," And He Was Given Until June 30, 2020 To Find A New Job Within BHP, Or Be Terminated**

18.     In November 2018, Mr. Powers was told that his job as Manager, Portfolio Strategy and Development was being eliminated as part of an organizational restructuring, and that he had to find another position within the Company.

19.     Mr. Powers's job was the only one eliminated in his department in Houston (from among 20 employees) and the only one Mr. Powers can think of from any Global Function in Houston (from among hundreds of employees).

20.     In late November 2019, Mr. Powers was given a temporary secondment role within the Company, with an ending date of June 30, 2020, and was told that his employment with BHP would end, unless he secured another job within the Company before June 30, 2020.

**E.**  **As It Turns Out, After BHP Took Mr. Powers's Job From Him, It Ultimately Gave It To A Weak Performing Female In Australia**

21.     In late November 2019, BHP Billiton Ltd. posted Mr. Powers's job as Lead Principal, Portfolio Strategy and Development (the same one he was told a year earlier was being eliminated) in Melbourne, Australia (the parent Company's Headquarters).   Ultimately, in approximately February 2020, the position was given to a female named Clare Eilbeck.   Ms. Eilbeck was not a strong performer like Mr. Powers, and Mr. Powers  was clearly better qualified than her for the role.   BHP Billiton Ltd. did not run an open interview process for Ms. Eilbeck's appointment and instead directly appointed her to the role (unusual for BHP Billiton Ltd. and against BHP Billiton Ltd. policies unless there are clearly exceptional circumstances), thereby preventing a real-time objective comparative assessment of qualified candidates.

**F.      During 2019, While He Was Trying To Find A Job Within BHP, Mr. Powers Was Rejected For Three Job Openings In Favor Of Three Female Candidates Who He Was Clearly Better Qualified Than**

22.      In an effort to stay employed at BHP after his job was taken from him under the guise of "job elimination" (later proven to be false), during 2019 Mr. Powers applied for three openings within BHP.  As explained below, Mr. Powers was passed over for all three jobs in favor of clearly less qualified females.

**1.      In March 2019, Mr. Powers Was Rejected For The Head of Credit And Market Risk Position, And It Was Awarded To A Clearly Less Qualified Female, Juliet Taylor**

23.      In March 2019, Mr. Powers was rejected for a position he had applied for, Head of Credit and Market Risk.  A "Head of" role at BHP is a Salary Grade 14 to 15 position, whereas Mr. Powers held a lower Salary Grade 13 position.  Juliet Taylor, a female, was selected for the job.  Mr. Powers was substantially better qualified than Ms. Taylor for the position (Ex. A-3).  The position required strong quantitative professional experience.  Mr. Powers had such a background (Ex. A-3).  Ms. Taylor did not (Ex. A-4).  Mr. Powers found out that he did not get the job through a video conference he had with the hiring manager, Vandita Pant, BHP Billiton's Chief Commercial Officer.  Ms. Pant admitted that Mr. Powers was qualified for this position.  Ms. Pant stated, "[p]eople who have worked with you say great things about you."  She told Mr. Powers that he was her second choice and that his performance during the interview was very impressive.  She could not give Mr. Powers a good reason why she did not select him.  There is none.  Notably, Ms. Pant herself was promoted to the position of Chief Commercial Officer in 2019 without any experience in commercial roles.  She replaced a male named Arnoud Balhuizen, who had been made to resign by BHP.

24.      There are three skills that are critical to the job of Head of Credit and Market Risk that Mr. Powers had and Ms. Taylor did not:

- **Quantitative professional experience** – enables accurate management of risk. All of Mr. Powers's professional experience includes quantitative analysis. Ms. Taylor had none.

- **Deep knowledge of fundamental analysis** – enables understanding of market and price risk. Mr. Powers's experience for the three years at BHP prior to his application for this job focused on this skill. Ms. Taylor had only superficial exposure as audience member during occasional presentations on BHP's Commodity Price Protocols (fundamental analysis).

- **Teamwork** – enables cross-functional collaboration. Mr. Powers had been commended on his teamwork and stakeholder management skills on many occasions. Ms. Taylor struggled in this area. Mr. Powers and Ms. Taylor were classmates in BHP's Future Emerging Leaders Program, Class of 2018. Because the program has only 16 participants and involves multiple week-long in-person sessions, Mr. Powers and Ms. Taylor had the opportunity to learn about each other's areas of expertise closely. In fact, Ms. Taylor highlighted during the group opening session in May 2018 that the main weakness she has was teamwork and collaboration, stating that her deficiencies working in a team setting have been pointed out by others. Her classmates also raised a number of concerns in this area during the program.

25. Upon learning that Juliet Taylor received this job, Yuliya Zhdanov,[1] part of the Commercial Leadership Team and BHP's VP Business Partner Supply Petroleum, was so shocked in hearing that non-quantitative person received the job that she exclaimed to Mr. Powers that "Juliet is a lawyer!" In addition, Ms. Zhdanov told Mr. Powers that Ms. Pant praised Mr. Powers by name during a Commercial Leadership Team meeting (after the job selection decision was announced) and how the Commercial function needs to figure out a way to have Mr. Powers join its ranks.

---

[1] Ms. Zhdanov was BHP's Head of Strategy and Planning for Petroleum Marketing from March 2017 until March 2019, after which time she became BHP's Vice President, Supply Petroleum. Prior to her promotion into this role, she had no professional experience in supply (procurement).

**2.      In July 2019, Mr. Powers Was Rejected For The Investor Roadshow Project Manager Position, And It Was Awarded To A Clearly Less Qualified Female, Jeanie Harrison**

26.     In July 2019, Mr. Powers was rejected for another position he had applied for, Investor Roadshow Project Manager.  This is a Job Grade 13 position, which was the same Salary Grade that Mr. Powers already was at the time.  Jeanie Harrison, a female who was also a Salary Grade 13 employee, was selected for the position.  Mr. Powers was substantially better qualified than Ms. Harrison for the position  (Exs. A-1 and A-3).  The position required a strong background in BHP Petroleum strategy (Ex. A-5).  Mr. Powers had such a background, as it was the main focus of his position at BHP for the prior approximately six years (Ex. A-3).  Ms. Harrison did not have a strategy or investor relations background (Ex. A-6).

27.     Mr. Powers learned that he did not get this job through an email from Niall McCormack, the then Vice President Exploration and Appraisal for Petroleum (Ex. A-7).  The email states, "[w]hile you certainly have good skills, we had quite a few applicants with fairly specialized skills in the investor relations space." (*Id*.).  After Mr. Powers found out who the selected candidate was (Jeanie Harrison), the email made even less sense to him because Ms. Harrison did not have investor relations experience except for the conference calls with the investors that she was exclusively invited to sit in on months before the position was advertised on the internal BHP job site.

28.     Putting this all together, it appears that the hiring manager had made up his mind on which candidate to select long before the process began, and the email was just damage-control. Consistent with this conclusion, before Mr. Powers applied for this job, he chatted with BHP's Vice President of Investor Relations, James Wear, and Mr. Wear stated that Mr. Powers would be a very strong candidate for the job and that they would love to have him on the team.

29.     Tellingly, on November 5, 2019, when Mr. Powers talked to his boss, Mr. York, about this position, he told Mr. Powers that the reason he did not get this job was because it was "marked for a woman."  Mr. Powers took written notes of that and shared that information with Sara Summerbell, Principal – Investigations at BHP, who later investigated a complaint about sex discrimination that Mr. Powers made in October 2019, as further explained below.  Mr. York also told Mr. Powers that BHP is trying to replace males with females on a systemic basis.  Mr. Powers had been told the same, or similar things, by other BHP managers and executives.

30.     There are three skills that are critical to the Investor Roadshow Project Manager position that Mr. Powers had and Ms. Harrison did not:

- **Strategy** – enables explaining to the investors how the Petroleum strategy fits within the overall BHP portfolio. Mr. Powers's specialization in graduate school was strategy.  He worked in strategic planning for another large oil and gas company.  He rose in the ranks of a top-three strategy consulting firm and has been part of BHP's strategy team for all of his six years. In fact, he wrote or co-wrote a number of Board papers on strategy. Ms. Harrison had only superficial exposure to strategy.

- **Project management** – enables coordinating the many internal functions and departments toward a common goal. Mr. Powers had been commended on many occasions in this area for delivering cross-functional products leveraging relationship skills (Exs. A-1 through A-3).  Ms. Harrison had difficulty in this area.  Mr. Powers  and Ms. Harrison serve as counterparts in BHP's price outlook analysis.  In early 2018, Ms. Harrison's project management skills were so poor that Mr. Powers  had to step in on numerous occasions to coordinate the overall process for both Mr. Powers's and Ms. Harrison's teams, including preparing Ms. Harrison's direct reports for the executive presentations.

