**U.S. DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BURAK POWERS** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-CV-01334** |
| | § | |
| **BROKEN HILL PROPRIETARY (USA)** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT BROKEN HILL PROPRIETARY (USA) INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Dated: May 19, 2022

OF COUNSEL

Kimberly F. Cheeseman
State Bar No.  24082809
S.D. Tex. Id. No. 2254668
kimberly.cheeseman@nortonrosefulbright.com

Jesika Silva Blanco
State Bar No. 24098428
S.D. Tex. Id. No. 2780677
jesika.blanco@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:      (713) 651-5246

Respectfully submitted,

/s/ Shauna Johnson Clark
Shauna Johnson Clark
State Bar No.  00790977
S.D. Tex. Id. No. 18235
shauna.clark@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:      (713) 651-5246

***Attorney in Charge for Defendant***

**TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................................ iii

I. NATURE AND STAGE OF PROCEEDINGS ........................................................... 1

II. STATEMENT OF ISSUES AND STANDARD OF REVIEW ................................... 1

III. SUMMARY OF THE ARGUMENT ........................................................................ 1

IV. RELEVANT FACTS .................................................................................................. 2

    A.     BHP Hired Powers for the Portfolio Strategy and Development Team ............... 2

    B.     Powers Understood and Agreed to Abide by BHP's Policies ............................. 3

    C.     BHP's Uses a Scorecard and Key Performance Indicators to Assess
          Company Performance ......................................................................................... 4

    D.     BHP Enacted an Inclusion and Diversity Initiative .............................................. 5

    E.     After the I&D Initiative, BHP Promoted Powers to Manager and
          Underwent Two Restructuring Efforts .................................................................. 6

    F.     Powers Continued To Struggle with Soft Skills ................................................... 8

    G.     Powers Applied to Four Roles and Considered Applying to a Fifth ................... 10

         1.     *The Head of Credit and Market Risk Role* .............................................. 10

         2.     *The Investor Roadshow Project Manager Role* ...................................... 11

         3.     *The Planning Principal II/Production Planner Role* .............................. 12

         4.     *The Head of Planning & Petroleum Leadership Team Support
              Role* ......................................................................................................... 14

         5.     *The Head of Financial Analysis Role* ..................................................... 14

    H.     BHP Created a New Position in PS&D Based in Australia ................................. 15

    I.     Powers Complains About Alleged Sex Discrimination ....................................... 15

    J.     Powers Filed His First Charge of Discrimination ............................................... 16

    K.     Powers's Employment Ends, and He Declined a Severance Package ................. 16

    L.     Powers Filed His Amended Charge of Discrimination and this Lawsuit ............ 17

V. ARGUMENT & AUTHORITIES .............................................................................. 18

    A.     Powers's Discrimination Claims Are Flawed ..................................................... 18

         1.     *Powers Cannot Establish Discrimination Claims Based on Direct
              Evidence* ................................................................................................... 18

**TABLE OF CONTENTS**
(continued)

**Page**

2.     *Powers Cannot Establish Discrimination Claims Based on Circumstantial Evidence* .................................................................... 20

      a.     Powers Cannot Establish a Prima Facie Case for Three Positions .................................................................................... 21

      b.     Powers Cannot Establish Pretext as to All of the Positions ........ 22

B.     Powers's Retaliation Claims Also Fail ................................................. 27

C.     Powers's Breach of Contract Claim Suffers the Same Flaws ............................ 28

VI. CONCLUSION .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berquist v. Washington Mut. Bank*,
  500 F.3d 344 (5th Cir. 2007) .........................................................................19, 26

*Carter v. O'Neill*,
  78 F. App'x 978 (5th Cir. 2003) ...........................................................................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................1

*Criner v. Texas-New Mexico Power Co.*,
  No. 09-cv-3859, 2011 WL 1565987 (S.D. Tex. Apr. 25, 2011) ...........................22

*Frank v. Xerox Corp.*,
  347 F.3d 130 (5th Cir. 2003) ................................................................................19

*Haag v. AOT Energy Am. LLC*,
  No. 13-cv-20-00351, 2022 WL 242750 (Tex. App.—Corpus Christi Jan. 27,
  2022, no pet. h.) ................................................................................................28, 29

*Halupka v. Fed. Express Corp.*,
  No. 03-CV-350, 2005 WL 8161037 (E.D. Tex. Sept. 22, 2005) ...........................18

*Harris v. Drax Biomass Inc.*,
  813 F. App'x 945 (5th Cir. 2020) .....................................................................18, 20

*Hoskins v. GE Aviation*,
  803 F. App'x 740 (5th Cir. 2020) .........................................................................26

*Hull v. Kapstone Container Corp.*,
  3:17-CV-0641, 2018 WL 4409798 (N.D. Tex. Sept. 17, 2018) ............................24

*Jenkins v. Louisiana Workforce Comm'n*,
  713 F. App'x 242 (5th Cir. 2017) .....................................................................20, 21

*Lamb v. Ashford Place Apartments, LLC*,
  914 F.3d 940 (5th Cir. 2019) .................................................................................1

*Lewis v. Vitol, S.A.*,
  No. 01-05-00367-CV, 2006 WL 1767138 (Tex. App.—Houston [1st Dist.]
  June 29, 2006, no pet.) (mem. op.) ......................................................................29

*Manning v. Chevron Chem. Co., LLC*,
  332 F.3d 874 (5th Cir. 2003) ...............................................................................27

*McDaniel v. Nat'l R.R. Passenger Corp.*,
   705 F. App'x 240 (5th Cir. 2017) ........................................................................20

*Moore v. Animal Health Int'l, Inc.*,
   No. 2:18-CV-12, 2019 WL 4889826 (N.D. Tex. June 21, 2019), *report and
   recommendation adopted*, 2019 WL 4888621 (N.D. Tex. Oct. 3, 2019) ..............24

*Okeke v. Adm'r s of Tulane Educ. Fund*, No. 2:20-cv-450, 2021 WL 2042213
   (E.D. La. May 21, 2021), *aff'd sub nom.*, 2022 WL 1025991 (5th Cir. Apr. 6,
   2022) ......................................................................................................................26

*Perks v. Town of Huntington*,
   234 F. App'x 8 (2d Cir. 2007) ..............................................................................28

*Price v. Fed. Express Corp.*,
   283 F.3d 715 (5th Cir. 2002) ..........................................................................22, 23

*Reynolds v. Sovran Acquisitions, L.P.*,
   650 F. App'x 178 (5th Cir. 2016) ....................................................................19, 25

*Rios v. Rossotti*,
   252 F.3d 375 (5th Cir. 2001) ................................................................................25

*Salazar v. Wynne*,
   No. 5:07-CV-00870, 2009 WL 10699498 (W.D. Tex. Feb. 5, 2009)....................27

*Sandstad v. CB Richard Ellis, Inc.*,
   309 F.3d 893 (5th Cir. 2002) ..........................................................................20, 26

*Smith v. Nine W. Grp., Inc.*,
   3:98-CV-1331, 2000 WL 562456 (N.D. Tex. May 8, 2000)................................25

*Stockton v. Christus Health Se. Tex.*,
   1:15-CV-333, 2017 WL 1287550 (E.D. Tex. Feb. 3, 2017)................................24

*Strong v. Univ. Health Care Sys., L.L.C.*,
   482 F.3d 802 (5th Cir. 2007) ..........................................................................26, 27

*Vital v. Nat'l Oilwell Varco*,
   No. 12-cv-1357, 2014 WL 4983485 (S.D. Tex. Sept. 30, 2014)..........................21

*Wilturner v. Best Buy Stores, L.P.*,
   1:05-cv-443, 2006 WL 8441532 (E.D. Tex. May 5, 2006) .............................22, 25