- **Investor Relations** – enables succinct and convincing messaging to investors. Mr. Powers developed communication materials to investors on numerous occasions (*e.g.,* pack to Citibank in 2016). In fact, Mr. Powers served as the liaison between his department and the Investor Relations team during most recent assignment, leveraging his prior experience.  In contrast, Ms. Harrison's experience was limited to being in the audience during the conference calls with investors. She was exclusively invited to these conference calls, implying that she had been chosen for the Project Manager role long before the hiring process took place.

31.     In its Position Statement that it filed with the EEOC in response to Ms. Power's Charge of Discrimination, BHP attempted to deflect attention from this comparison – and from its own Investor Relations Vice President's admission – by vaguely asserting that there were concerns from unidentified persons that Mr. Powers may not be qualified for this role because it required "specialized skills in the investor relations space, including benchmarking and price decks experience." (Ex. E at 2). This ambiguous assertion falls flat: Mr. Powers  spearheaded benchmarking initiatives at BHP and has substantial experience with price decks.  For example, Mr. Powers founded and led the Petroleum Benchmarking Program in 2016 covering both financial and operational benchmarking. Mr. Powers also developed an automated system to value assets using multiple price decks in 2018.  As Mr. McCormack and Mr. Wear essentially conceded, Mr. Powers was highly qualified for this job.  Ms. Harrison's experience in benchmarking or price decks was neither as varied nor as deep as Mr. Powers's.

### 3.     In December 2019, Mr. Powers Was Rejected For The Production Planner Position, And It Was Awarded To A Clearly Less Qualified Female, Anna Pechatnikov

32.     In approximately September 2019 Mr. Powers applied for an internal job at BHP as Production Planner, Salary Grade 13.  After Mr. Powers applied, he chatted with a member of the Planning Team who had some influence on hiring decisions.  That person told Mr. Powers that they were looking to hire a female for the position.  He then said, "but of course we boys are not allowed to talk about that."  Later, after BHP could not find a female at Salary Grade 13 level, BHP downgraded the position to Salary Grade 12.  On December 6, 2019, BHP announced that the position was awarded to Anna Pechatnikov, a female who was substantially less qualified for the position than Mr. Powers.

33.     There are three skills that are critical to the Production Planner job that Mr. Powers had and Ms. Pechatnikov did not:

1. **Planning** – enables the main deliverable of the job, *i.e.* planning and budget for Production function. Mr. Powers led his department's planning and budgeting activities and has deep knowledge of the Petroleum Planning Database. Ms. Pechatnikov had none of these skills.

2. **Technical / engineering background** – enables working with the stakeholders or input providers, vast majority of whom are engineers. Mr. Powers has an undergraduate degree in engineering and received a graduate certificate from the Colorado School of Mines's Petroleum SuperSchool, focusing on technical aspects (which BHP sponsored, with only three BHP attendees in that year). Ms. Pechatnikov has undergraduate and graduate degrees in economics, and her exposure to technical aspects have been limited to economic analysis. Furthermore, Irada Williams, the hiring manager, had told Mr. Powers that there was a strong emphasis / need for a candidate with a technical background and that if no one with a technical background was found, she would invite Mr. Powers for an interview. Mr. Powers was not invited for an interview and was surprised to learn that the selected candidate was Ms. Pechatnikov, who does not have a technical background. Notably, Ms. Williams had been promoted into her role to replace a male named John Simmons, who had been made to resign by BHP.

3. **Understanding of BHP assets** – enables making sound recommendations on how to optimize the assets. Mr. Powers started and led the Petroleum asset strategies, leading to deep understanding of all of BHP's Petroleum assets. Geraldine Slattery (President Petroleum Operations) has commended Mr. Powers on numerous occasions on his deep knowledge of the assets (ranging from economic to technical to geopolitical analyses) and his ability to distill the vast amount of information into digestible recommendations. In contrast, Ms. Pechatnikov's understanding was limited to the few assets she has assisted on in only the economic evaluations.

34.     Not receiving any of the above-referenced three roles in 2019 constitutes an adverse employment action because, unlike the temporary secondment position Mr. Powers was given that ended in July 2020, two of these three positions are permanent positions with no end date. The Investor Roadshow Project Manager was a secondment, but would have given Mr. Powers wider exposure to the Petroleum Leadership Team (PLT), improving his chances of finding a permanent position by June 30, 2020. Also, Mr. Powers's temporary secondment is in another commodity

(fertilizers) in which Mr. Powers had no experience.  Hence, the Investor Roadshow Project Manager position (in Petroleum) would have given him a higher chance of securing permanent employment.  As if to prove that point, in June 2020, Jeanie Harrison, the female who received the Investor Roadshow Project Manager position, received a promotion into a permanent position at BHP as "Head of Planning" for which Mr. Powers was not selected. *See infra*.

35.     As a result, at the time he applied and was rejected for all three positions, Mr. Powers was in a far less secure position, with less opportunity for advancement, than any of these three positions.  In other words, the temporary secondment position he was in was objectively worse than any of the three positions.  Based on this alone, the fact that he did not receive any of the three positions constitutes an adverse employment action.  *See Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503-04 (5th Cir. 2014), *reh'g en banc denied*, 779 F.3d 343 (5th Cir. 2015) (holding that receiving objectively worse position, such as one that is less interesting, or has less room for advancement, constitutes an adverse employment action under Title VII).

36.     In addition, a "Head of" role at BHP is a Salary Grade 14 to 15 position, whereas Mr. Powers held a lower Salary Grade 13 position.  Accordingly, receiving the Head of Credit and Market Risk position would have been a promotion.  It is well settled that a failure to promote "can constitute adverse employment actions for the purposes of establishing a *prima facie* case under Title VII." *Mims v. Carrier Corp.*, 88 F. Supp. 2d 706, 719 (E.D. Tex. 2000) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997)).  In this context, "[u]ltimate employment decisions include acts such as hiring, promoting, compensating, and firing." *Id*. (citing *Dollis v. Rubin*, 77 F.3d 777, 782 (5th Cir. 1995)).  As noted, not receiving the Head of Credit and Market Risk role constituted a denial of a promotion, which is plainly an adverse employment action.

37.     Finally, while Mr. Powers has proven that not receiving the three at-issue positions in 2019 constitutes an adverse employment action irrespective of those positions' pay, the "Head of" role would pay more than Mr. Powers was earning, because it is one to two levels Salary Grade higher than the Salary Grade he was in at the time.

**G.     What Happened To Mr. Powers Is Part Of BHP's Systemic Pattern Of Top-Down Sex Discrimination – As Proven By Its Own Documents And Bonus System**

38.     As set forth above, Mr. Powers's job was taken from him, and given to a female who was not a strong performer like Mr. Powers, or who had been designates as high performer, like he had been.  After that, Mr. Powers applied for three jobs in 2019, but all three were given to substantially less qualified females.  As explained below, he applied for another in 2020, and that one was also given to a female.  *See supra*.  This is not a coincidence.  Rather, it is the direct result of BHP Billiton Ltd. and BHP's systemic, intentional, discrimination against males, in favor of females, on a global, top-down basis.  The document trail proving this allegation is long, overwhelming, and conclusive.

39.     As explained herein, the very top of BHP Billiton Ltd.'s organization has sponsored and implemented initiatives, and fostered an attitude that is intended to drive sex discrimination throughout the Company.   BHP Billiton Ltd. and BHP have targets for increasing the percentage of female employees at all levels, and it financially incentivizes managers to satisfy those targets by discriminating on the basis of sex (which, conversely, financially penalizes any manager who refuses to discriminate based on sex).

40.     BHP Billiton Ltd.'s 2015 Annual Report recites that "from our baseline in 2010, female representation increased by (i) 13 per cent in manager and senior leadership roles to 21 per cent; and (ii) two per cent in our overall workforce representation to 17 per cent.  We remain committed to increasing overall female representation, with a specific focus on operational areas."

(Ex. A-8).  BHP Billiton Ltd.'s 2015 Annual Report also states that, in regard to its "multi-year diversity plan," "monitoring and tracking performance against inclusion and diversity plans was undertaken" and "Performance for each Business, Group Function and Marketing was evaluated against FY2015 measurable **objectives and the results of these evaluations were taken into account in determining bonus remuneration**."  (*Id*) (bold added).

41.     On the heels BHP Billiton Ltd.'s 2015 Annual Report, Andrew Mackenzie, the CEO of BHP Billiton Ltd., gave an interview to the Sydney Morning Herald in early 2016 in which he stated a desire for younger employees because he believes "younger people" "are at their most productive, their most inspirational, their most quick-thinking, their most quick-witted …" (Ex. A-9).  In the same article, Mr. Mackenzie endorsed "harder targets" for hiring women and stated BHP Billion Ltd. was "absolutely committed to shifting the dial" on gender representation in the workplace (*Id*.).  Mr. Mackenzie also asserted that more women were needed because of "urgency, if you like, from the male side which can actually lead at times to a recklessness."  (*Id*.).   Mr. Mackenzie also boasted about already having "specific quotas for female . . . workers" in Queensland, Australia  (*Id*.).