## EXHIBIT LIST

Exhibit A     →     Declaration of Marius Kotze

- −   Exhibit A-1:   BHP's Code of Business Conduct
- −   Exhibit A-2:   PS&D Scorecard
- −   Exhibit A-3:   I&D Frequently Asked Questions
- −   Exhibit A-4:   2017-2018 Performance Review
- −   Exhibit A-5:   2018-2019 Performance Review
- −   Exhibit A-6:   E-mails Soliciting Feedback for Performance Review
- −   Exhibit A-7:   Executive Coach E-mail
- −   Exhibit A-8:   E-mails re Applications
- −   Exhibit A-9:   E-mails re Mobility
- −   Exhibit A-10: E-mail from P. Perry re Position
- −   Exhibit A-11: E-mails re Planner Position
- −   Exhibit A-12: E-mail from B. Sklar
- −   Exhibit A-13: Investigation Report re Powers's October 2019 Complaint
- −   Exhibit A-14: Termination Letter
- −   Exhibit A-15: STI Plan
- −   Exhibit A-16: STI E-mail Correspondence
- −   Exhibit A-17: Head of Credit & Market Risk Job Listing
- −   Exhibit A-18: Investor Roadshow Project Manager Job Listing
- −   Exhibit A-19: Head of Planning and PLT Support Listing

Exhibit B     →     Excerpts from Deposition of Plaintiff Burak Powers

Exhibit C     →     Excerpts from Deposition of Harold "Skip" York

Exhibit D     →     Declaration of Paul Perry

Exhibit E     →     Excerpts from Deposition of Paul Perry

Exhibit F     →     Declaration of Vandita Pant

Exhibit G     →     Excerpts from Deposition of Irada Williams

Exhibit H     →     Declaration of Irada Williams

Exhibit I     →     December 2019 EEOC Charge of Discrimination

Exhibit J     →     July 2020 EEOC Charge of Discrimination

Exhibit K     →     Excerpts from Deposition of Manson Kan

Pursuant to Federal Rule of Civil Procedure 56, Broken Hill Proprietary (USA) Inc. ("BHP" or "Company") files this Motion for Summary Judgment.

## I.  NATURE AND STAGE OF PROCEEDINGS

Plaintiff Burak Powers ("Powers") filed suit against BHP alleging three claims:  (1) sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) breach of contract; and (3) post-termination retaliation under Title VII.  BHP denies Powers's allegations.  Discovery is closed, and BHP now seeks summary judgment.

## II.  STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue presented is whether BHP is entitled to summary judgment on Powers's (1) discrimination and post-termination retaliation claims because he fails to meet his burden of establishing a prima facie case or pretext and (2) breach of contract claim because he cannot establish BHP breached the Company's short term incentive plan.  Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, no genuine dispute as to any material fact exists, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); Fed. R. Civ. P. 56(c). Summary judgment is warranted if Powers fails to establish the existence of an essential element of his case.  *Celotex*, 477 U.S. at 322.  Powers must produce evidence upon which a jury reasonably could base a verdict in his favor.  *Id.*  Powers cannot defeat summary judgment with conclusory allegations or unsubstantiated beliefs and opinions.  *Lamb v. Ashford Place Apartments, LLC*, 914 F.3d 940, 946 (5th Cir. 2019).

## III.  SUMMARY OF THE ARGUMENT

This is a single plaintiff disparate treatment discrimination, retaliation, and breach of contract case.  Powers does not have probative evidence to establish a genuine dispute as to any

material fact with regard to any of his claims.  Specifically, Powers cannot establish the elements of his prima facie case of sex discrimination.  Nor can Powers establish pretext because he has no evidence that BHP discriminated against *him* based on his sex.  Rather, in support of his claims, Powers relies significantly on BHP's aspirational goal to increase female representation globally within the Company.  In doing so, Powers essentially attempts to use alleged disparate ***impact*** evidence to establish his individual disparate ***treatment*** claims.  Powers's efforts fail because the relevant legal inquiry is focused on his individual employment decisions, none of which were based on sex.  Powers likewise fails to establish that BHP retaliated against him or breached the terms of its short term incentive ("STI") plan when the Company requires every exiting employee to sign a release, regardless of sex or protected activity.  Accordingly, as more fully set forth below, summary judgment is appropriate on all of Powers's claims.

## IV.  RELEVANT FACTS

### A.    BHP Hired Powers for the Portfolio Strategy and Development Team

BHP is a leading global resources company.  *See* Declaration of M. Kotze at ¶ 3 (hereinafter "Kotze Dec. at ___"), attached as Ex. A.  In 2013, BHP hired Powers as a Senior Analyst for the Finance Department's Portfolio Strategy and Development ("PS&D") team.  *See* Deposition of B. Powers at 37:16-18; 41:11-25 (hereinafter "Powers Depo. at ___"), attached as Ex. B.  The core function of the PS&D team is to analyze market and price forecasts for BHP's commodities and provide strategy analyses as to which assets the Company should grow.  *See* Deposition of S. York at 14:21-15:11; 17:2-8 (hereinafter "York Depo. at ___ "), attached as Ex. C; *see also* Powers Depo. at 42:6-43:25.

The PS&D team is organized by geographic region and subgroups.  *See* Declaration of P. Perry at ¶ 3 (hereinafter "Perry Dec. at ___"), attached as Ex. D.  Specifically, the PS&D team is

located in London, England; Houston, Boston, Seattle, and San Francisco, United States; Toronto and Saskatoon, Canada; Santiago, Chile; Manila, Philippines; and Melbourne, Adelaide, Brisbane, and Perth, Australia.   *Id.* at ¶ 2.   Within the team, there are six subgroups—Mergers & Acquisitions; Innovation & Ventures; Corporate Planning; Business Development; Strategy Marketing & Intelligence ("SM&I"); and Decision Evaluation.  *Id.* at ¶ 4.  The SM&I subgroup focuses on corporate strategy and supply-side analysis to provide guidance to the Company's various assets.  *Id.*

Powers reported to Skip York, Head of SM&I.  *See* Powers Depo. at 73:21-74:12; *see also* Deposition of P. Perry at 8:7-20 (hereinafter "Perry Depo. at ___"), attached as Ex. E.  York, in turn, reported to Paul Perry, Vice President of SM&I, who reported to Johan van Jaarsveld, PS&D Officer.  *Id.*; *see also* Ex. E at 11:18-23.

## B.    Powers Understood and Agreed to Abide by BHP's Policies

During his employment, Powers had access to and was familiar with BHP's policies and procedures.   Powers Depo. at 37:24-38:19.   Specifically, BHP's Code of Business Conduct instructs employees that BHP does not tolerate any form of discrimination or harassment based on, among other things, sex.  *See* Kotze Dec. at ¶ 4; *see also* Code of Business Conduct, attached as Ex. A-1.  Further, BHP does not tolerate any form of retaliation against an employee who files a complaint in good faith regarding any actual or perceived discrimination, harassment, or retaliation.  *Id.* at ¶ 4.

BHP requires all employees, including Powers, to complete annual training on the Company's expectations for respectful workplace conduct.  *Id.* at ¶ 5.  BHP also encourages employees to report concerns about inappropriate conduct to management or Human Resources.  *Id.* at ¶ 6.  In fact, BHP provides employees with various avenues to lodge complaints, including

a confidential 24-hour hotline.  *Id.*; Powers Depo. at 38:11-19.

The Company promptly investigates all complaints and takes appropriate remedial or disciplinary action if necessary.  *See* Kotze Dec. at ¶ 7.  Powers admits that he knew how to—and, in fact, did—utilize the various avenues offered by the Company if he had any questions or concerns about his employment.  Powers Depo. at 38:11-19.

## C.    BHP's Uses a Scorecard and Key Performance Indicators to Assess Company Performance

To monitor company performance, BHP relies on scorecards across all levels of the workforce.  *See* Kotze Dec. at ¶ 8.  In particular, BHP issues a scorecard for the entire Company, each function, and every group.  *Id.*; *see* PS&D Scorecard, attached as Ex. A-2.  Each scorecard contains Key Performance Indicators ("KPIs"), which are goals the Company believes represent strong performance and which the Company hopes to achieve.  *See* Kotze Dec. at ¶ 8.  The scorecards and KPIs assess performance across various measures, including health and safety, performance, portfolio, strategy, culture, risk, and social value.  *Id.* at ¶ 9.  In an effort to provide data and performance transparency, BHP utilizes dashboards that display information on all KPIs. *Id*.