42.     On May 5, 2016, Mr. Mackenzie conducted a "town hall" style meeting at BHP in Houston, Texas.  On information and belief, Mr. Mackenzie boasted about the fact that BHP had made substantial progress in achieving one aspect of the (illegal) quotas he had extolled in his interview in the Sydney Morning Herald (*Id*.).  On information and belief, Mr. Mackenzie said that he had recently learned that "you just can't write it [the illegal quotas] down" because, "that is when you get in trouble."

43.     Consistent with Mr. Mackenzie's statements about "shifting the dial" and adopting "harder targets," in 2016 BHP Billiton Ltd. set a target to achieve gender balance of its employees

by 2025 (Exs. A-10 and A-11).  This would require hiring 21,000 women (Ex. A-11).  To achieve this target, in September 14, 2016, Mr. Mackenzie communicated that BHP Billiton Ltd. established a Key Performance Indicator ("KPI") for senior leaders to demonstrate a contribution to a 3% global increase in female representation across the company, evaluated annually (Ex. A-12).  BHP Billiton Ltd.'s 2016 Sustainability Report states, "[a]chieving a culture of inclusion and increasing female representation has been a focus for BHP since 2010.  Despite the positive trend on the Inclusion Index, improvements at our leadership levels and our progress in the past three years being favorable, further accelerated action is planned."  (Ex. A-13).

44.    Mr. Mackenzie reaffirmed his commitment to discrimination based on sex in order to achieve what he calls gender equality in numerous interviews and company communications. In an October 19, 2016 article, Mr. Mackenzie is quoted as stating, "[w]ithout new initiatives it would take us 30 years just to get to 30 per cent female representation.  More must, and will, be done."  (Ex. A-11).

45.    In a November 8, 2016 article, Mike Henry, who at the time was BHP Billiton's Ltd.'s President of Operations, commenting on the gender balancing initiative, stated, "[w]e know what we are up against it, but if we don't make a bold declaration we will consign ourselves to incremental gains that are not better than the status quo."  (Ex. A-10).  The article also states, "[t]o get from 17.5 per cent women now to reach 50 per cent of its 28,000-strong workforce within nine years, BHP will have to hire, train, and promote far more women than men every year."  (*Id*.).  The article goes on to state, **"[m]anagers' bonuses will be tied to performance benchmarks requiring them to increase the number of women in their teams by three percentage points every year and also lift inclusion measures by three percentage points."**  (*Id*.) (bold added). Mr. Henry is further quoted as stating, that the new goal was already showing up, "in stronger

plans and stronger outcomes at the operational level." (*Id.*).  In 2019, Mr. Henry was named to succeed Ms. Mackenzie as the new CEO of BHP.  He assumed that position in January 2020.  As part of the announcement of Mr. Henry's new role as CEO of BHP, it was emphasized that he will continue strongly focusing and working towards gender balance in the workplace.

46.    In a September 17, 2017 internal message to employees, Mr. Mackenzie stated, "[i]in this year's Annual Report we will announce that we achieved an increase of 2.9 per cent in female representation in the last financial year against a goal of a three per cent increase across the company." (Ex. A-14).  Mr. Mackenzie concedes, "[t]he 2.9 per cent result hasn't been without its challenges and we have much to learn in this area." (*Id.*).

47.    Continuing with this theme, in a September 18, 2017 company communication, Mr. Mackenzie conceded, "I have to admit that our aspirational targets raised a few eyebrows," but stated, "We need to feel uncomfortable about the targets we set ourselves to know we have pushed hard enough." (Ex. A-15).

48.    In a December 5, 2017 speech, Mr. Mackenzie stated, "We've made more progress towards gender balance in the last financial year than in the past decade." (Ex. A-16).  In another article dated January 2, 2018, Mr. Mackenzie states that BHP Billiton Ltd.'s "ground-breaking target for gender balance in our company by 2025" is one of the most important events in his working life (Ex. A-17).  BHP Billiton Ltd.'s 2017 Annual Report and Sustainability Report both continue to beat the drum of increasing the number of women at the Company (Exs. A-18 and A-19).

49.    In a June 29, 2018 internal communication to employees, Mr. Mackenzie explained the basis for the Short-Term Incentive ("STI") pool outcome, which included progress on gender diversity as a factor.  Mr. Mackenzie stated, "By 31 May 2018, gender diversity had increased 1.9

per cent with 22.3 per cent of our workforce now female.  Progress remains positive, while slower than our scorecard measure."  (Ex. A-20).

50.     In BHP Billiton Ltd.'s 2018 Sustainability Report, the Company reported that "[w]e have an aspirational goal to achieve gender balance globally by CY2025.  At the end of FY2018, there were 915 more women employees at BHP than the same time last year, contributing to an increase in the representation of women by 1.9 per cent up to 22.4 per cent."  (Ex. A-23).

51.     In early 2019, it was reported that BHP promoted three women to the Executive Team, in a "bid to create a 50% female workforce by 2025."  (Ex. A-24).  The same article reported that since setting the target, it had hired 2,000 women, and only 500 men, thereby increasing the amount of women at the Company from 17.6% to 22.4%.  (*Id*.).  It was also reported that while the female turnover rate stayed roughly the same from FY2018 to FY2019, the male turnover rate went from 6.5% in FY2018 to 11.4% in FY2019 – a marked increase year-over-year that is consistent with the systemic forcing out of males, many guised as "job elimination or organizational restructuring" as is the case with Mr. Powers (Ex. A-25).

52.     In BHP Billiton Ltd.'s 2019 Sustainability Report, the Company reported that "[i]n FY2019 we increased the representation of women working at BHP by 2.1 per cent, resulting in 1,156 more female employees than at the same time in FY2018.  Our overall representation of women is 24.5%."  (Ex. A-26).  BHP also reported a decrease in the turnover rate for women (*Id*.).

53.     Senior executives' bonuses at BHP and its parent company are tied to a minimum increase in female percentage in the executive ranks.  Specifically, the Company's FY2020 Portfolio Strategy and Development ("PS&D") (Mr. Powers's department) Scorecard lists as a Key Performance Indicator ("KPI") in deciding bonuses the requirement to "[c]ontribute to

increased female representation by 4% for grade 12 and above." (Ex. A-27).  The bonuses at BHP are set and determined at the global level (including female representation goals).

54.     All of the BHP and its parent company's employees' bonuses are tied to a minimum increase in female percentages among the entire workforce.  BHP Billiton Ltd.'s 2019 Annual Report lists as one of the reasons that the annual bonuses were 80% of target (rather than 100%) was because the female percentages did not increase as quickly as desired (Ex. A-28).  Hence, even non-executive level supervisors have a financial incentive to ambitiously increase female representation within the Company.

55.     In BHP Billiton Ltd.'s 2020 Annual Report, the Company recited its goal to have a 50% female workforce by 2025, stating, "[w]e aim to achieve gender balance by CY2025." (Ex. O).  On January 7, 2021, *The Sydney Morning Herald* reported that BHP's new CEO, Mike Henry, told the paper that BHP was focused on "ensuring that we have a workforce that is balanced." (Ex. P).  According to the article, "[m]ore than 60 per cent of BHP's new hires over 2019-20 were women, compared to 10.5 per cent five years ago when the company first embarked on the gender-diversity drive . . . ." (*Id.*).  The article reported that "[c]ompany statistics reveal female representation . . . has now hit a new high of 26.5 per cent." (*Id.*).

56.     Since 2015, the repeated directive from the top of BHP Billiton Ltd. and BHP to the rest of the organization has been clear:  Executives and managers are expected to take actions to meet aggressive gender-based diversity targets.  Those who did would be rewarded, financially and otherwise.  Those who did not would be punished.  As one might expect, these targets, and linking compensation to meeting the targets, has resulted in BHP Billiton Ltd. and BHP making employment decisions based on sex.  Indeed, that is exactly what BHP Billiton Ltd. and BHP's own data shows.  And that is exactly what happened to Mr. Powers.

**H.    In October 2019 Mr. Powers Complained To BHP's HR Department About Sex Discrimination, And In December 2019, He Filed A Charge Of Discrimination With The EEOC**

57.    On October 15, 2019, Mr. Powers submitted a written complaint of sex discrimination to Marius Kotze, BHP's Vice President of Human Resources (Ex. B).  Mr. Powers told Mr. York, his boss, about his complaint of sex discrimination, and he agreed with Mr. Powers.

58.    On December 6, 2019, Mr. Powers filed a sworn Charge of Discrimination with the EEOC alleging sex discrimination (Ex. A and A-1 through A-29).