At the end of the year, each function and group will evaluate the performance of their employees against their applicable scorecard and KPIs.  *Id.* at ¶ 10.  BHP will also assess the Company's performance against the Company-wide scorecard.  *Id.* at ¶ 11.  This involves an evaluation of all KPIs, with no particular KPI being mandatory or dispositive.  *Id.*  The outcome of this assessment is then used to set the Short Term Incentive ("STI") bonus pool for the Company.  *Id.*  The STI is intended to reward BHP's employees for the Company's performance. *Id*.

### D.     BHP Enacted an Inclusion and Diversity Initiative

Recognizing that diversity in the workforce leads to stronger teams, more effective problem solving, and enhanced creativity, BHP enacted an inclusion and diversity ("I&D") initiative in late 2016 and early 2017.  *See id.* at ¶ 12.  As part of the I&D initiative, BHP set an aspirational goal of a 3% increase in the representation of women globally and in compliance with all applicable laws and regulations.  *Id.* at ¶ 13; *see also* Ex. A-3 at FAQ 1.  In doing so, BHP recognized that goals are useful in focusing efforts to achieve gender balance in the workplace.  Kotze Dec. at ¶ 13.  A balanced workplace is one in which the employee population is fairly representative and reflective of the communities in which BHP operates.  *Id.*  The aspirational goal is not a quota, and BHP's policies prohibit unlawful preferential hiring decisions.  *Id.* at ¶ 14; *see also* Ex. A-1; Ex. A-3.  Instead, BHP set a global aspirational goal to support its efforts to attract, develop, and retain the most talented and qualified women.  Kotze Dec. at ¶ 14.

Some employees were apprehensive of the I&D initiative and how the Company would reach the aspirational goal.  *See* York Depo. at 25:5-7; 78:9-21.  For instance, York admitted he felt and vocalized his frustrations with the initiative, although he stated he has never seen any of his concerns play out in employment decisions.  *Id.* at 78:9-21 (" Q. Have you seen any of those frustrations that you may have expressed play out in any employment decisions?  A. No.").  As part of the I&D rollout, to address employee concerns and common questions that may arise, BHP hosted various townhalls to explain the business case for the initiative.  *See* Kotze Dec. at ¶ 15.  BHP also provided a list of Frequently Asked Questions ("FAQs") to emphasize that while the Company remained committed to its I&D initiative, BHP would comply with all laws and regulations.  *Id.*; *see also* FAQs, attached as Ex. A-3.

As part of the I&D effort, BHP includes the company's aspirational goal as a KPI on the

Company's scorecard.  Kotze Dec. at ¶ 16.  Individual departments and some leaders' scorecards may also include a KPI focused on support for BHP's aspirational goal for women.  *Id.*  Since the KPI on gender balance relates to the Company's global aspirational goal, it is one of the KPIs considered in the STI determination, although, again, no particular KPI is mandatory or dispositive.  *Id.* at ¶ 11.  For instance, in announcing the STI bonus in 2019 and 2020, BHP announced the Company was behind the aspirational goal in both years, but in 2019 the bonus was paid out 80% whereas in 2020 the bonus was paid out at 114%.  *Id.* at ¶ 17.  In other words, KPIs— including the KPI on gender balance—are goals BHP hopes to achieve.  *Id.*  They are not mandatory metrics.  *Id.*

E.     **After the I&D Initiative, BHP Promoted Powers to Manager and Underwent Two Restructuring Efforts**

During 2017, Powers performed well in his job.  York Depo. at 39:14-21.  In fact, BHP nominated Powers for the Future Emerging Leaders Program ("FELP"), which is a program for employees who are considered to have the potential to be high performers.  *Id.* at 43:6-23.  In May 2017, BHP promoted Powers to Manager, Oil & Gas, in the SM&I subgroup.[1]  Powers Depo. at 53:1-25.  In this position, he assumed three direct reports.  *See* York Depo. at 29:14-20.

In his performance review for the 2017-2018 year, York commended Powers's performance and coached him regarding areas of improvement, particularly on "improving his people leader skills and experience."  *Id.* at 40:6-41:20; *see also* 2017-2018 performance review, attached as Ex. A-4.  Powers admitted that "collaboration with his . . . colleagues could be better."  Ex. A-4.

In 2018, BHP went through two corporate restructurings.  York Depo. at 25:22-26:5.  The

---

[1] At some point Powers's position was also referred to as Manager, Oil & Gas, Supply Analysis, but the role was the same.  *See* Powers Depo. at 53:1-14.

first restructuring occurred in summer of 2018 as BHP sold its shale asset that amounted to half of its entire petroleum division.  *Id.* at 26:17-27:25.  As a result of this drastic decrease in workload, BHP restructured the department and enacted a headcount reduction.  *Id.*  A committee made the decisions as to any positions that were being eliminated or backfilled as part of the shale sale.  *Id.*  As to Powers, this resulted in reducing his direct reports from three to two, and one of his direct reports transferred to another team.  *Id.*; *id.* at 28:8-30:8.  Elena Walker backfilled this position and reported to Powers.  *Id.*

The second restructuring occurred in November 2018.  *Id.* at 32:20-33.  While the shale exit impacted just the petroleum organization, the second restructuring was a company-wide effort called World Class Functions ("WCF").  *Id.*  BHP hired Boston Consulting Group to provide recommendations on how the Company could improve structure, efficiency, and effectiveness.  *Id.*  The WCF review encompassed every function that supports BHP's direct business, including Finance.  *Id.* at 33:16-34:1.  One of the directives from the WCF review was to flatten the organization and increase the number of direct reports per supervisor to eight or nine employees.  *Id.* at 34:9-36:24.

To comply with the recommendation to reduce headcount within PS&D, Perry made the decision to eliminate the manager role that Powers held.[2]  *Id.*; *see* Perry Depo. at 12:25-14:22.  Consistent with the WCF recommendation, this would increase York's direct reports as he assumed supervision over those previously reporting to Powers.  York Depo. at 34:9-36:24; Perry Depo. at 14:18-22 ("So we decided across finance we were going to eliminate the manager role and flatten the structures.").  Powers's position changed to Lead Principal with no direct reports.

---

[2] Van Jaarsveld and Peter Beaven, BHP's CFO, had no objection to the elimination.  Perry Depo. at 14:1-10.

*See* Powers Depo. at 65:19-24; York Depo. at 34:18-35:15.

Powers was informed that he would need to secure a new position within BHP or he would be exited from the Company by the end of the year.[3]  York Depo. at 36:18-38:10.  There was initial miscommunication regarding the effective date of Powers's job elimination.  In particular, York thought the elimination would occur at the end of the calendar year (*i.e.*, December 2019), but BHP intended the restructuring to occur at the end of its fiscal year, June 30, 2019.  *Id.*  When he learned of his error, York informed Powers's that his job would be eliminated on June 30, 2019.  *Id.*  Following the job elimination, BHP did not backfill Powers's position.  *Id.* at 124:14-25.  Rather, York assumed all of his job responsibilities.  *Id.*

## F.    Powers Continued To Struggle with Soft Skills

The behavioral issues identified in Powers's 2017-2018 performance evaluation continued.  As part of the performance management process, York solicited feedback for Powers's 2018-2019 evaluation, including feedback from individuals suggested by Powers.  *See id.* at 39:25-40:21.  In response, York received several complaints about Powers's engagement (including from those who Powers suggested York contact) that Powers lacked professional etiquette, was hard to build a rapport with, failed to engage team members, and committed to things too far out such that they often needed to be walked back.  *See* 2018-2019 performance review, attached as Ex. A-5; *see also* Feedback E-mails, attached as Ex. A-6.