**I.    After Mr. Powers Filed His EEOC Charge, BHP Continued Its Institutionalized Policy And Practice Of Systemic Sex Discrimination**

59.    On December 17, 2019, eleven days after Mr. Powers  filed his EEOC Charge, the CEO-elect for BHP's parent company in Melbourne, Australia, Mike Henry, held an employee town hall meeting in Houston, Texas.  Mr. Powers attended the town hall meeting.  Mr. Henry reaffirmed BHP Billiton Ltd.'s and BHP's target of gender balance. When asked what he would be most proud of at the end of his tenure as CEO, he stated, "If we achieve our goal of 50% female by 2025, I would be most proud of that."  The only way to achieve such an audacious goal in such a short time is to discriminate against males, in favor of females, when it comes to hiring, promotions, and terminations.

60.    On February 4, 2020, Sara Summerbell, Principal – Investigations with BHP, sent Mr. Powers an email stating that "the investigations team" had concluded its investigation into Mr. Powers's complaints of sex discrimination, and found them to be "unsubstantiated."  (Ex. C).  This is a same thing BHP has said before in response to meritorious internal complaints of sex discrimination in favor of females, and against males.  It is what BHP has to say in order to try to preserve the illegal system it has created.

61.     Fifteen days later, on February 19, 2020, during an employee town hall meeting in Houston, Texas, Geraldine Slattery, President, Petroleum Operations (who had replaced BHP's male President, Steve Pastor, in February 2019), stated that for the first half of the financial year, BHP trailed behind its goal on female parity.   In addition, Marius Kotze stated that internal movement of personnel is a focus area for developing and retaining female talent.   These statements are completely consistent with, and provide additional support for, Mr. Powers's allegations that BHP took his job from him and gave it to a female who, unlike him, was not a strong performer, and then rejected him for multiple job openings in favor of less qualified females, because of sex: so that it could retain females, shed males, and thus try to reach its goal of a 50% female workforce in just five years from the current 24%.

62.     Two days later, on February 21, 2020, BHP Billiton Ltd. issued a document demonstrating that it remained committed to it march towards the 50% female workforce goal (Half-year Progress Report – FY2020 BHP Scorecard, Ex. D).  This scorecard determines a single year-end bonus for all employees globally, including those in Houston, and ties the hiring of females directly to bonuses.

63.     At the end of June 2020, BHP Billiton Ltd. announced the outcome of the Short-Term Incentive (STI), the annual bonus given to all employees (2020 FY2020 Short Term Incentive Pool Outcome and Scorecards, Ex. G).  There were three reasons stated as negative factors in the STI, "falling slightly below on some production volumes, unit costs and gender balance aspirations."  (*Id*.).  The same announcement states, "[a]fter a slow start in the first half of the year, female representation in our workforce improved during the second half with more gender-balanced hiring. Despite this, we are behind our aspiration[2] of three per cent annual

---

[2] BHP Billiton Ltd. uses the terminology "aspiration," but it is clear from including the gender percentages in the annual employee bonuses and other evidence that this is far from a mere aspiration and a critical Key Performance

increase in female representation across the organisation." (*Id*.).  The annual scorecard shows that the "female workforce participation" is the only area with the score of "behind target," which is the worst score (Ex. G at Scorecard at page 1). The definition page of the scorecard has a footnote, "to the extent legally permissible and possible in compliance with all the laws and regulations across all jurisdictions where BHP operates and has presence." (Ex. G at Scorecard at page 2). BHP recently started including this footnote in an attempt to falsely paint its illegal discrimination in a more acceptable light. The Comments section states, "[y]ear-to-date end May female representation is 26.4%, which is up 1.9% (against the annual improvement aspiration of +3%), compared to 24.5% as at 30 June 2019 (and up from 16.7% at 30 June 2016), with further improvement expected in the last month of the financial year" (Ex. G at Scorecard page 3).

**J.   In June 2020, Mr. Powers Was: (1) Rejected For A Head of Planning Position In Favor Of A Female Candidate Who He Was Clearly Better Qualified Than; And (2) Excluded From The Recruitment Process For The Position Of Financial Analysis for Transactions, So That BHP Could Hire Yet Another Female, And Rid Itself Of Mr. Powers**

**1.   Mr. Powers Was Rejected For A Head of Planning Position In Favor Of A Female Candidate Who He Was Clearly Better Qualified Than, Ms. Harrison**

64.     In June 2020, Mr. Powers was rejected for another position he had applied for, Head of Planning.  A "Head of" role at BHP is a Salary Grade 14 to 15 position, whereas Mr. Powers held a lower Salary Grade 13 position.  Jeanie Harrison, a female who was also a Salary Grade 13 employee, was selected for the position.  Mr. Powers was substantially better qualified than Ms.

---

Indicator. In fact, Athalie Williams, Chief People Officer at BHP Billiton Ltd., stated in a June 2020 video, "The first of those was inclusion and diversity, and our trajectory to a gender balance.  We have a lot more work ahead of us and it's going to require the entire organization to double down to deliver on our commitments."  (Ex. H at page 2). Moreover, the Company-wide bonus metric is based on the overall female percentage as a proportion of all employees. Hence, male turnover (including voluntary and involuntary) and female turnover are part of the bonus metric. BHP managers are thus financially motivated by the bonus program to terminate males and promote females.

Harrison for the position  (Job Description for Head of Planning and PLT Support Position, Ex. I).

Nevertheless, Ms. Harrison received the role – and a promotion – over Mr. Powers.

65.     Mr. Powers applied for the position, but did not even get an interview.  He learned

that he did not get this job through an email from Brian Sklar, Principal HR (Email from Brian

Sklar to Powers of 06/18/20, Ex. J).  In a subsequent email, Mr. Sklar explained to Mr. Powers

that he did not get an interview because:

> The candidates who were chosen for interviews have all held the formal role of
> Manager or Head Of at BHP. Having formally managed a team as a Manager or a
> Head Of was a skill set that was important for this Head Of Planning & PLT Support
> role [PLT: Petroleum Leadership Team]. Additionally, those interviewed had a
> PLT-level recommendation and were listed on an internal Talent List, which
> contains people with formal management experience.

(Email from Brian Sklar to Powers of 06/25/20, Ex. J).

66.     Mr. Powers sent an email back to Mr. Sklar, and expressed his surprise and

bafflement at the inaccuracy of this rationale because Mr. Powers had been a Manager at BHP

with three direct reports (*Id*.).  In 2019, all Manager titles at Mr. Powers's department were

changed to "Lead Principal," and this change was explained as a formality to get around the span

of control issue during a reorganization.  Regardless, Mr. Powers was a Manager (with direct

reports) between 2017 and 2019 at BHP.  Mr. Powers had not heard of an internal Talent Pool that

he was not a part of.  As previously noted, he is part of BHP Billiton Ltd.'s flagship FELP. This is

the most selective and prestigious of BHP Billiton Ltd.'s leadership programs. Ms. Harrison started

the FELP program in May 2020 (two years after he did), with Mr. Powers's assistance to be

selected for the program. She was not scheduled to finish the program until October 2020.  After

Mr. Powers challenged HR's rationale as inaccurate, he did not get a response.

67.     The hiring manager for this position was Todd Lee, the then Vice President of

Transformation, Performance & Planning. Mr. Lee was also the hiring manager for the previously

mentioned role Investor Roadshow Project Manager, which was also given to Ms. Harrison, without an interview with Mr. Powers.  BHP realizes that Mr. Powers's strong qualifications and job performance combined with his strong performances during job interviews make it difficult to explain why he is not selected for positions. Hence, BHP was not even inviting Mr. Powers to be interviewed to limit the data points that are counter to BHP's supposed selection criteria. Mr. Lee's five-person team is 100% female (Picture of Todd Lee's Team, Ex. K).

68.     Before Mr. Powers applied for this job, he spoke in June 2020 with Irada Williams, who held the position prior to Ms. Harrison.  Ms. Williams stated that Mr. Powers would be a great fit for the position and encouraged him to apply.  Ms. Williams was also the hiring manager for the previously mentioned position of Production Planner, who reports to this position, Head of Planning.  At the time, Ms. Williams had stated that there is a strong push to bring in people with technical / engineering backgrounds into the team. Mr. Powers has an engineering background while Ms. Harrison does not.

69.     Mr. York, Mr. Powers's boss, expressed his surprise at Mrs. Harrison's being chosen. Mr. York has worked closely with both Mr. Powers and Ms. Harrison for three years at BHP.