In response to these concerns, York discussed with Perry how a "wide cut of people,"

---

[3] BHP learned during the course of discovery that, after Powers was notified his position would be eliminated, he recorded the majority of his conversations with his colleagues and supervisors—more than 100 conversations.  Many of these conversations included confidential business matters wholly unrelated to decisions about his employment.  Powers did so in the hopes he could gather "evidence" in support of this lawsuit.  His efforts failed spectacularly as not a single conversation supports that BHP discriminated or retaliated against Powers.

provided negative feedback that Powers was not "collaborative" and "treats teams as data inputs in his process rather than thought partners working together for the best result."  *See* York Depo. at 60:14-61:1; Executive Coach E-mail, attached as Ex. A-7.  As a result, Perry and York offered to hire Powers an executive coach paid for by the Company.  *See* York Depo. at 60:14-61:1; *see* Ex. A-7.  Powers refused the opportunity.  *See* Powers 84:5-21; York Depo. at 61:5-10.

After WCF, York and Perry endeavored to find Powers another role.  York Depo. at 38:11-21, 62:14-65:6; *see also* E-mails re Applications, attached as Ex. A-8.  To continue Powers's employment following his job elimination, York and Perry helped secure Powers a short-term secondment to the Potash asset so that his employment could be extended until June 2020.[4]  *See* Powers Depo. at 119:19-120:9; York Depo. at 38:11-21, 62:14-65:6.

Even though York acknowledged Powers's behavioral deficiencies, he nonetheless believed that Powers had a skillset that could be valuable to the Company and improved through coaching.  *See* York Depo. at 158:20-25.  In July 2019, while applying for other positions within BHP, Powers designated himself as "not mobile" in BHP's systems.  *See* Powers Depo. at 159:15-25; *see also* E-mails re Mobility, attached as Ex. A-9.  Powers acknowledged that he could not accept an international assignment because he was unable to move his family out of the country.[5] *See id.*  Powers's change in mobility status limited the roles available to him.  *See* York Depo. at 69:17-21.  In fact, Powers voluntarily withdrew his application for a position in Australia, Head of Planning and Analytics, because of his non-mobile status.  *See* Powers Depo. at 159:15-160:25; *see also* Ex. A-9.

---

[4] Potash is a term commonly used to describe the mineral potassium-containing salt, which is used as the main ingredient in fertilizer.  *See* York Depo. at 38:22-25.

[5] Powers explained that his wife maintained a law practice in Houston and had recently announced her political candidacy for Texas State House of Representatives.  *See* Ex. A-9; *see also* Powers Depo. at 154:6-14.

**G.      Powers Applied to Four Roles and Considered Applying to a Fifth**

Powers applied for four roles:  (i) Head of Credit and Market Risk; (ii) Investor Roadshow Project Manager; (iii) Production Planner; and (iv) Head of Planning & PLT Support.  *See* Powers Depo. at 142:21-143:13.  Powers also considered applying (but did not actually apply) for the Head of Financial Analysis role.  *Id.* at 231:23-232:3; 237:3-7.  During the application process, Powers sought the feedback and advice from several colleagues, and none discouraged him from apply for any position.  *See, e.g., id.* at 211:15-25.

**1.      *The Head of Credit and Market Risk Role***

In March 2019, Powers applied for the Head of Credit and Market Risk role.  Powers Depo. at 170:14-19; 171:-21-25.  Vandita Pant, then Group Treasurer, was the hiring manager.  *See* Declaration of V. Pant at ¶ 4 (hereinafter "Pant Dec. at ___"), attached as Ex. F.  She assessed several key competencies for the role, including leadership abilities, stakeholder management, and technical skills and experience.  *Id.* at ¶ 5.  Sixteen internal candidates applied for the position from across the business, including PS&D, Strategy, and Finance.  *Id.* at ¶ 6.  Seven of the sixteen candidates who applied for the position were interviewed, including Powers and Juliet Taylor.  *Id.* at ¶ 7.

Michiel Hovers, then Vice President Marketing Petroleum, provided Pant with feedback on the candidates.  *Id.* at ¶ 8.  He had exposure to both Powers and Taylor in his role.  *Id.*  Hovers provided Pant with negative feedback about Powers—namely, that Powers had a high IQ but his team engagement capabilities were not always productive.  *Id*.  This feedback, of course, was consistent with the feedback York and Perry provided to Powers in his 2017-2018 and 2018-2019 evaluations.  *See* Ex. A-4, A-5.  To ensure an unbiased process, Pant interviewed Powers alone and did not include Hovers.  Vant Dec. at ¶ 8.  While Powers interviewed well, he was not the best

qualified candidate and therefore not the successful candidate.  *Id*.

Pant's decision to hire Taylor was based on her qualifications and merit, not based on her gender or any KPI related to gender.  *Id*. at ¶ 9.  Indeed, Pant testified that her decision to hire Taylor was not a close call.  *Id*.  Pant viewed Taylor as "head and shoulders" above the other candidates.  *Id*.  Pant had also observed Taylor's work in a prior role and viewed it to be "outstanding."  *Id*.  The former Chief Operating Officer, Arnoud Balhuizen, also highly recommended Taylor who had previously worked for him as a planner.  *Id*.  Taylor had both the correct technical skills for the role and the required soft skills needed for the position.  *Id*.  She had deep experience across the Marketing and Supply groups and a good knowledge of market risk. *Id*.  Taylor also had more relevant experience because Powers had never worked in Marketing.  *Id*. Taylor was also stronger than Powers in her soft skills, which was critical for the position as it was a leadership role that required stakeholder management, collaboration, and the ability to influence others.  *Id*.  Moreover, Taylor was a participant in Future Emerging Leaders Program and had a very high academic achievement from well-regarded universities globally.  *Id*.

### 2.    *The Investor Roadshow Project Manager Role*

A few months later, in July 2019, Powers applied for the Investor Roadshow Project Manager role.  Powers Depo. at 194:22-24.  Niall McCormack, former Vice President of Exploration, and Todd Lee, former Vice President of Transformation, were the hiring managers for the role.  *See* Kotze Dec. at ¶ 18.  In filling the position, McCormack sought a candidate with specialized skills in investor relations, particularly pricing decks and benchmarking data and who was familiar with the consulting group Wood Mackenzie and their models.  *Id*. at ¶ 19.

The role was posted using BHP's Expression of Interest process rather than the standard recruitment process.  *Id*. at ¶ 20.  Typically, when an Expression of Interest process is used the

hiring managers already have a strong candidate in mind. *Id.* In this case, McCormack had already identified Jeanie Harrison as a strong candidate for the role who possessed the attributes he was looking for in a candidate. *Id.* Specifically, Harrison previously worked at Wood Mackenzie for seven years as a research analyst and research manager prior to BHP. *Id.* at ¶ 21. Harrison also understood pricing decks and had relevant specialized experience in her prior role in Market Analysis. *Id.* Moreover, Harrison had made it publicly known that her explicit career goal was a position in the Investor Relations function. *Id.*

While the role was posted, Perry emailed McCormack to express his support for Powers. *Id.* at ¶ 31; *see also* Perry E-mail, attached as Ex. A-10. In response, McCormack explained that there was another more competitive candidate whose background was extremely well aligned and likely more at the level for which they were looking. Ex. A-10. Although McCormack considered Harrison superbly qualified for the position, he nonetheless met with Powers. Kotze Dec. at ¶ 22. Even before the meeting, McCormack had serious concerns about Powers's suitability for the role, finding him "hard headed" and not the easiest to work with. *Id.* McCormack also questioned whether Powers truly wanted the role. *Id.* For these reasons, McCormack determined that Powers was not the best qualified candidate for the position. *Id.*

Harrison and one other candidate, Luca Tagini (male), were shortlisted for the role. *Id.* at ¶ 23. Lee spoke to both and recommended proceeding with Harrison. *Id.* McCormack agreed with Lee's recommendation to hire Harrison. *Id.* Their decision to hire Harrison was based on her qualifications and merit, not based on her gender or any KPI. *Id.*

### 3. *The Planning Principal II/Production Planner Role*

In September 2019, Powers also applied for the Production Planner role. *See* Powers Depo. at 216:20-217:1. Irada Williams, then Chief of Staff and Head of Planning, Petroleum, served as

the hiring manager.  *See* Deposition of I. Williams at 22:9-21 (hereinafter "Williams Depo. at __"),

attached as Ex. G.  Morgan Hughes, Principal Strategic Planner/Analyst, and Rohan Goudge, Head

of Appraisal, also served on the interview panel.  *Id.* at 30:23-31:24.  The Production Planner role

was originally designated to have a salary grade 12 or 13.  *See* Williams Depo. at 26:17-19.  Given

the high demands of the group, Williams wanted the role to be a promotion and a developmental

opportunity for whomever filled the role.  *See* Declaration of I. Williams at ¶ 4 (hereinafter

"Williams Dec. at ___"), attached as Ex. H.  Williams did not interview Powers for the Production

Planner role because Powers lacked the necessary technical background.  Williams Depo. at 35:11-

19.  After interviewing three candidates, Williams concluded that none of the applicants were fit

for the position.  *Id.* at 30:4-12; *see also* Williams Dec. at ¶ 3

Accordingly, the scope of the role was modified, the level of the role was downgraded to

Grade 12, and the role was changed to Planning Principal II.  Williams Depo. at 28:12-29:4.