70.     There are three skills that are critical to the Head of Planning position that Mr. Powers had and Ms. Harrison did not:

      a.  **Corporate Alignment Process (CAP)** – enables coordinating the annual planning and budgeting process.  Mr. Powers has not only been involved in the revamp of the CAP, which is managed by Mr. Powers's department, but he also was in charge of the CAP process for his department in Houston for two years.  Mr. Powers also is intimately familiar with the Petroleum Planning Database from his four years of closely working with it during the strategy initiatives. Ms. Harrison does not have these skills.

      b.  **Project management** – enables coordinating the many internal functions and departments toward a common goal. Mr. Powers had been commended on many

occasions in this area for delivering cross-functional products leveraging relationship skills (Exs. A-1 through A-3). Ms. Harrison had difficulty in this area. Mr. Powers and Ms. Harrison serve as counterparts in BHP's price outlook analysis. In early 2018, Ms. Harrison's project management skills were so poor that Mr. Powers had to step in on numerous occasions to coordinate the overall process for both Mr. Powers's and Ms. Harrison's teams. Moreover, this position requires directly supporting the Petroleum Leadership Team ("PLT"). Mr. Powers led the Directional Appraisal process (delivered to the CEO) for two years. During this process, he worked closely with PLT members for three months each year. Ms. Harrison does not have an experience that is comparable.

c. **Board paper submission support for President Petroleum** – enables succinct and convincing messaging in recommendations to the Board. Mr. Powers wrote one Board paper (Group Scenarios) and co-wrote, as one of two authors, two Board papers (Entry into Mexico and Exit out of Shale), a contribution usually reserved for senior executives. All of these three Board papers have been highlighted as examples of successful papers. He also assisted on many Board paper submissions as his department is in charge of almost all Board papers. Mr. Powers also had a close working relationship with Geraldine Slattery, President Petroleum, during the six-month Petroleum Asset Strategies, which Mr. Powers started and led. Ms. Harrison's involvement in Board papers was limited to providing inputs for specific sections.

    **2.**     **Mr. Powers Was Excluded From The Recruitment Process For The Position Of Head of Financial Analysis for Transactions, So That BHP Could Hire Yet Another Female, And Rid Itself Of Mr. Powers**

71.    In June 2020, Irada Williams was announced to fill the newly created position of Head of Financial Analysis for Transactions. This role is focused on supporting Mergers and Acquisitions ("M&A") transactions. Mr. Powers spoke with Ms. Williams after the announcement. Ms. Williams stated that the hiring manager in Melbourne, Australia, Rod Mainland, Vice President of Decision Evaluation, headhunted her and convinced her over several months to apply for the position. Mr. Mainland initially stated that the position would have to be based in Melbourne, Australia, where almost all of the M&A transactions for BHP would take place. London, UK is second in terms of transaction frequency, with Houston a distant third.

72.    After Ms. Williams rejected the idea of accepting the position, and stated that she had to remain in Houston for family reasons, Mr. Mainland said that he would make an exception

for her and move the position to Houston. Had the position been advertised with the flexibility of location (Houston), or had he been told the location was flexible, Mr. Powers would have applied for the job of Head of Financial Analysis for Transactions. Mr. Powers's background would be a strong fit for the position.

73.     Mr. Mainland is part of the leadership team in Mr. Powers's department and was aware that Mr. Powers would lose his employment with BHP unless he secured a position by June 30, 2020. Still, he chose not to advertise the position or communicate to Mr. Powers such a relevant opening, preferring instead to recruit a female for the job.

**K.     Mr. Powers Was Terminated On July 11, 2020, And Then – Motivated By Retaliation – BHP Breached Its Contractual Obligation To Pay Out His 2020 STI Bonus**

74.     On June 30, 2020, Mr. Powers's temporary secondment position was scheduled to end. BHP extended it twelve days to get his exit paperwork in order, and Mr. Powers's employment with BHP was terminated on July 11, 2020.

75.     Had Mr. Powers been hired for any of the four above-mentioned positions he had applied for, he would still be employed by BHP, as the females who were awarded those positions (Juliet Taylor, Jeanie Harrison and Anna Pechatnikov) are all still employed by the Company. Likewise, had he been awarded the Head of Financial Analysis for Transactions position, he would still be employed by BHP, as the female (Irada Williams) awarded that role is still employed by the Company.

76.     On July 16, 2020, Mr. Powers filed an amended EEOC Charge, alleging sex discrimination (Ex. L). On July 20, 2020, Mr. Powers's undersigned counsel sent BHP's outside counsel an email with an attached draft federal court Title VII lawsuit that stated that Mr. Powers had filed his amended EEOC Charge on July 16, 2020 (Ex. L-1).

77.     BHP's Short Term Incentive ("STI") Plan pays out STI payments to eligible employees based on a performance year that runs from July 1 through June 30 (BHP STI Plan Participant Guide, Ex. M at 4).  Employees who are terminated between October 1 and June 30 and are deemed "Good Leavers" are entitled to be paid their STI payment for the performance year (*Id.* at 7). Mr. Powers was terminated effective July 11, 2020 – 19 days before the close of the STI performance year – and was deemed by BHP to be a "Good Leaver."  As such, Mr. Powers was entitled to his STI payment under the STI Plan.  Despite that, after Mr. Powers's termination, BHP refused to pay the STI payment to Mr. Powers unless he first signed a release of all claims against BHP, which would have released BHP from any liability to Mr. Powers for the sex discrimination set forth in this lawsuit that was also the subject of his pending EEOC Charge (Email from Kan to Powers of 08/04/20, Ex. N).  The STI Plan does not permit BHP to condition payment on a release.  As such, BHP's refusal to pay Mr. Powers his STI payment is a breach of the STI plan, and also clear retaliation for the fact that Mr. Powers had filed an (amended) EEOC Charge of Discrimination against the Company, and internally complained about sex discrimination.  *See supra*.  The individuals at BHP who refused to pay Mr. Powers his STI payment in breach of the STI plan were well aware of Mr. Powers's protected activities.  But for Mr. Powers's protected activities, those individuals, and BHP, would not have refused to pay Mr. Powers his STI payment in breach of the STI plan.

78.     On January 29, 2021, the EEOC issued a Dismissal and Notice of Right to Sue to Mr. Powers, through his counsel, giving him 90 days from its receipt to file a Title VII sex discrimination case against BHP (Ex. Q).  Mr. Powers received the notice through his counsel on February 5, 2021.  Mr. Powers files this suit well within the 90-day deadline.

## CLAIMS FOR SEX DISCRIMINATION UNDER TITLE VII

**A.     Liability**

**1.     Legal Standards**

79.     Mr. Powers incorporates the preceding paragraphs of this Original Complaint as if set out verbatim.

80.     Sex discrimination in employment is prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*   Specifically, under Title VII, an employer cannot "fail or refuse to hire or [ ] discharge any individual, or otherwise [ ] discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).  "A Title VII plaintiff may make out a *prima-facie* case of discrimination using either direct or circumstantial evidence." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015) (citing *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir. 1994)).

81.     The circumstantial model of proof that applies in employment discrimination cases is governed by the well-known burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a *prima facie* case of sex discrimination under Title VII, a plaintiff may show that: (1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that they occupied or sought; (3) the plaintiff was removed from the job they occupied, or was rejected for the job they sought; and (4) the employer filled the position with a person of the opposite sex.  *See Autry v. Fort Bend Indep. Sch. Dist.,* 704 F.3d 344, 346–47 (5th Cir. 2013); *Oden v. Oktibbeha County, Miss*., 246 F.3d 458, 468 (5th Cir. 2001); *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179 (5th Cir. 1999).

82.     After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse employment action. *McCoy v. City*

*of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  The employer's burden is one of production, not persuasion, and does not involve a credibility assessment. *Id*. at 559.  The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (alteration in original).  Under the pretext alternative, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory ... purpose." *McCoy*, 492 F.3d at 557. Under the mixed-motive alternative, if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic. *See Rachid*, 376 F.3d at 312.

83.     "The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *See Portis*, 34 F.3d at 328 (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Id*. at 329.  A statement or document which shows "on its face that an improper criterion served as a basis-not necessarily the sole basis, but a basis-for the adverse employment action [is] direct evidence of discrimination." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

84.     As set forth below, Mr. Powers has a compelling sex discrimination case based on both direct and circumstantial evidence.

### 2.   Analysis

#### a)   Direct Proof Of Sex Discrimination

85.   Direct evidence of sex discrimination is evident from BHP's initiatives to increase the hiring, promotion, and retention of women, over men, so as to create a 50% female workforce by 2025, and to specifically tie bonuses to the taking steps towards the attainment of that goal (*see, e.g.*, Exs. A-10, A-16, A-17, A-23, A-27, and A-28 and Exs. D and G).  For example, in *Messer v. Meno*, 130 F.3d 130, 133 (5th Cir. 1997), the Fifth Circuit ruled against the Texas Education Agency, which had "aspired to 'balance' its workforce according to the gender and racial balance of the state."  The court stated that the Agency's apparent widespread reliance upon gender and race in making employment decisions constituted illegal discrimination and permitted the white female plaintiff to proceed with her Title VII sex and race discrimination claims.  *Id*. at 139.