Williams determined that Anna Pechatnikov, who had previously interviewed for the Production

Planner role, was the best qualified candidate and hired her for the Planning Principal II position.

*Id.* at 33:25-34:11; *see also* Williams Dec. at ¶ 4; E-mails re Planner Position, attached as Ex. A-

11 ("Anna is delivery focused and structured with her current work.  Integration with the team

looks strong, she is diligent and trustworthy, respectful and has a positive attitude.  There is running

room for her to develop in this role, which is a plus in terms of continuing to be challenged.").

Williams did not believe Powers was best suited for the Planning Principal II role because

it was a grade level lower than Powers's current level (Grade 13) and would not be a promotion

or developmental opportunity, whereas it would be for Pechatnikov (Grade 11).  Williams Dec. at

¶ 5.  Williams's decision to hire Pechatnikov was based on her qualifications and merit, not based

on her gender or any KPI.  *Id.* at ¶ 6.

### 4.      *The Head of Planning & Petroleum Leadership Team Support Role*

Around the time Powers's secondment was coming to an end in June 2020, Powers applied for the Head of Planning & Petroleum Leadership Team ("PLT") Support role.  Powers Depo. at 211:8-14.  McCormack and Lee were the hiring managers for the role, and Harrison was the successful candidate.  *See* Kotze Dec. at ¶ 24.

Several individuals applied for the role, including Powers and Harrison.  *Id.* at ¶ 25.  Powers was not interviewed because the candidates chosen to be interviewed all held a formal role of "Manager" or "Head Of" at BHP, had a PLT-level recommendation, and were listed on an internal talent list.  *Id.* at ¶ 26; *see also* E-mail to Powers from B. Sklar, attached as Ex. A-12.  While Powers had managerial experience, he lacked the other criteria—namely, Powers did not have a recommendation from a PLT member, and he was not on the internal talent list.  *See* Powers Depo. at 214:7-17; *see also* Kotze Dec. at ¶ 27.  Harrison, on the other hand, was managing a team of more than eight direct reports at the time of her application, was highly recommended by PLT members, and was on the internal talent list.  *See* Kotze Dec. at ¶ 28.  Therefore, as with all the other roles, BHP ultimately filled the role with the best qualified candidate.  McCormack and Lee's decision to hire Harrison was based on her qualifications and merit, not based on her gender or any KPI.  *Id.* at ¶ 29.

### 5.      *The Head of Financial Analysis Role*

Around the same time in June 2020, Powers also considered applying (but did not actually apply) for the Head of Financial Analysis role.  *See* Powers Depo. at 231:23-232:3; 237:3-7.  Rod Mainland was the hiring manager for the position, and he hired Irada Williams for the role in June 2020.  *Id.* at 236:4-21; Williams Depo. at 61:9-63:4.  Powers does not contend that Williams is not qualified for the role.  Powers Depo. at 232:16-23.  To the contrary, he admits that Williams is

"very qualified for that position." *Id.* Powers, however, alleges that the role was "hidden" from him because it was advertised as being based in Melbourne, Australia, and because he was not mobile, he did not apply. *Id.* at 233:1-7. Powers asserts that BHP encouraged Williams to accept the role by changing the position location from Australia to Houston. *Id.* at 233:14-234:10. According to Powers, had he known there was flexibility in the role being based in Houston, he would have applied. *Id.* at 233:1-7. Powers admits, however, that even had he known of the job location and applied, he does not know whether he would have been hired for the role. *Id.* at 237:3-7. Importantly, Powers does not contend that he is clearly better qualified for the role than Williams. *Id.*

## H.    BHP Created a New Position in PS&D Based in Australia

In November 2019, PS&D had a need within Strategy Marketing & Intelligence team for a Lead Principal role based in Australia. *See* Perry Dec. at ¶ 5. This Lead Principal position focused on group portfolio (not petroleum-specific) strategy, had a preference for a strategic foresight and broad resources industry background, and was based in Australia. *Id.* at ¶ 7. Clare Eilbeck, who resided and worked in Australia, was selected for the role. *Id.* at ¶ 6. Eilbeck satisfied all of these qualifications. *Id.* at ¶ 8. Powers did not. *Id.* The job title "Lead Principal" is used for several positions at the Company and does not render all positions the same. *Id.* at ¶ 9.

## I.    Powers Complains About Alleged Sex Discrimination

On October 15, 2019, Powers filed an internal complaint with Human Resources that included concerns about sex discrimination. *See* Kotze Dec. at ¶ 30; Summerbell Investigation Report, attached as Ex. A-13. Specifically, Powers complained that he applied for and was not chosen for the following positions: (i) Head of Credit and Market Risk role in March 2019, and (ii) Investor Roadshow Project Manager role in July 2019. Ex. A-13. Powers complained that he was substantially better qualified than the two females selected to fill the roles. *Id.* Powers also

complained that there was a delay in notifying him about his secondment assignment, which he believed was an effort by BHP to push out male employees to hire more female employees. *Id.*

BHP promptly conducted an internal investigation of Powers's complaints. *See* Kotze Dec. at ¶ 30. As part of the investigation, BHP interviewed twelve witnesses (including Powers), reviewed relevant documents and e-mails between witnesses, and issued a fourteen page report. Ex. A-13. BHP did not substantiate Powers's complaints of sex discrimination. *Id.* In particular, BHP determined that Powers's non-selection for the two roles was not sex-based. *Id.* Instead, after a thorough investigation, BHP concluded that the best qualified candidates were selected to fill the roles. *Id.* Further, while there was delay in notifying Powers about his secondment announcement, this did not support a finding of sex discrimination, but instead a lack of management efficiencies by Human Resources. *Id.*

## J.   Powers Filed His First Charge of Discrimination

On December 6, 2019, Powers filed his first Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). *See* First Charge of Discrimination, attached as Ex. I. In his Charge, Powers alleged that BHP discriminated against him on the basis of his sex (male) because lesser qualified women were hired for the following three positions: (i) Head of Credit and Market Risk, (ii) Investor Roadshow Project Manager; and (iii) Production Planner. *Id.* Powers also alleged that his former position was re-opened in Australia and filled by a women. *Id.* Powers claimed that his internal complaint to Human Resources went unanswered. *Id.*

## K.   Powers's Employment Ends, and He Declined a Severance Package

Powers's secondment concluded in June 2020, and because he was unsuccessful in securing another position, his employment ended shortly thereafter on July 11, 2020. Powers

Depo. at 258:7-259:1. As part of his termination, Powers was offered a severance package.  *Id.* at 259:2-260:16.  Powers's termination letter expressly stated that Powers may be eligible to receive a Short Term Incentive ("STI") payment based on the relevant terms of the Company policy and/or STI plan.  *Id.*; *see also* Termination Letter, attached as Ex. A-14.  The STI plan also explicitly states that the "STI plan enables employees to earn performance-based pay" and "[a]s such, STI is variable and not fixed or guaranteed."  *See* STI Plan at 4, attached as Ex. A-15.  The plan also details that "eligibility will ordinarily be detailed in the individual contract of employment" and "[t]o confirm eligibility, please contact your HR Business Partner."  *Id.* at 4.