86.   Also, in *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003), the evidence showed that Xerox implemented a program called the Balanced Workforce Initiative (BWF).  The BWF targets were established on an annual basis and were based on government labor force data. Throughout the time Xerox had the BWF in place, Xerox produced reports listing the actual and desired racial and gender compositions of each office, and shared those reports with its managers. These reports indicated to the company that blacks were over-represented and whites were under-represented in Xerox's Houston office in comparison to the local population.  As a result, the general manager of the Houston XBS office directed that the Houston office create its own localized BWF reports to remedy the disproportionate racial representation.   Several black employees in the Houston office sued Xerox for race discrimination after they did not receive certain positions within the company that they wanted.  In ruling for the black employees, the Fifth Circuit stated:

> We find that the existence of the BWF program is sufficient to constitute direct evidence of a form or practice of discrimination. . . . Here, in the BWF summary reports, Xerox candidly identified explicit racial goals for each job and grade level. The reports also stated that blacks were over-represented and whites were under-represented in almost every job and grade level at the Houston office.  Senior staff notes and evaluations also indicate that managers were evaluated on how well they complied with the BWF objectives.  A jury looking at these facts could find that Xerox considered race in fashioning its employment policies and that because Plaintiffs were black, their employment opportunities had been limited.

*Id*. at 137 (bold added).

87.    The evidence of BHP's top-down documented scheme to intentionally hire, promote, and retain women, over men, because of sex, is just as strong as it was in *Messer v. Meno*, and *Frank v. Xerox Corp*.  Indeed, it is proven largely by BHP's own documents, many of which – like Xerox's "balancing" scheme – also have the express goal of creating gender "balance" (Exs. A-10, A-27, A-28, and Exs. D, G, H, O, and P).  As such, under *Messer v. Meno*, and *Frank v. Xerox Corp*., Mr. Powers has produced direct evidence of sex discrimination.

### b)    Circumstantial Proof Of Sex Discrimination

88.    Mr. Powers makes out a *prima facie* case of sex discrimination: (a) his job as Manager, Portfolio Strategy and Development was taken from him under the guise of "job elimination," retitled, and ultimately given to a female (Clare Eilbeck), who was not a strong performer like Mr. Powers; (b) the four at-issue roles he applied for in 2019 and 2020 were given to substantially less qualified candidates, Juliet Taylor, Jeanie Harrison (twice) and Anna Pechatnikov; and (c) a fifth position that BHP strategically hid from him was also given to a female, Irada Williams.  *See supra*.  This is sufficient to establish a *prima facie* case.

89.    As for BHP's articulated legitimate, non-discriminatory reasons, it claims that Mr. Powers's job Manager, Portfolio Strategy and Development was eliminated, and that it filled the four at-issue roles that Mr. Powers had applied in 2019 and 2020 for with better qualified

candidates, Juliet Taylor, Jeanie Harrison (twice) and Anna Pechatnikov – all of whom just happen to be female – and that Mr. Powers has no proof of pretext.  BHP is wrong.

90.     First, Mr. Powers's job as Manager, Portfolio Strategy and Development, was not eliminated.  It was given to a female (Clare Eilbeck) who was not a strong performer like Mr. Powers, in November 2019.  That BHP gave a false reason as to this position is sufficient, by itself, to establish pretext and sex discrimination *vel non*.  That BHP gave a false reason as to this position is sufficient, by itself, to establish pretext and sex discrimination *vel non*.  *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a sex discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

91.     Second, as explained in detail above, Mr. Powers shows pretext with evidence that he was clearly better qualified than the female employee who assumed his job, Clare Eilbeck, or the females who were awarded the four at-issue positions he applied for, Juliet Taylor, Jeanie Harrison (twice) and Anna Pechatnikov.  *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 n. 11 (5th Cir. 2007) ("[A] showing that a plaintiff is 'clearly better qualified' is one way of demonstrating . . . pretext"); *Davis v. AMPCO Sys. Parking*, 748 F. Supp. 2d 683, 698-99 (S.D. Tex. 2010) (genuine issue of material fact existed as to whether plaintiff was clearly better qualified precluded summary judgment for employer on Title VII discrimination claim).

92.     Third, Mr. Powers shows pretext with evidence that on November 5, 2019, his boss, Mr. York, told Mr. Powers that the reason he did not get the Investor Roadshow Project Manager job that was awarded to Jeanie Harrison was because it was "marked for a woman."  Mr. York

also communicated to Mr. Powers that BHP Billiton, Ltd. and BHP are trying to replace males with females on a systemic basis.  Other BHP managers and executives have told Powers the same or similar things.  Rule 701 of the Texas Rules of Evidence allows a lay witness to offer an opinion provided it is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." The Federal Rule is the same.  *See* Fed. R. Evid. 701(a)-(b).  The Fifth Circuit examined Rule 701 in the employment-discrimination context in *Hansard v. Pepsi–Cola Metropolitan Bottling Co.*, where a coworker, Miller, testified that the plaintiff was not rehired because of his age. 865 F.2d 1461 (5th Cir.1989).  Miller had no first-hand knowledge regarding the disputed employment decision, but he was familiar with the defendant's "hiring policy and its general corporate youth movement...." *Id*. at 1465–66.  The Fifth Circuit observed that "[c]ourts often have permitted lay witnesses to express opinions about the motivation or intent of a particular person if the witness has an adequate opportunity to observe the underlying circumstances." *Id*. at 1466.  The Fifth Circuit found no abuse of discretion in allowing the testimony. *Id*. at 1467.

93.     In *Haun v. Ideal Industries Inc.*, where it affirmed the decision to allow lay testimony that the employer was "phasing out older workers." 81 F .3d 541, 548 (5th Cir. 1996). The coworker's testimony stood because it was "based on his perception [drawn from personal observations] and helped the jury determine whether [the employer] discriminated." *Id*.  Based on *Hansard and Haun*, the opinions and perceptions of Mr. York and others at BHP are relevant and admissible, so long as they are based on, or drawn from, their own personal observations and rational perceptions.  Given the mountain of evidence from BHP's own documents about the Company's obsession with increasing its female population to 50% by 2025 at all costs (Exs. A-8 through A-29, and Exs. D and G), Mr. York's observations and perceptions are rationally based,

and admissible, just as in *Hansard and Haun. See also Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1178–80 (10th Cir. 2001) (citing *Hansard* and reaching a similar conclusion).

94.     Fourth, pretext, and sex discrimination, can be inferred from the fact that Mr. Mackenzie, who was BHP Billiton's Global CEO, and Mr. Henry, who became the CEO in January 2020, other top level executives at BHP and its parent company, have, as set forth above, repeatedly expressed their clear preference for female workers, and demanded hiring and other personnel decisions be made on the basis of sex (Exs. A-8 through A-29, and Exs. D, G, O and P). A reasonable jury would be entitled to find this evidence is potent proof of sex discrimination because of its timing and its substantive content.   *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003) ("After *Reeves,* however, so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent.").   Moreover, that the comments were made by BHP Billiton Ltd.'s Global CEO – the top executive in the entire organization – make the comments especially strong evidence of sex discrimination. *See, e.g.*, *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132 (3d Cir. 1997) (comments made by top executives may be offered to prove culture of discrimination).

95.     Fifth, BHP's own published statistics regarding the large increase in female representation after announcing its so-called 50% initiative, is additional proof of pretext, and evidence that the Company has relied on sex to make employment decisions benefitting woman, to the detriment of men.   *Decorte v. Jordan*, 497 F.3d 433, 439 (5th Cir. 2007) (affirming jury verdict for the plaintiffs in a discrimination case, and stating, "Plaintiffs presented statistical data from which the jury could have further based its finding that race was a motivating factor in Jordan's staffing decisions.") (citing *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1137 (5th Cir.

1983) ("An employee may use statistics to show that an employer's justification for a discriminatory act is pretext."); *Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) (per curiam) ("We have recognized that gross statistical disparities ... may be probative of discriminatory intent, motive or purpose").  More statistical analysis will further prove this point.

96.     Finally, as to the position of Head of Financial Analysis for Transactions, unlike the other four mentioned positions, Mr. Powers never applied for this position.  The reason he did not apply is because the position was listed as being based in Melbourne, Australia.  As it turns out, however, the hiring manager for the job, Mr. Mainland, targeted a female (Ms. Williams) for hiring into the role, and then secretly told her – but not Mr. Powers – that she could work in the position while based in Houston.  Had Mr. Powers ever been told that, he would have applied for the job.  Because he never was told that, he did not apply.  Under these unique circumstances, Mr. Powers may sue over the job even though he did not apply for it.