Further, when an employee is eligible to receive an STI payment, the Company has full discretion in determining the percentage for the STI, which is based on performance and can range from 0% to 150% of the STI target.  *Id.*  As a policy and practice, BHP requires that an employee who is exiting the Company sign a release to be eligible to receive an STI payment.  *See* Deposition of M. Kan at 81:23-82:25 (hereinafter "Kan Depo. at ___", attached as Ex. K. ("Because it's standard process in terms of making people redundant. Anybody that we give a redundancy letter to has a release that they need to sign, so it's part of standard processing that I was following."); *id.* at 88:12-15 ("I'm saying that in our standard past practice for all redundancies, there is a release letter tied to specific payments as part of your redundancy.").  Manson Kan, Principle HR Business Partner, communicated with Powers about this requirement.  *Id.* at 9:2-5; Powers Depo. at 261:15-18.  Because Powers refused to sign the release agreement, he did not receive an STI payment. *See* Powers Depo. at 260:17-23.

**L.**     **Powers Filed His Amended Charge of Discrimination and this Lawsuit**

Shortly after Powers's termination, he filed an Amended Charge of Discrimination with the EEOC on July 16, 2020.  *See* July 2020 EEOC Charge, attached as Ex. J.  Powers amended his

Charge to allege that he was discriminated against on the basis of his sex (male) when he was not selected for the fourth position—the Head of Planning & PLT Support role.  *Id.*  He also alleged he was discriminated against with respect to the Head of Financial Analysis for Transactions role, even though he never applied.  *Id.*

After the EEOC issued Powers his Right to Sue, Powers filed this lawsuit alleging three claims: (1) sex discrimination under Title VII; (2) breach of contract; and (3) post-termination retaliation under Title VII.  *See* D.E. 1. ¶¶ 84-96; 107-110; 113-114.  As to his sex discrimination claim, Powers alleges the following actions were discriminatory:

a) BHP eliminated his Lead Principal job but later hired a female (Eilbeck) for a position with the same job title in Australia;

b) BHP hired females (Taylor, Harrison, and Pechatnikov) for the four positions to which Powers applied—Head of Credit and Market Risk; Investor Roadshow Project Manager; Production Planner; and Head of Planning & PLT Support; and

c) BHP failed to disclose that the Head of Financial Analysis position would be located in Houston, and this failure prevented him from applying, and BHP selected a female for the role (Williams).

*See* D.E. 1 at ¶ 88.  As to his breach of contract and post-termination retaliation claim, Powers alleges that BHP failed to pay him an STI bonus and improperly conditioned it on a release of claims.  *See* D.E. 1 at ¶¶ 108, 113.  The remainder (and majority) of Powers's Complaint contains allegations as to broad statements about BHP's I&D initiatives and global goals, even though the statements are not directed to Powers and do not relate to any of his employment decisions.

BHP denies these allegations in their entirety.

## V.  ARGUMENT & AUTHORITIES

### A.    Powers's Discrimination Claims Are Flawed

#### 1.    *Powers Cannot Establish Discrimination Claims Based on Direct Evidence*

Powers has no direct evidence of discrimination.  "Direct evidence is evidence which, if believed, proves the fact without inference or presumption."  *Harris v. Drax Biomass Inc.*, 813 F. App'x 945, 947 (5th Cir. 2020).  In his Complaint, Powers argues the Company's I&D initiative and aspirational goal constitute direct evidence.  *See* D.E. 1 ¶¶ 85-87.  But to show direct evidence of discrimination through an affirmative action plan, Powers must show (1) the actual existence of an affirmative action plan, <u>*and*</u> (2) demonstrate specific adverse consequences to the plaintiff in his particular adverse employment action.  *See Carter v. O'Neill*, 78 F. App'x 978 (5th Cir. 2003); *Halupka v. Fed. Express Corp.*, No. 03-CV-350, 2005 WL 8161037, at *14 (E.D. Tex. Sept. 22, 2005).  Moreover, to the extent that Powers attempts to rely on any statements by the Company as direct evidence, the remarks must be (1) related to sex; (2) be temporally proximate to the adverse employment decision at issue; (3) be made by someone with authority over that decision; and (4) relate to the decision.  *Id.*

Powers simply cannot show the existence of an affirmative action plan or specific adverse consequences to Powers.  To be clear, BHP's I&D initiative set a ***global aspirational goal***.  Unlike the cases cited by Powers, BHP did not set specific goals by office, specific jobs, or grade levels.  *See Frank v. Xerox Corp.*, 347 F.3d 130, 133 (5th Cir. 2003) (establishing race targets annually for each job and grade level in the Houston office).  Beyond that, Powers cannot show a causal nexus between BHP's I&D initiative and any specific employment action ***related to Powers***.  Therefore, Powers cannot establish a discrimination claim based on "direct evidence."

Nor can Powers demonstrate that any alleged remarks were made in temporal proximity to his adverse employment decisions, by someone with authority over that specific decision, and related to that decision.  Instead, Powers references remarks by York, even though York was not the decision maker for any of the positions at issue.  Nor was York even consulted in the hiring

decisions.  *See* York Depo. at 76:6-15 ("Q. Just to make sure I'm clear, for the investor road show, production planner, head of planning, and head of credit and market risk positions, were you consulted in the hiring decisions for those roles? A. No.").

Powers also references generally statements from 2016 and 2017 made to Australia press or in speeches about BHP's aspirational goal to increase female representation ***globally*** within the Company and the Company's progress towards this goal.  These statements, however, are broad statements about overall management goals that are ***not*** directed at Powers, ***not*** related in temporal proximity, and ***not*** related to any of Powers's specific employment decisions or positions to which he applied.  Therefore, they do not constitute direct evidence of discrimination.  *Reynolds v. Sovran Acquisitions, L.P.*, 650 F. App'x 178, 183 (5th Cir. 2016) (holding that remarks expressing a preference for male hires were insufficient to show sex discrimination when they were not proximate in time or related to the employment decision at issue); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 352 (5th Cir. 2007) (holding that comments about a desire to attract young talent were not evidence of age discrimination); *see Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (finding that management's goal to "identify . . . younger managers . . . for promotion to senior management over the next 5+ years, ultimately replacing senior management" was not evidence of pretext because it did not reflect a policy of firing older managers to make room for younger managers).

## 2. *Powers Cannot Establish Discrimination Claims Based on Circumstantial Evidence*

When a Title VII plaintiff relies on circumstantial, rather than direct, evidence, he must meet the *McDonnell-Douglas* burden-shifting framework.  *Harris*, 813 F. App'x at 947.  Under this framework, Powers bears the initial burden of establishing a prima facie case of discrimination.  *McDaniel v. Nat'l R.R. Passenger Corp.*, 705 F. App'x 240, 244 (5th Cir. 2017).

To establish a prima facie case, a plaintiff must show (1) he belongs to a protected class; (2) applied for and was qualified for a position for which applicants were being sought; (3) he was rejected from the position; and (4) a person outside of his protected class was hired for the position. *Jenkins v. Louisiana Workforce Comm'n*, 713 F. App'x 242, 244 (5th Cir. 2017).

Only if Powers can meet his initial burden, does the burden shift to BHP to provide a legitimate, non-discriminatory reason for its action. *See McDaniel*, 705 F. App'x at 244.  Once BHP meets its burden of production, any presumption of discrimination disappears, and the burden shifts back to Powers to show that the articulated reason was merely pretext for intentional discrimination. *Id.*

### a.      Powers Cannot Establish a Prima Facie Case for Three Positions

For three positions—(i) Head of Planning & PLT Support, (ii) Head of Financial Analysis, and (iii) Lead Principal, SM&I in Australia—Powers cannot establish the second element of his prima facie claims.  Specifically, Powers cannot show he was qualified for or actually applied to these positions.