## B.     Damages

97.     Mr. Powers incorporates the preceding paragraphs of this Original Complaint as if set out verbatim.

98.     <u>Backpay</u>.  Mr. Powers is entitled to backpay.  The purpose of backpay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination.*" Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).  Lost share awards, or options, and lost 401K and pension contributions are all recoverable as lost backpay in a discrimination and retaliation case like this one.  *Cf. Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1243-44 (10th Cir. 2000) (wrongfully discharged executive entitled to damages for unrealized stock option appreciation); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 360 (D. Me. 2007) (awarding plaintiff who was illegally fired based on his disability the value of unvested stock that would have vested but for his wrongful termination); *Miller v. Raytheon Co.*, 716 F.3d

138, 144 (5th Cir. 2013) ("The jury awarded Miller $227,000 for an enhancement to his ultimate pension benefits that would have vested between the time of his termination in March 2008 and trial in 2010").

99.      Mr. Powers also participated in BHP-sponsored health and welfare benefit plans that, as a result of his termination, he can no longer participate in.  The costs of uncovered medical treatments, or payments for replacement insurance, and other benefits, are recoverable as part of the lost backpay calculation.  *See Pearce v. Carrier Corp.*, 966 F.2d 958, 959 (5th Cir. 1992); *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 179 (5th Cir. 1992).

100.     <u>Reinstatement or front-pay.</u>  Mr. Powers also seeks reinstatement or front-pay. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  The law allows a plaintiff to recover front pay when a plaintiff shows that reinstatement is not feasible.  TEX. PATTERN JURY INSTRUCTIONS § 110.30, Comment, Front Pay (2003 ed.) (citing federal law); *cf. Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992) (ADEA case).  Generally, reinstatement is the preferred equitable remedy for a discriminatory discharge.  *Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 2002). However, if reinstatement is not feasible, front-pay will be awarded if it is consistent with the remedial purposes of the law.  *Brunnemann*, 975 F.2d at 180.  "[R]einstatement is not preferred over front pay when there is no vacancy in the desired position." *Mitchell v. Sisters of Charity of Incarnate Word*, 924 F. Supp. 793 (S.D. Tex. 1996) (quoting *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir. 1985)).  In other words, if reinstatement would require displacing or bumping an innocent employee from their job, then it is considered to be infeasible, and front-pay may be awarded instead of reinstatement.  *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995).

101.    "Front pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 936 n. 8 (5th Cir. 1996).  If front-pay were awarded, Mr. Powers plans to work at least another twenty years, thus justifying a significant front-pay award. *See, e.g*., *Jackson*, 2011 WL 2119644, at *7-8 (affirming five-year front-pay award); *Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming ten year front-pay award); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009) (holding that district court did not abuse its discretion in awarding plaintiff front pay for ten years); *Meacham v. Knolls Atomic Power Lab*., 381 F.3d 56, 79 (2d Cir. 2004) (affirming front pay awards of nine to twelve and one-half years), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp*., 191 F.3d 1148 (9th Cir. 1999) (affirming an eleven year front pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co*., 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front pay award did not constitute an abuse of discretion); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten year front pay award did not constitute an abuse of discretion).

102.    Compensatory Damages.  Mr. Powers is also entitled to compensatory damages under the Title VII for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."   42 U.S.C.A. § 1981a(b)(3).  Mr. Powers has suffered such damages, and seeks relief for them. *See, e.g*., *Jackson*, 2011 WL 2119644, at *8-9 (affirming $300,000.00 compensatory damages award in a single-plaintiff TCHRA age-discrimination case); *Giles v. General Electric Co*., 245 F.3d 474, 489 (5th Cir. 2001) (awarding $150,000.00 compensatory damages award in a single-plaintiff employment discrimination case).

103.   <u>Punitive Damages</u>.   Claimants under the Title VII are also entitled to punitive damages where a violation is shown to have been made with reckless disregard or malice – as it was here.   42 U.S.C. § 1981a(b)(1).   *See, e.g., Lowery v. Circuit City Stores, Inc*., 206 F.3d 431, 443 (4th Cir. 2000) (holding evidence that a managerial employee intentionally refused to promote the plaintiff "in the face of a perceived risk that her decision would violate federal law" was sufficient to support a punitive damages award).

104.   <u>Attorneys' Fees</u>.   Under the Title VII, attorneys' fees are also recoverable, and Mr. Powers seeks them.   *See, e.g., Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff sex discrimination failure to promote case); *Mota,* 261 F.3d at 527-28 (affirming an attorneys' fees award of more than $300,000.00 in a retaliation case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case $336,010.50 in attorneys' fees).

**C.   Exhaustion**

105.   Mr. Powers exhausted his administrative remedies under Title VII before bringing this lawsuit.   Specifically, Mr. Powers: (a) filed his EEOC Charge or amended EEOC Charge within 300 days of learning of the adverse employment actions against him that he complains of in this lawsuit; and (b) filed this lawsuit within 90 days of receiving the Dismissal and Notice of Rights letter that the EEOC issued on January 29, 2021 (Ex. Q).

**<u>CLAIMS FOR BREACH OF CONTRACT AND POST-TERMINATION RETALIATION</u>**

**<u>BREACH OF CONTRACT</u>**

106.   Mr. Powers incorporates the preceding paragraphs of this Original Complaint as if set out verbatim.

107.     The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *APMD Holdings, Inc. v. Praesidium Med. Prof'l Liab. Ins. Co.*, 555 S.W.3d 697, 707 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App.—Houston [1st Dist.] 2015, no pet.).   A breach of contract occurs when a party fails or refuses to do something it has promised to do. *APMD Holdings*, 555 S.W.3d at 707; *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

108.     BHP's STI Plan, which is contractually binding, pays out STI payments to eligible employees based on a performance year that runs from July 1 through June 30 (BHP STI Plan Participant Guide, Ex. M at 4).   Employees who are terminated between October 1 and June 30 and are deemed "Good Leavers" are entitled to be paid their STI payment for the performance year (*Id*. at 7). Mr. Powers was terminated effective July 11 – 19 days before the close of the STI performance year – and was deemed by BHP to be a "Good Leaver."   As such, Mr. Powers was entitled to his STI payment under the STI Plan.  Despite that, BHP refused to pay the STI payment to Mr. Powers unless he first signed a release of all claims against BHP, which would have of course released BHP from any liability to Mr. Powers for the sex discrimination set forth in this lawsuit (Email from Kan to Powers of 08/04/20, Ex. N).   The STI Plan does not permit BHP to condition payment on a release.  As such, BHP's refusal to pay Mr. Powers his STI payment is a breach of the STI plan.   The amount of the payment Mr. Powers was, and remains, entitled to, is at least 35% of his base salary, which translates to approximately $92,000.

109.     The rule, accepted in Texas, is that "[a]n employer's promise to pay a bonus in contemplation of the employee's exerting extra or additional efforts in his service for the

employer's benefit . . . create[s] a valid and enforceable contract once accepted as against the contention of lack of consideration." Elizabeth T. Tsai, Annotation, *Promise By Employer to Pay Bonus as Creating Valid and Enforceable Contract*, 43 A.L.R.3d 503 § 8 (1972). The case of *Toch v. Eric Schuster Corp.*, 490 S.W.2d 618, 624 (Tex. Civ. App.–Dallas 1972, writ ref'd n.r.e.) is instructive. In *Toch*, the plaintiff's initial employment agreement was silent on whether he would receive any bonus, but the employer later "set up a bonus scale to induce the salesmen to work harder to perform their contracts or as an added incentive to carry out their duties." 490 S.W.2d at 624. The court held that because "[t]his scale was accepted by the employees, including Toch . . . it can reasonably be said that it constitutes a contract for the payment of services rendered . . . ." *Id*.

110.    Similarly, in *Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, CIV.A. H–07–2690, 2008 WL 4899631 (S.D. Tex. Nov.12, 2008) (Rosenthal, J.), the plaintiff sued his employer for a bonus under an incentive compensation plan. The employer argued that the bonus plan was discretionary, and thus not contractually binding, as a matter of law. *Id*. at *12-13. Judge Rosenthal rejected the employer's argument because the incentive compensation plan contained a scale for the bonus and did not clearly give the employer discretion to unilaterally decide not to pay any bonus if the employee was otherwise entitled to the bonus under the plan. *Id*. at *13. The same is true here. As such, the BHP STI Plan is contractually binding on BHP, and BHP breached it.

111.    Mr. Powers also seeks recovery of his reasonable attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code. Mr. Powers, through his undersigned counsel, made presentment of his breach of contract claims in writing to BHP's outside legal counsel. More than thirty days have expired since then, and BHP has failed and refused to pay the amount

contractually due to Mr. Powers.  Under Chapter 38 of the Texas Civil Practice and Remedies Code Mr. Powers is thus entitled to his reasonable attorneys' fees for his breach of contract claim.