For the Head of Planning & PLT Support role, Powers was not qualified because he did not have a recommendation from a PLT member and he was not on the internal talent list. *Compare* Powers Depo. at 214:3-9 ("Q. And you did not have anyone on the [P]LT recommend you for the head of planning role, did you?  A.  As far as I know, I did not."), *with id.* at 215:12-14 ("Q.  Do you know if she [Harrison] had a recommendation by PLT -- a PLT member or PLT members?  A.  Looking at the emails, it looks like she did.").  The Fifth Circuit is clear that the plaintiff must show that he was qualified for the position at the prima facie stage. *See Jenkins*, 713 F. App'x at 345 (requiring a showing that plaintiff was qualified for the role).  Powers simply cannot do so.

Similarly, Powers cannot establish his prima facie burden as to the Head of Financial Analysis position because he ***never applied for*** the role.  The fact that he did not apply for the position is fatal to his claim.  *See Vital v. Nat'l Oilwell Varco*, No. 12-cv-1357, 2014 WL 4983485, at *26 (S.D. Tex. Sept. 30, 2014) (holding the fact that plaintiff did not apply for the position was fatal to his claim for discriminatory failure to promote).  To be clear, Powers ***chose*** not to apply because the position was at an unfavorable geographical location.  This has nothing to do with Powers's sex.  The role was advertised to everyone as being based in Melbourne, Australia. Williams expressed her interest in the role, but only if it were located in Houston.  BHP agreed to change the location, and Williams—an actual applicant—was selected.   There is no evidence of gender discrimination since the role was advertised in the same way to both men and women, and Powers elected not to apply.

Last, Powers cannot show he was qualified for the Lead Principal, SM&I role in Australia. As mentioned, BHP regularly uses the job title "Lead Principal" across the Company, but this does not mean the positions are performing the same role.  The Lead Principal position in Australia focused on group portfolio (not petroleum-specific) strategy.  BHP also had a preference for a strategic foresight and broad resource industry background, and the position required the employee to be in Australia.  Even assuming Powers could perform the work (which BHP does not submit he could do), he does not have a broad resources background and was not located in Australia.  In fact, Powers affirmatively marked himself in BHP's system as "not mobile" because he was unwilling to move his family internationally.

### b.     Powers Cannot Establish Pretext as to All of the Positions

Even assuming that Powers can establish a prima facie case based on any of the roles, his claims nonetheless fail because he has no evidence of pretext.  BHP hired who it deemed to be the

best qualified candidate for each of the roles.  Fifth Circuit precedent is clear that an employer's decision to hire a better qualified individual is a legitimate reason for rejecting another applicant. *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 n.2 (5th Cir. 2002) (holding that the selection "of a better qualified applicant is a legitimate and nondiscriminatory reason for preferring the successful applicant over the rejected employee who claims that the rejection was discriminatory"); *Criner v. Texas-New Mexico Power Co.*, No. 09-cv-3859, 2011 WL 1565987, at *3-4 (S.D. Tex. Apr. 25, 2011) (same).  Further, BHP's concerns about Powers's suitability for certain roles due to his exhibited deficiencies in relationship and leadership skills are legitimate, non-discriminatory reasons for not choosing Powers.  *See Wilturner v. Best Buy Stores, L.P.*, 1:05-cv-443, 2006 WL 8441532, at *4 (E.D. Tex. May 5, 2006) (holding that concerns about the plaintiff's leadership skills were legitimate and non-discriminatory).

Powers cannot establish pretext to refute BHP's legitimate, non-discriminatory reason for not selecting him for the roles.  To establish pretext, Powers must show that he was ***clearly better qualified***, which he cannot do.  *Price*, 283 F. 3d at 723 (explaining that plaintiff must show she is "clearly better qualified" as opposed to similarly qualified or merely better qualified).

For instance, for the Head of Credit and Market Risk role, BHP received feedback that while Powers had a high IQ, his team engagement capabilities were not always productive.  In addition, the hiring manager Vant had previously seen Taylor's work in her prior role and considered it outstanding.  The former Chief Operating Officer also highly recommended Taylor who had previously worked for him as a planner.  Taylor was also a FELP participant.  Powers simply cannot show that he was clearly better qualified.

The same result is reached with the Investor Roadshow position.  The hiring managers McCormack and Lee wanted someone familiar with the consulting group Wood Mackenzie and

who had specialized skills in investor relations.  The successful candidate Harrison had seven years' experience working at Wood Mackenzie and years as a research analyst.  Harrison also made it publicly known that her career goal was a position in the Investor Relations group.  Powers had done neither.  One of the hiring managers, McCormack, also found Powers "hard headed" and not the easiest to work with, so he had concerns regarding his suitability for the role.

Likewise, for the Planning Principal II role, the hiring manager Williams wanted the role to be a promotion and a developmental opportunity, especially after she downgraded the role when none of the original applicants were a fit for the position.  Williams did not believe Powers was best suited for the position because it was a grade level lower than Powers's current level (Grade 13) and would not be a promotion or developmental opportunity, whereas it would be for the successful candidate Pechatnikov (Grade 11).

As mentioned, for the Head of Planning & PLT Support position, although Powers may have had some managerial experience, Powers did not have a PLT recommendation, nor was he on an internal talent list.  Harrison had all of these requirements, including recommendations by PLT members.

Notably, for the Head of Financial Analysis position (to which Powers did not apply), Powers does not contend that he is clearly more qualified for the role than Williams.  In fact, he admits that Williams is "very qualified for that position."  Powers Depo. at 232:20-23.

Last, for the Lead Principal, SM&I position in Australia, Powers cannot show he was clearly more qualified when he does not have a background in broad resources, does not perform group portfolio strategy, and was not able to move to Australia for the position.  The role filled by Eilbeck in Australia was a different role than the role Powers previously held in Houston in terms of reporting structure, responsibilities, and location.  Powers cannot establish pretext under these

facts.  *See Moore v. Animal Health Int'l, Inc.*, No. 2:18-CV-12, 2019 WL 4889826, at *6 (N.D. Tex. June 21, 2019), *report and recommendation adopted*, 2019 WL 4888621 (N.D. Tex. Oct. 3, 2019) (holding plaintiff failed to establish pretext because the job posting was for a different position with different job requirements); *see Hull v. Kapstone Container Corp.*, 3:17-CV-0641, 2018 WL 4409798, at *6 (N.D. Tex. Sept. 17, 2018) (holding that the fact that a posting for a Human Resources Generalist position was created in Idaho shortly after plaintiff's former position as Human Resources Manager position in Texas was eliminated was insufficient to show pretext).

Courts generally defer to an employer's judgment calls regarding who is more qualified for a position.  *Stockton v. Christus Health Se. Tex.*, 1:15-CV-333, 2017 WL 1287550, at *14 (E.D. Tex. Feb. 3, 2017).  Powers provides nothing more than his own opinion that he was clearly better qualified.  To be sure, Powers's allegation that he has more experience, even if true, does not meet the high burden of establishing that he is clearly better qualified.  *See id.*  Likewise, the fact that he had a history of prior good performance or was part of BHP's FELP in 2018 does not show he is clearly better qualified.  *See Wilturner*, 2006 WL 8441532, at *4 (holding that good performance appraisals, prior promotions, or more years of experience at the company did not establish the plaintiff was clearly better qualified).

Powers's remaining allegations also fall short of establishing pretext.  Again, Powers cannot rely on alleged statements by individuals who were not the decision makers for the roles at issue to establish pretext.  *See Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) ("[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden.") (citation omitted).  Thus, any attempt to rely on frustrated statements made by York or other unnamed persons are insufficient to show pretext. Powers presents no evidence of when the comments were made, that the comments were made by

a decision maker, or that the comments related to the decision not to hire Powers for the roles. *See Reynolds v. Sovran Acquisitions, L.P.*, 650 F. App'x 178, 183 (5th Cir. 2016) (holding that remarks expressing a preference for male hires were insufficient to show sex discrimination when they were not proximate in time or related to the employment decision at issue); *Smith v. Nine W. Grp., Inc.*, 3:98-CV-1331, 2000 WL 562456 (N.D. Tex. May 8, 2000) (holding that comment about pressure from unidentified upper management personnel to fill the position with a woman was merely a stray remark and of no consequence because it did not relate to the plaintiff's claim). Thus, these comments are, at best, stray remarks and insufficient to establish pretext.  This is especially true given York testified that he never saw any of his frustrations play out in employment decisions.