## CLAIM FOR POST-TERMINATION RETALIATION

112.     Mr. Powers incorporates the preceding paragraphs of this Original Complaint as if set out verbatim.

113.     Title VII prohibits post-termination retaliation.  *See Robinson v. Shell Oil Co*., 519 U.S. 337, 346, 117 S.Ct. 843 (1997).  "There are three elements to a *prima facie* case of retaliation: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002).  Mr. Powers satisfies all three elements.  First, he filed an EEOC Charge, and then amended it on July 16, 2020 (Exs. A and L).  That satisfies the first element, because filing and then amending an EEOC Charge is considered protected activity under Title VII.[3]  Second, he suffered an adverse employment action, because just days after he amended his EEOC Charge, BHP informed him that it would not pay him his STI of approximately $92,000 unless he first signed a release of all claims against BHP, even though the STI does not permit BHP to condition payment on his execution of a release (Email from Kan to Powers of 08/04/20, Ex. N).  Impermissibly denying an employee an approximately $92,000 payment they are entitled to is an adverse employment action.  *See, e.g.*, *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 170 (5th Cir. 2018) (denial of a bonus may qualify as an adverse employment action); *Cones v. Duke Energy Corp*., 367 F. Supp.2d 1092, 1100 (S.D. Tex. 2005) (reduction of short-term incentive bonus was an adverse employment action

---

[3] In addition, Mr. Powers complained internally about sex discrimination (Ex. B), which is also protected activity under Title VII, so long as the complaint was reasonable and in good faith, which it was. *See, e.g.*, *Badgerow v. REJ Properties, Inc*., 974 F.3d 610, 620 (5th Cir. 2020) (holding that an internal complaint of perceived sex discrimination was protected activity under Title VII).

for purposes of retaliation claim).  Third, there is a causal link between Mr. Powers's protected activity and the denial of his STI payment, as is evident from the closing timing – just days – between the date Mr. Powers filed an amended EEOC Charge, and the date of the STI denial, and the fact that the given reason for the denial is false. *See Garcia v. Professional Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (two and one-half month gap between protected activity and termination is sufficiently close to establish a causal nexus for purposes of a *prima facie* case of retaliation).  This same evidence also suffices to prove pretext and "but for" causation.  *See Haire*, 719 F.3d at 365 n. 10 ("[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).

114.    That Mr. Powers did not file an EEOC Charge over the STI denial is no bar to his bringing the claim in court.  In *Gupta v. East Texas State Univ.*, 654 F.2d 411 (5th Cir. 1981), the Fifth Circuit Court of Appeals held that "it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Id.* at 414.  The Court reasoned that requiring Gupta to file another charge for retaliation would have done nothing but create additional procedural technicalities when a single filing would comply with the intent of Title VII.  *Id.*  The court believed that eliminating that needless procedural barrier would deter employers from attempting to discourage employees from exercising their rights under Title VII.  *Id.*  Under *Gupta*, Mr. Powers need not have filed with the EEOC before bringing his retaliation claim over the STI denial in court.

115.    Finally, it is worth observing that BHP's denial of the STI payment to Mr. Powers – unless he signed a release that it was not entitled to under the STI Plan – reeks of bad faith, spite,

and malice.  BHP sought to muscle Mr. Powers into releasing it from its sex discrimination by taking away the approximately $92,000 STI payment he was already entitled to, at the time they knew that he needed it most – right after his termination during a pandemic, oil crash, and the worst job market in the last half century.  BHP's brazen bully tactics call for a significant punitive damages award.  *See, e.g., Rubinstein v. Administrators of Tulane Educ. Fund,* 218 F.3d 392, 406-07 (5th Cir. 2000) (holding that punitive damages were properly awarded to the plaintiff in a Title VII retaliation case); *Hubbell v. Fedex Smartpost*, 933 F.3d 558, 572-75 (6th Cir. 2019) (affirming district court's award of $300,000 in a Title VII retaliation case).

## JURY DEMAND

116.    Mr. Powers demands a jury trial.

## PRAYER

Mr. Powers asks that the court issue citation for Defendant BHP to appear and answer, and that he be awarded a judgment against Defendant BHP for the following:

a.   Actual damages for sex discrimination, retaliation, and breach of contract (including what he is contractually entitled to under the BHP STI Plan), including but not limited to pecuniary losses, non-pecuniary losses, back-pay, reinstatement (or front-pay), and compensatory damages;

b.   Punitive damages;

c.   Prejudgment and post-judgment interest;

d.   Attorneys' fees under Title VII and Chapter 38 of the Texas Civil Practice and Remedies Code;

e.   Court costs;

f.   Injunctive and equitable relief; and

g.   All other relief to which Plaintiff is entitled under Title VII.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:    s/ Mark J. Oberti
        Mark J. Oberti
        State Bar No. 00789951
        S.D. Texas No. 17918
        712 Main Street, Suite 900
        Houston, TX 77002
        (713) 401-3555 – Telephone
        (713) 401-3547 – Facsimile
        mark@osattorneys.com – Email

        ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO ORIGINAL COMPLAINT | EXHIBIT |
|---|---|
| Burak Powers's EEOC Charge of 12/6/2019 | A |
| Nomination of Burak Powers to Future Emerging Leaders Program of 12/18/2017 | A-1 |
| Notification that Burak Powers was successful in his candidacy for the Finance Emerging Leaders Program of 3/26/18 | A-2 |
| Burak Powers Resume | A-3 |
| Juliet Taylor LinkedIn Profile | A-4 |
| BHP Job Posting for Investor Roadshow Project Manager Position of 6/11/19 | A-5 |
| Jeanie Harrison LinkedIn Profile | A-6 |
| Email from Niall McCormack to Burak Powers of 7/9/2019 | A-7 |
| BHP Billiton 2015 Annual Report Excerpt | A-8 |
| Article in *The Sydney Morning Herald* of 1/8/2016 | A-9 |
| Article in Dow Jones Newsletter of 11/8/2016 | A-10 |
| Article in Bloomberg of 10/20/2016 | A-11 |
| Message from Andrew Mackenzie of 09/14/2016 | A-12 |
| BHP Billiton 2016 Sustainability Report Excerpt | A-13 |
| Message from Andrew Mackenzie of 9/17/2017 | A-14 |
| Article from Andrew Mackenzie of 9/18/2017 | A-15 |
| Speech of Andrew Mackenzie of 12/5/2017 | A-16 |
| Article in Dow Jones Newsletter of 1/2/2018 | A-17 |
| BHP 2017 Annual Report Excerpt | A-18 |

| | |
|---|---|
| BHP 2017 Sustainability Report Excerpt | A-19 |
| Message from BHP Leadership Team of 6/28/2018 | A-20 |
| BHP External Affairs Performance Report – FY18 Progress | A-21 |
| Message from Steve Pastor, BHP President, of 8/16/2018 | A-22 |
| BHP 2018 Sustainability Report Excerpt | A-23 |
| Article of 2/28/2019 Concerning Promotion of Three Women to BHP Executive Team and BHP's Commitment to Achieving a 50% Female Workforce by 2025 | A-24 |
| BHP FY 19 Inclusion and Diversity Dashboard | A-25 |
| BHP 2019 Sustainability Report Excerpt | A-26 |
| BHP FY2020 PS&D Scorecard | A-27 |
| BHP 2019 Annual Report Excerpt | A-28 |
| Message from Andrew Mackenzie of 10/14/2019 | A-29 |
| Burak Powers's Internal Sex Discrimination Complaint to BHP of 10/15/2019 | B |
| Email from Sara Summerbell to Burak Powers of 2/4/2020 | C |
| BHP Half-year Progress Report – FY2020 BHP Scorecard of 2/21/2020 | D |
| BHP's Position Statement to the EEOC of 2/27/2020 | E |
| Burak Powers's Reply to BHP's Position Statement to the EEOC of 3/23/2020 | F |
| 2015-2016 PEP Form for Burak Powers | F-1 |
| 2016-2017 PEP Form for Burak Powers | F-2 |
| 2017-2018 PEP Form for Burak Powers | F-3 |
| 2018-2019 PEP Form for Burak Powers | F-4 |
| LinkedIn Comments Concerning Burak Powers | F-5 |

| | |
|---|---|
| Email from Sara Summerbell to Burak Powers of 2/4/2020 | F-6 |
| BHP Half-year Progress Report – FY2020 BHP Scorecard of 2/21/2020 | F-7 |
| July 2, 2020 FY2020 Short Term Incentive Pool Outcome and Scorecards | G |
| Announcements from Athalie Williams, BHP Billiton, Ltd.'s President of HR | H |
| Job Description for Head of Planning and PLT Support Position | I |
| Emails between Brian Sklar and Powers of 06/18/20 and 06/25/20 | J |
| Picture of Todd Lee's Team | K |
| Powers's Amended EEOC Charge | L |
| Email from Oberti to Clark of 07/20/20 | L-1 |
| BHP's STI Plan Participant Guide | M |
| Email from Kan to Powers of 08/04/20 | N |
| BHP 2020 Annual Report Excerpt | O |
| Article in *The Sydney Morning Herald* of 1/7/21 | P |
| EEOC Right to Sue Notice of 01/29/21 | Q |