Finally, Powers's reference to out-of-context statements made several years ago in 2016 and 2017 to Australian press or in speeches is not evidence of pretext.  Powers points to general statements about BHP's aspirational goal to increase female representation globally within the Company by 2025 and the Company's progress in increasing female representation.   As mentioned, these broad statements about overall management goals on a global basis were not directed at Powers and do not relate to any specific employment decision for Powers.  Therefore, these statements are insufficient to establish pretext. *See Berquist*, 500 F.3d at 352; *see Sandstad*, 309 F.3d at 897; *see also Okeke v. Adm'r s of Tulane Educ. Fund*, No. 2:20-cv-450, 2021 WL 2042213, at *9 (E.D. La. May 21, 2021), *aff'd sub nom.*, 2022 WL 1025991 (5th Cir. Apr. 6, 2022) ("In an individual disparate treatment case, 'an individual plaintiff pursuing an individual claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence.'  Instead, a plaintiff must present prima facie evidence that she individually was treated less favorably than a specific similarly

situated employee.  Statistical evidence may not be used for this purpose.").

Because Powers cannot establish pretext to refute BHP's legitimate, non-discriminatory reason for not selecting him for the roles, his sex discrimination claims fail.

**B.      Powers's Retaliation Claims Also Fail**

To prevail on retaliation claims, even post termination, Powers must show that he (1) engaged in a protected activity, (2) suffered an adverse employment action, and (3) the adverse action is causally connected to the protected activity.  *Hoskins v. GE Aviation*, 803 F. App'x 740, 745 (5th Cir. 2020).  Only if Powers can establish a prima facie case of retaliation does the burden shift to BHP to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  Powers must then prove that BHP's explanation is pretextual and that engaging in the protected activity was the ***but-for*** cause of the adverse employment action.  *See Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 807 (5th Cir. 2007).  "The but-for causation standard is significantly more difficult to prove than prima facie causation."  *Id.*

The entirety of Powers's retaliation claims is that "days after he amended his EEOC Charge, BHP informed him that it would not pay him his STI of approximately $92,000 unless he first signed a release of all claims against BHP[.]"  *See* D.E. 1 ¶113.  Powers argues that there is a casual link because of the "close timing" between the date he filed his amended Charge and the date he was denied payment of his STI.  *Id.*   This claim fails because Powers cannot meet the second or third elements of a prima facie case of retaliation.

Because the STI payment was discretionary and not automatic, BHP's refusal to award Powers an STI payment does not rise to the level of an adverse action.  *See Salazar v. Wynne*, No. 5:07-CV-00870, 2009 WL 10699498, at *2 (W.D. Tex. Feb. 5, 2009).  Powers confuses eligibility with entitlement.  When an employee is eligible to receive an STI payment, the Company has full

discretion in determining the percentage for the STI, which is based on performance and can range from 0% to 150% of the STI target.  *See* Ex. A-15 at 4.

More importantly, there is no casual connection between Powers's protected activity and the requirement for him to sign the release.  BHP required ***all exiting employees*** to sign the same release form before they could receive an STI payment.  See Kan Depo. at 81:23-82:25 ("Because it's standard process in terms of making people redundant. Anybody that we give a redundancy letter to has a release that they need to sign, so it's part of standard processing that I was following."); 88:12-15 ("I'm saying that in our standard past practice for all redundancies, there is a release letter tied to specific payments as part of your redundancy.").

 Therefore, when BHP refused to award Powers an STI payment, it was simply applying that general policy to Powers, not retaliating against him.  Powers has no evidence (because there is none) that BHP required only him, and not other exiting employees, to sign a release to receive the STI.  *See Manning v. Chevron Chem. Co., LLC,* 332 F.3d 874, 884 (5th Cir. 2003) (holding there was no causal link between refusing to award the employee a severance package and his protected activity because the employer required ***all employees*** to sign a release before receiving a severance package).

For those same reasons, BHP has a legitimate, non-retaliatory reason for not paying Powers the STI payment—the Company was following its general policy and practice of making all exiting employees sign a release.  *See Perks v. Town of Huntington*, 234 F. App'x 8, 12 (2d Cir. 2007) (holding that denying incentive pay because he refused to sign the waiver that ***all eligible employees*** were required to sign was a legitimate, non-discriminatory reason).  Powers simply has no evidence of pretext and therefore cannot establish his retaliation claims.

## C.    Powers's Breach of Contract Claim Suffers the Same Flaws

Powers also cannot establish a breach of contract claim under Texas law.  To establish a breach of contract claim, Powers must establish (1) the existence of a valid contract between plaintiff and defendant, (2) the plaintiff's performance or tender of performance, (3) the defendant's breach of the contract, and (4) the plaintiff's damage from the breach.  *Haag v. AOT Energy Am. LLC*, No. 13-cv-20-00351, 2022 WL 242750, at *3 (Tex. App.—Corpus Christi Jan. 27, 2022, no pet. h.).

Powers cannot show that BHP breached the terms of any contract.  Under the plain terms of the termination letter and the STI plan, Powers was not entitled to or guaranteed an STI payment.  Again, Powers is conflating eligibility with entitlement.  Instead, Powers was merely ***eligible*** to receive an STI payment if he met certain requirements.  The plan instructs employees "[t]o confirm eligibility, please contact your HR Business Partner."  *See* Ex. A-15 at 4.  The termination letter and Human Resources explained that ***all exiting employees*** have to sign a release to receive the payment.  *See* Ex. A-14.  Moreover, the plan itself details that a STI payment is not guaranteed.  *See* Ex. A-15 at 4 (explaining the "STI plan enables employees to earn performance-based pay" and "[a]s such, STI is variable and not fixed or guaranteed.").  Even more so, when an employee is eligible to receive an STI payment, the Company retains ***full discretion*** in determining the percentage for the STI, which BHP could decide to set at zero percent.  *Id.*

Courts routinely find that summary judgment is appropriate on breach of contract claims because the terms "eligible" and "discretionary" convey that there was no promise of a guaranteed bonus.  *See, e.g.*, *Haag*, 2022 WL 242750, at *4 (affirming summary judgment because the terms eligible and discretionary conveyed that the employer was not promising that the employee would absolutely receive an annual bonus); *see also Lewis v. Vitol, S.A.*, No. 01-05-00367-CV, 2006 WL 1767138, at *4–5 (Tex. App.—Houston [1st Dist.] June 29, 2006, no pet.) (mem. op.) (concluding

that the contract's use of the term "'eligible' indicated that the employee is not guaranteed a bonus, but is qualified, or eligible, to be considered for a bonus, and the phrase "[t]he bonus is at the sole discretion of the management" did not "contractually entitle[ ]" an employee to a bonus"). Powers's breach of contract claim thus suffers the same fate as his discrimination and retaliation claims.

## VI.  CONCLUSION

For the above-stated reasons, Defendant Broken Hill Proprietary (USA) Inc. prays that the Court grant its Motion for Summary Judgment all of Plaintiff Burak Powers's claims.

Dated: May 19, 2022

OF COUNSEL

Kimberly F. Cheeseman
State Bar No.  24082809
S.D. Tex. Id. No. 2254668
kimberly.cheeseman@nortonrosefulbright.com

Jesika Silva Blanco
State Bar No. 24098428
S.D. Tex. Id. No. 2780677
jesika.blanco@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:       (713) 651-5246

Respectfully submitted,

/s/ Shauna Johnson Clark
_____
   Shauna Johnson Clark
   State Bar No.  00790977
   S.D. Tex. Id. No. 18235
   shauna.clark@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:       (713) 651-5246

*Attorney in Charge for Defendant*

107938186.1

- 30 -

## CERTIFICATE OF SERVICE

This pleading was served in accordance with the Federal Rules of Civil Procedure on all counsel of record via the Court's CM/ECF system on this 19th day of May, 2022.

*/s/  Kimberly Cheeseman*
Kimberly F. Cheeseman

107938186.1