**U.S. DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BURAK POWERS** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:21-CV-01334** |
| | § | |
| **BROKEN HILL PROPRIETARY (USA)** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT BROKEN HILL PROPRIETARY (USA) INC.'S**
**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Dated: June 14, 2022

OF COUNSEL

Kimberly F. Cheeseman
State Bar No.  24082809
S.D. Tex. Id. No. 2254668
kimberly.cheeseman@nortonrosefulbright.com

Jesika Silva Blanco
State Bar No. 24098428
S.D. Tex. Id. No. 2780677
jesika.blanco@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:     (713) 651-5151
Facsimile:      (713) 651-5246

Respectfully submitted,

/s/ Shauna Johnson Clark
    Shauna Johnson Clark
    State Bar No.  00790977
    S.D. Tex. Id. No. 18235
    shauna.clark@nortonrosefulbright.com

Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:     (713) 651-5151
Facsimile:      (713) 651-5246

*Attorney in Charge for Defendant*

Defendant Broken Hill Proprietary (USA) Inc. ("BHP" or "Company") files this Reply in Support of its Motion for Summary Judgment ("Motion").[1] *See* Doc. 32.

## I.  ARGUMENT AND AUTHORITIES

Perhaps because Plaintiff Burak Powers ("Powers") realizes he has no evidence to support ***his own individual claims***, Powers spends the majority of his Response focusing on BHP's aspirational goal to increase female representation globally within the Company.  In doing so, Powers cites broad statements about overall management goals that were ***not*** directed at Powers (or even his group)***, not*** related in temporal proximity to any of the alleged adverse actions at issue, and ***not*** related to any employment decisions for Powers.  It bears repeating:  this is a disparate treatment discrimination case that requires individual evidence as to Powers.  Thus, any effort to point to alleged disparate impact or pattern-or-practice evidence does not save Powers's individual claims.

In sum, Powers alleges in his Response that (i) BHP's aspirational goal constitutes direct evidence of discrimination under *Frank v. Xerox Corp.*, 347 F.3d 130 (5th Cir. 2003); (ii) BHP tied annual bonus payouts to achieving a 3% increase in females in the workplace, which influenced the decision of the hiring managers for the positions to which Powers applied; (iii) BHP's restructuring decision expressly factored in gender balance and resulted in Powers's job being given to a woman; (iv) Powers can establish his prima facie case and pretext on all of his failure-to-hire claims; (v) Powers can establish pretext on his retaliation claim because a recent employee who was terminated received his STI payment without having to sign a release; and (vi) Powers can prove a fact issue exists as to whether BHP breached the Company's STI policy.

Each argument is without merit, and BHP addresses each in turn below.

---

[1] Any references in the Reply to page numbers are to the document's original pagination and not CM/ECF numbering.

A.      **Powers Has No Direct Evidence of Discrimination**

Powers simply has no direct evidence of sex discrimination.  Specifically, Powers alleges direct evidence of discrimination exists because (i) BHP created an "unprecedented" inclusion and diversity (I&D) program that set an aspirational goal of increasing females in the workplace by 3% and achieving gender balance; (ii) BHP tracked the progress toward that goal on a global basis and by business unit; (iii) BHP announced the Company's statistical progress toward the goal; and (iv) BHP included the aspirational goal as a Key Performance Indicator ("KPI") for purposes of the short-term incentive ("STI") bonus.  *See* Resp. at 25-26.

None of this, however, is direct evidence of discrimination as to Powers.  The Fifth Circuit has recognized that "direct evidence of discriminatory intent is rare." *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Mechelle v. USA Indus., Inc.*, No. 21-20481, 2022 WL 1262128, at *2 (5th Cir. 2022).  None of Powers's purported evidence satisfies that standard such that an inference or presumption would not be required.

Powers's reliance on *Frank v. Xerox Corp.* for his direct discrimination argument is misplaced.  First, unlike in *Frank*, BHP's diversity initiative set a global aspirational goal.  It is not an affirmative action plan that set specific and concrete targets by office, jobs, or grade levels. Further, the Fifth Circuit later clarified in *Carter v. O'Neill*, that even assuming the existence of an affirmative action plan, the plaintiff must still prove the plan was "***casually connected [to] his own individual work experiences*** with his failure to obtain the particular promotion[.]"  78 F. App'x 978, 979-80 (5th Cir. 2003) (Rosenthal, J. sitting by designation) (emphasis added).  The Fifth Circuit held that "merely establishing the existence of . . . programs to attain work force diversity in high-level technical and management positions within the [defendant organization] is

no substitute for [plaintiff] satisfying the burden in [a] private, non-class action lawsuit." *Id.* at 980. Accordingly, a plaintiff who seeks to "prove intentional discrimination through direct evidence of an affirmative action plan must show the existence of an affirmative action plan ***and*** demonstrate specific adverse consequences to the plaintiff in his particular adverse employment action." *See Halupka v. Fed. Express Corp.*, No. 03-CV-350, 2005 WL 8161037, at *14 (E.D. Tex. Sept. 22, 2005) (discussing decisions post-*Frank* and finding that plaintiff failed to prove a causal connection between defendant's affirmative action plan and the adverse actions). Powers simply has no direct evidence of discrimination because (1) BHP does not have an affirmative action plan, and (2) none of BHP's aspirational global goals were directed at Powers.

Here, the aspirational goal is not an affirmative action plan. Even more so, the record is devoid of any evidence that the relevant decision makers relied upon the I&D initiative or aspirational goal in making the decisions ***as to Powers***. The fact the Company tracked and kept statistics on the Company's progress and included the aspirational goal as a KPI demonstrates overall management goals. It does not demonstrate a causal connection as to any of Powers's specific employment decisions or positions to which he applied. Accordingly, Powers's emphasis on BHP's I&D program and the aspirational goal is insufficient to defeat summary judgment because neither constitutes direct evidence of discrimination. *See, e.g.*, *Carter*, 78 F. App'x at 980 (holding that plaintiff must still prove a causal connection between any affirmative action program and the adverse employment action at issue); *Halupka*, 2005 WL 8161037, at *14 (same); *see also Blanke v. Rochester Tel. Corp.*, 36 F. Supp. 2d 589, 597–98 (W.D.N.Y. 1999) ("The statements articulating [defendant's] broad goal of increasing the number of minority employees within its ranks contain no suggestion that white employees would be terminated in order to effectuate that goal. Even the statements concerning specific targets for the number of minority employees by

year's end do not in themselves suggest that whites would be let go in the process.  In any business, vacancies will arise from time to time as employees retire, resign, or get promoted or transferred. . . . [Defendant's] stated objectives, then, indicate no more than that managers should be on the lookout for, or actively recruit, minority candidates when positions did become open."); *Bernstein v. St. Paul Companies, Inc.*, 134 F. Supp. 2d 730, 739 n.12 (D. Md. 2001) ("A company's (or its CEO's) commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races and both genders, or fostering workplace tolerance, is not proof of discriminatory motive with respect **to any specific hiring decision**.  Indeed, it would be difficult to find today a company of any size that does not have a diversity policy." (emphasis added)).

**B.     BHP's Annual Bonuses Are Not Tied to the Aspirational Goal**

Powers incorrectly asserts that the Company "implement[ed] annual bonuses that are tied to the 3% yearly increase in females in the workforce." *See* Resp. at 1, 3-8, 12-14, 16, 21-22-23. As fully and accurately explained in BHP's Motion, the Company utilizes KPIs to assess Company performance.  *See* Doc. 32 at 5-6.  KPIs are goals the Company believes represent strong performance and which the Company hopes to achieve.  *Id.*  The KPIs assess performance across various measures, including health and safety, performance, portfolio, strategy, culture, risk, and social value.  *Id.*  As part of the I&D effort, BHP includes the Company's aspirational goal as a KPI.  *Id.*  When the Company determines the annual STI bonus pool, BHP evaluates *all* KPIs, with no particular KPI being mandatory or dispositive.  *Id.*  The STI bonus payouts for years 2019 and 2020 are illustrative of this point.  In announcing the STI bonus in 2019 and 2020, BHP announced the Company was **behind the aspirational goal in both years**, but in 2019 the bonus was paid out 80% whereas in 2020 the bonus was paid out at 114%.  *Id.*  Therefore, Powers's characterization that the bonus is "tied" to the aspirational goal is simply wrong given no KPI is mandatory or

dispositive.  *See* Doc. 32-1 at ¶ ("KPIs—including the KPI on gender balance—are goals BHP hopes to achieve.  They are not mandatory metrics.").

Moreover, Powers's attempts to argue that the decision makers at issue here were "incentivized" by the KPI ignore the reality of the summary judgment evidence—every decision maker expressly testified that no KPI played a role in their hiring decision.  *See* Doc. 32-1 at ¶¶ 23, 29 (explaining the decision "to hire Harrison was based on her qualifications and merit, not based on her gender or any KPI"); Doc. 32-6 at ¶ 9 (explaining "decision to hire Ms. Taylor was based on her qualifications and merit, not based on her gender or any [KPI] related to a gender initiative"); Doc. 32-8 at ¶ 6 (explaining "decision to hire Pechatnikov was based on her qualifications and merit, not based on her gender or any [KPI]").

Powers's reliance on a 2018 communication sent by Fiona Vines, Principal Inclusion & Diversity, to certain leaders regarding KPIs is misleading.  *See* Resp. at 26, Pl's Ex. AA.  Powers misconstrues this e-mail to state that BHP "instructed" the decisions makers that they had a "duty" to achieve balanced hiring and departures.  *Id.*  The e-mail does no such thing, and it actually includes several bullet points on "how" to achieve balanced hiring and departures—none of which involve hiring and promoting women only to exit men.  In fact, Vines expressly instructed leaders this was "not the intent" of the KPI.  *See* Pl's Ex. AA at BHP 0006011.  Instead, BHP appropriately explained that achieving balanced hiring and departures includes, among other things, working to review how job descriptions are written; assessing the capabilities required for the role; using social media and other innovative channels to build diverse pipeline of talent; considering "on boarding" interviews of new hires to hear about how inclusive their experience was; and using forums to understand how inclusive the culture is and make changes to improve retention.  *See* Pl's Ex. AA at BHP 0006012.

In short, BHP's global aspirational goal is not a mandatory metric tied to the Company's STI bonus payment, and Powers's attempts to paint the decision makers as having a financial incentive or instruction as to KPIs fall flat.

**C.    Powers's Position Elimination Discrimination Claim Fails as a Matter of Law**

In his Response, Powers argues that his role was not eliminated, but instead given to a woman (Clare Eilbeck) in November 2019. *See* Res. at 11-12; 28-29. Powers also argues that leaders were instructed by e-mail to consider gender balance aspirations as part of the World Class Functions ("WCF") reduction in force, and somehow this consideration adversely affected him. *See id.* Powers has no evidence to support either contention.

First, Powers's job was not "taken" from him and given to Eilbeck. As Paul Perry explained, the position Eilbeck filled "**was not the same position as Powers's previous role**." *See* Doc. 32-4 at ¶ 7 (emphasis added). The position Eilbeck filed was located in Australia, focused on group portfolio, and had a preference for a broad resource background (and not just Petroleum). *See id.* The mere fact both positions contained the title "Lead Principal" does not, in fact, mean they are the same position. *Id.* at ¶ 9 ("The job title 'Lead Principal' is used for several positions at the Company and does not render all positions the same."). Powers fails to offer any competent summary judgment evidence to support his contention that his former Houston-based position was the same as the position Eilbeck filled in Australia.

Second, Powers's reliance on the e-mail sent to Global I&D members does not save his claim. The e-mail is a request for Global I&D members to "consider raising" issues of gender balance aspirations in conversations about WCF. *See* Pl's Ex. UU. As explained in the e-mail, the Global I&D members are told they can "offer to assist teams who might want to learn more about bias and merit when it comes to selection, or who might need to understand more about how

to embed flex [working]." *Id.* Modeling also existed for teams in case they wanted to understand how different scenarios impact the overall company progress towards gender balance. *Id.* Other than offering assistance about the I&D initiative, there is nothing in this e-mail that relates to Powers, the decision to eliminate his position, and/or the reasons he was not selected for other roles.

Perry testified that one of the directives he received from Boston Consulting Group as part of the WCF was to flatten the organization and increase the number of direct reports per supervisor to eight or nine employees. *See* Doc. 32 at 7-8. Perry complied with this recommendation within PS&D by eliminating the manager role that Powers held. *Id.;* Doc. 32-5 at 14:18-22 ("So we decided across finance we were going to eliminate the manager role and flatten the structures."). Consistent with the WCF recommendation, this would increase Skip York's direct reports as he assumed supervision over those previously reporting to Powers. *Id.*; *see also* Doc. 32-4 at 34:9-36:24. There is simply no evidence that the e-mail from Global I&D played any role in Perry's decision to eliminate Powers's position.

Even more so, Perry expressly testified that even after he made the decision to eliminate Powers's position to comply with the WCF, he was "keen to keep [Powers] in the company." *See* Doc. 33-63 at 15:9-16:6. In fact, several e-mails show Perry's efforts to help secure Powers another position within the Company. *See* Doc. 32-1 at Ex. A-8. Perry even succeeded in securing Powers a short-term secondment to the Potash asset so that his employment could be extended until June 2020. *See* Doc. 32-8 at 8-9.

In sum, Powers's subjective belief that his position was "given" to Eilbeck and that sex was a factor in the decision to eliminate his role are insufficient to defeat summary judgment. This is even more true given Perry's efforts to help Powers after Perry made the elimination decision.

*See, e.g.*, *Garcia v. Penske Logistics, LLC,* 631 F. App'x 204, 212 (5th Cir. 2015) (emphasizing that an employee's subjective belief of discrimination is not sufficient to warrant judicial relief); *Blanke*, 36 F. Supp. 2d at 597–98 ("The statements articulating [defendant's] broad goal of increasing the number of minority employees within its ranks contain no suggestion that white employees would be terminated in order to effectuate that goal. . . . . [Defendant's] stated objectives, then, indicate no more than that managers should be on the lookout for, or actively recruit, minority candidates when positions did become open.").

## D.   For His Failure-to-Hire Claims, Powers Has Not Established a Prima Facie Case for Certain Positions or Pretext as to All Positions

Powers fails to raise a genuine dispute of material fact regarding the second prima facie element for certain positions, and similarly fails to raise a genuine dispute as to pretext on all of the positions.

### a.   Powers Cannot Establish a Prima Facie Case for Two Positions

For two positions[2]—(i) Head of Planning & PLT Support and (ii) Head of Financial Analysis—Powers cannot establish the second element of his prima facie claims. Specifically, Powers cannot show he was qualified for or actually applied to these positions.

First, regarding the Head of Planning & PLT Support role, Powers was not qualified because he did not have a recommendation from a PLT member and he was not on the internal talent list. *See* Doc. 32 at 21-22. In Response, Powers cites to *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) to argue that he satisfied all qualifications in the job description.

---

[2] In its Motion, BHP also discussed why Powers cannot establish the prima facie element as to the Lead Principal, SM&I in Australia—*i.e.*, that Powers was not qualified for the position in Australia. *See* Doc. 32 at 21-22. In his Response, Powers admits that he is not alleging a failure to hire claim as to this position (most likely because he knows he is not qualified). *See* Doc. 33 at 11 n.4. Instead, he is only suing under the theory that this position was his original job that was "taken" from him.

*See* Resp. at 27.  *Medina*, however, does not stand for this proposition.  In *Medina*, the only qualification given by the defendant was the applicant must have "substantial sales experience." 238 F.3d at 681.  The Fifth Circuit held this was a "subjective criteria" because what constitutes "substantial" is subject to interpretation.  *Id.*  The Fifth Circuit elaborated that an employer may not "utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification" at the prima facie stage.  *Id.*  As a result, the Fifth Circuit emphasized that for purposes of the second prima facie element, the inquiry is whether the plaintiff demonstrates that the ***objective*** qualifications have been met.  *Id.* (emphasis added).

Here, there is nothing "subjective" about BHP's qualifications.  For the Head of Planning & PLT Support role, Powers was not qualified because he did not have a recommendation from a PLT member and he was not on the internal talent list.  *See* Doc. 32 at 21-22.  Even if Powers tries to quibble that the "internal talent list" is subjective, it does not save his claim because he still lacks the ***objective*** criteria of a recommendation from a PLT member.  Even Powers admits he did not have this qualification.  *See* Doc. 32-2 at 214:3-9 ("Q. And you did not have anyone on the [P]LT recommend you for the head of planning role, did you? A. As far as I know, I did not."). Therefore, Powers's reliance on *Medina* is misplaced.

Second, regarding the Head of Financial Analysis position, he cannot meet his prima facie burden because he ***never applied for the role***.  The fact that he did not apply for the position is fatal.  *See Vital v. Nat'l Oilwell Varco*, No. 12-cv-1357, 2014 WL 4983485, at *26 (S.D. Tex. Sept. 30, 2014) (holding the fact that plaintiff did not apply for the position was fatal to his claim for discriminatory failure to promote).  Powers attempts to explain away this fact by claiming he was prevented from applying because BHP failed to disclose that this position could be located in Houston (instead of Australia).  *See* Resp. at 27-28.  Powers relies on *Dupont-Lauren v. Schneider*

*(USA), Inc.*, 994 F. Supp. 802, 818 (S.D. Tex. 1998) to support his argument.

*Dupont-Lauren*, however, is inapplicable.   In *Dupont-Lauren*, the court examined situations where a formal application may not be required for the second prima facie element.  *Id.* The two scenarios discussed by the court were (i) where the vacant position was never posted, or (ii) where the normal hiring procedures did not entail a formal application.  *Id.*  No such scenario exists here.  The Head of Financial Analysis position was posted and advertised to everyone as being based in Melbourne, Australia.  Irada Williams expressed her interest in the role, but only if it were located in Houston.   BHP agreed to change the location, and Williams—an actual applicant—was selected.  There is no evidence of sex discrimination since the role was advertised in the same way to both men and women, and Powers elected not to apply.  To be clear, Powers *chose* not to apply because the position was at an unfavorable geographic location.  This has nothing to do with Powers's sex, and Powers cannot establish the second prima facie element as to the Head of Financial Analysis role.

### b.    Powers Cannot Establish Pretext as to All of the Positions

Powers also fails to establish pretext as to **_all_** of the positions: (i) Head of Credit and Market Risk; (ii) Investor Roadshow Project Manager; (iii) Production Planner; (iv) Head of Planning & PLT Support; and (v) the Head of Financial Analysis (to which he did not actually apply).   For these positions, Powers claims that he establishes pretext in several ways—through comments made by York about the global aspirational goal; through an alleged statement by Morgan Hughes that BHP was looking to hire a woman; through the fact BHP includes the aspirational goal as a KPI; because Powers is clearly more qualified than the selected candidates; and because BHP "suspiciously manipulated" the hiring process such that he could not apply for one position.  *See* Resp. at 29-31.   As explained below, Powers fails to establish pretext as to all positions, and

summary judgment is proper.

### (1)      York's Statements

Powers's reliance on York's statements does not establish pretext.  As BHP explained in its Motion, York admitted he felt and vocalized his frustrations with the I&D initiative, but he stated he has never seen any of his concerns play out in employment decisions.  *See* Doc. 32-3 at 78:9-21 ("Q. Have you seen any of those frustrations that you may have expressed play out in any employment decisions?  A. No.").

But more importantly, York was not the decision maker for any of the positions at issue, nor was he even consulted in the hiring decisions.  *See* Doc. 32-3 at 76:6-15 ("Q. Just to make sure I'm clear, for the Investor Road Show, Production Planner, Head of Planning, and Head of Credit and Market Risk positions, were you consulted in the hiring decisions for those roles? A. No."). Accordingly, Powers cannot demonstrate that these remarks were made in temporal proximity to his adverse employment decisions, by someone with authority over that specific decision, and related to that decision.  *Reynolds v. Sovran Acquisitions, L.P.*, 650 F. App'x 178, 183 (5th Cir. 2016) (holding that remarks expressing a preference for male hires were insufficient to show sex discrimination when they were not proximate in time or related to the employment decision at issue); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 352 (5th Cir. 2007) (holding that comments about a desire to attract young talent were not evidence of age discrimination); *see Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (finding that management's goal to "identify . . . younger managers . . . for promotion to senior management over the next 5+ years, ultimately replacing senior management" was not evidence of pretext because it did not reflect a policy of firing older managers to make room for younger managers); *Smith v. Nine W. Grp., Inc.*, 3:98-CV-1331, 2000 WL 562456 (N.D. Tex. May 8, 2000) (holding that comment about

pressure from unidentified upper management personnel to fill the position with a woman was merely a stray remark and of no consequence because it did not relate to the plaintiff's claim).

### (2)   *Hughes's Statement*

Similarly unavailing is the alleged statement by Hughes that BHP was "looking to hire a female" for the Planning Principal II/Production Planner position.  *See* Resp. at 29.  The phrase "looking to hire" is telling because, even if the statement is true, all it does is reflect the objective that "managers should be on the lookout for, or actively recruit, minority candidates when positions . . . become open."  *Blanke*, 36 F. Supp. 2d at 597–98.  This does not establish pretext. In any event, although Hughes may have served on the interview panel, he was not the decision maker.  Irada Williams made the hiring decision.  As Williams explained, she did not believe Powers was best suited for the Planning Principal II role because it was a grade level lower than Powers's current level (Grade 13) and would not be a promotion or developmental opportunity, whereas it would be for Anna Pechatnikov (Grade 11).  *See* Doc. 32 at 12-13.  Moreover, Williams also expressly testified that her decision to hire Pechatnikov was based on her qualifications and merit, not based on her gender or any KPI.  *Id.*  Therefore, Powers's reliance on Hughes's statement fails to establish pretext.  *See Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) ("[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden.").

### (3)   *BHP's Aspirational Goal*

Powers also claims that BHP's aspirational goal constitutes pretext because leaders perceived the only way to achieve the KPI on gender balance was to "hire and promote women and only to exit men."  *See* Resp. at 29 (citing Pl's Ex. AA at BHP 0006011).  Powers, again, cherry-picks one incomplete sentence from the 2018 e-mail sent by Vines.  To be clear, this e-mail was sent in **June 2018**—well before any hiring decisions for the positions at issue.  Therefore, to

the extent there was any confusion on how to achieve the KPI, Vines cleared it up before any of the decision makers made the decisions as to Powers.  In fact, Vines expressly stated the intent of the KPI is **_not_** to hire and promote women and only exit men.  Instead, Vines offered leaders several action items on "how" to achieve KPI progress on gender balance.  As explained, this includes, among other things, reviewing how job descriptions are written; assessing the capabilities required for the role; using social medial and other innovative channels to build diverse pipeline of talent; considering "on boarding" interviews of new hires to hear about how inclusive their experience was; and using forums to understand how inclusive the culture is and make changes to improve retention.  *See* Pl's Ex. AA at BHP 0006012.  Therefore, Powers's reliance on a partial sentence from Vines's e-mail is unavailing.

Similarly, Powers alleges that BHP's "published and celebrated statistics regarding the large increase in female representation" is evidence of pretext.  *See* Resp. at 31.  Powers relies on statistics included in global publications and announcements for the entire company—not statistics related to any of Powers's specific employment decisions or positions to which he applied. Moreover, courts have repeatedly held that "[i]n an individual disparate treatment case, an individual plaintiff pursuing an individual claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence.  Instead, a plaintiff must present prima facie evidence that she individually was treated less favorably than a specific similarly situated employee.  Statistical evidence may not be used for this purpose."  *See Okeke v. Adm'rs of Tulane Educ. Fund*, No. 2:20-cv-450, 2021 WL 2042213, at *9 (E.D. La. May 21, 2021), *aff'd sub nom.*, 2022 WL 1025991 (5th Cir. Apr. 6, 2022). Powers's attempt to impute alleged pattern-or-practice type evidence to his individual claim fails.

### (4) *Clearly Better Qualified*

Powers alleges that he can also establish pretext because he is "clearly better qualified"

than the selected candidates for the positions at issue. *See* Resp. at 30. Powers conveniently glosses over the standard for proving whether a plaintiff is "clearly better qualified." As the Fifth Circuit has emphasized, the bar is "**set high for this kind of evidence**." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019) (emphasis added). A plaintiff cannot satisfy this burden "by showing that he is merely better than or as qualified" as the individual selected. *Id.* Instead, "[t]o carry this heavy burden, a plaintiff must show that the qualifications are so widely disparate that no reasonable employer would have made the same decision." *Id.* (internal quotation marks omitted). Courts generally defer to an employer's judgment calls regarding who is more qualified for a position. *Stockton v. Christus Health Se. Tex.*, 1:15-CV-333, 2017 WL 1287550, at *14 (E.D. Tex. Feb. 3, 2017).

Here, all Powers does is offer his personal beliefs as to why he is clearly better qualified. For each position, Powers offers through his own declaration an explanation as to "three skills" he believes he has and the selected candidates do not. *See* Resp. at 12, 15, 17, 20-21. Even assuming these are true, they do not "show that the qualifications are so widely disparate" such that Powers's qualifications "leap from record" when contrasted with the successful candidates. *See* Doc. 32 at 10-15 (detailing every position and the successful applicant); *see also McMichael*, 934 F.3d at 459; *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723 (5th Cir. 2002); *see also Meeks v. Gonzales*, No. 06-CA-182-DB, 2007 WL 4365769, at *7 (W.D. Tex. Dec. 11, 2007) ("[A] plaintiff's subjective belief that he was clearly better qualified is insufficient to establish pretext."). This is especially true given the Court is to defer to an employer's judgment calls regarding who is more qualified for a position. *See Stockton*, 2017 WL 1287550, at *14; *see also Meeks*, 2007 WL 436759, at *7 ("[T]he Court is not permitted to critique an employer's good faith decision in selecting one applicant over another." (citing *Deines v. Tex. Dep't of Protective & Regul. Servs.*, 164 F.3d 277,

282 (5th Cir. 1999))).  Accordingly, Powers's self-serving discussion of why he is "clearly better qualified" fails to meet the "high bar" required to prove pretext.

### (5)     *"Suspicious Manipulation"*

Last, Powers alleges that pretext exists as to the Head of Financial Analysis position—to which he did not apply—because BHP "suspiciously manipulated" the application process by hiding the fact the job could be based in Houston.  *See* Resp. at 31.  As discussed, there was nothing "suspicious" about the process.  The position was posted and advertised to everyone as being based in Melbourne, Australia.  Williams expressed her interest in the role, but explained that she would only do the position if it were located in Houston.  BHP agreed to change the location, and Williams—an actual applicant—was selected.  Powers does not allege (nor can he) that he also expressed an interest in the job and similarly asked to perform the position from Houston.  Nor does the case relied upon by Powers—*Watkins v. Tregre*, 997 F.3d 275, 285 (5th Cir. 2021)—have any similar facts or reasoning applicable here.  In short, Powers simply never applied to the position in Australia or asked to perform the role remotely like Williams did.  His claim of "suspicious manipulation" is nothing more than a convenient excuse as to his failure to act.

### E.     Powers's Retaliation Claim as to His STI Bonus Fails

As fully explained in BHP's Motion, the entirety of Powers's retaliation claim is that "days after he amended his EEOC Charge, BHP informed him that it would not pay him his STI of approximately $92,000 unless he first signed a release of all claims against BHP[.]"  *See* Doc. 1 ¶113.  In his Response, Powers argues that (i) his denial of the STI constitutes an adverse action, and (ii) pretext primarily exists because a recent employee, Adam Goss, exited the Company and

received his STI bonus without signing a release.[3]  *See* Resp. at 32-33.

Powers's argument as to his prima facie burden incorrectly assumes that payment of an STI award is guaranteed such that a refusal to pay would be an adverse action.  BHP's communications are clear:  STI payments are discretionary and "not fixed or guaranteed."  *See* Doc. 32-1, Ex. A-15 at 4.  Moreover, Powers confuses *eligibility* with *entitlement*.  When an employee is eligible to receive an STI payment, the Company has full discretion in determining the percentage for the STI, which is based on performance and can range from 0% to 150% of the STI target.  *See* Doc. 32-1, Ex. A-15 at 4.  Therefore, denial of an STI payment does not rise to the level necessary to qualify as an adverse action.  *See Salazar v. Wynne*, No. 5:07-CV-00870, 2009 WL 10699498, at *2 (W.D. Tex. Feb. 5, 2009).

Moreover, Powers claims pretext exists because a recent employee, Goss, was terminated and received his STI payout without signing a release.  *See* Resp. at 33, Pls' Ex. NNN.  But Powers fails to inform the Court about important details that belie Powers's argument.  As explained in BHP's Motion, BHP requires all exiting employees who are made redundant (like Powers) to sign a release to receive any STI Payment.  *See* Doc. 32 at 16-17; *see also* Declaration of Manson Kan ¶ 3 (hereinafter "Kan Dec ¶ __"), attached here as Def's Exhibit J.  Unlike Powers, BHP terminated Goss effective May 31, 2022 because an EthicsPoint investigation found that Goss engaged in inappropriate behavior that did not comply with BHP's Charter Values.  *See* Kan Dec ¶ 4.  In addition, BHP had previously coached Goss regarding inappropriate behavior with his colleagues. *Id.*  Typically, when BHP terminates an employee for behavior or performance (like Goss), BHP

---

[3] Powers also claims that pretext exists, in part, because Kotze stated in his deposition that an ERISA-governed severance policy requires execution of a release before receiving any STI payment.  *See* Resp. at 33.  But a review of Kotze's deposition reveals that he was "assuming" this language existed and he could not recall actually looking at a plan to this effect.  *See* Doc. 33-62, Pls' Ex. JJJ at 79:1-5 ("Q.  Okay.  Well I'll have to take a look at it.  But your testimony is you actually recall seeing specific references to the STI payment or you're just assuming that?  A.  I'm assuming that.").

does not offer the terminated employee any STI payment.  *Id.* at ¶ 5.

In anticipation of the merger with Woodside Energy, which was effective June 1, 2022, BHP had communicated that any individual who was employed by BHP on May 31, 2022 would receive a pro-rated STI payment for Fiscal Year 2022.  *Id.* at ¶ 6.  BHP did not require individuals employed on May 31st to execute a release to receive the pro-rated STI payment.  *Id.*  Because Goss was still an employee on May 31st, BHP determined that he was eligible to receive the pro-rated STI payment without requiring execution of a release.  *Id.*  **This decision was made as a result of the merger with Woodside.**  *Id.* (emphasis added).

In short, Powers's reliance on Goss amounts to a strawman argument given the dissimilarity in their employment separations from BHP.  Powers continues to lack any evidence that BHP does not require all employees ***who are exited as part of a redundancy*** to sign the same release form before they could receive an STI payment.  *See* Doc. 32-11 at 81:23-82:25 ("Because it's standard process in terms of making people redundant. Anybody that we give a redundancy letter to has a release that they need to sign, so it's part of standard processing that I was following."); *id.* at 88:12-15 ("I'm saying that in our standard past practice for all redundancies, there is a release letter tied to specific payments as part of your redundancy."); *see Manning v. Chevron Chem. Co., LLC,* 332 F.3d 874, 884 (5th Cir. 2003) (holding there was no causal link between refusing to award the employee a severance package and his protected activity because the employer required ***all employees*** to sign a release before receiving a severance package); *see also Perks v. Town of Huntington*, 234 F. App'x 8, 12 (2d Cir. 2007) (holding that denying incentive pay because he refused to sign the waiver that ***all eligible employees*** were required to sign was a legitimate, non-discriminatory reason).

**F.      Powers's Breach of Contract Claim Also Fails**

The crux of Powers's breach of contract arguments are the same as those he asserts in support of his retaliation claim—that he should have received his STI payment without signing a release.  *See* Resp. at 34-35.  As more fully explained in BHP's Motion, under the plain terms of the termination letter and the STI plan, Powers was not entitled to or guaranteed an STI payment.  Powers was merely ***eligible*** to receive an STI payment if he met certain requirements.  The plan instructs employees "[t]o confirm eligibility, please contact your HR Business Partner."  *See* Doc. 32-1, Ex. A-15 at 4.  The termination letter and Human Resources explained that all exiting employees have to sign a release to receive the payment.  *See id.*  Further, the plan itself details that a STI payment is not guaranteed.  *See* Ex. A-15 at 4 (explaining the "STI plan enables employees to earn performance-based pay" and "[a]s such, STI is variable and not fixed or guaranteed.").  Even more, when an employee is eligible to receive an STI payment, the Company retains ***full discretion*** in determining the percentage for the STI, which BHP could decide to set at zero percent.  *Id.*

As explained, courts routinely find that summary judgment is appropriate on breach of contract claims because the terms "eligible" and "discretionary" convey that there was no promise of a guaranteed bonus.  *See, e.g.*, *Haag v. AOT Energy Am. LLC*, No. 13-cv-20-00351, 2022 WL 242750, at *4 (Tex. App.—Corpus Christi Jan. 27, 2022, no pet. h.). (affirming summary judgment because the terms eligible and discretionary conveyed that the employer was not promising that the employee would absolutely receive an annual bonus); *see also Lewis v. Vitol, S.A.*, No. 01-05-00367-CV, 2006 WL 1767138, at *4–5 (Tex. App.—Houston [1st Dist.] June 29, 2006, no pet.) (mem. op.) (concluding that the contract's use of the term "'eligible' indicated that the employee is not guaranteed a bonus, but is qualified, or eligible, to be considered for a bonus, and the phrase

"[t]he bonus is at the sole discretion of the management" did not "contractually entitle[ ]" an employee to a bonus").  Powers's breach of contract claim continues to suffer the same fate as his discrimination and retaliation claims.

## II.  CONCLUSION

For the reasons stated above and more fully in its Motion for Summary Judgment, Defendant Broken Hill Proprietary (USA) Inc. prays that the Court grant its Motion for Summary Judgment all of Plaintiff Burak Powers's claims.

Dated: June 14, 2022                                    Respectfully submitted,

OF COUNSEL

Kimberly F. Cheeseman                          */s/ Shauna Johnson Clark*
State Bar No.  24082809                              Shauna Johnson Clark
S.D. Tex. Id. No. 2254668                           State Bar No.  00790977
kimberly.cheeseman@nortonrosefulbright.com          S.D. Tex. Id. No. 18235
                                                    shauna.clark@nortonrosefulbright.com
Jesika Silva Blanco
State Bar No. 24098428                          Norton Rose Fulbright US LLP
S.D. Tex. Id. No. 2780677                       1301 McKinney, Suite 5100
jesika.blanco@nortonrosefulbright.com           Houston, TX  77010-3095
                                                Telephone:    (713) 651-5151
Norton Rose Fulbright US LLP                    Facsimile:     (713) 651-5246
1301 McKinney, Suite 5100
Houston, TX  77010-3095                              ***Attorney in Charge for Defendant***
Telephone:    (713) 651-5151
Facsimile:     (713) 651-5246

## CERTIFICATE OF SERVICE

    This pleading was served in accordance with the Federal Rules of Civil Procedure on all counsel of record via the Court's CM/ECF system on this 14th day of June, 2022.

*/s/  Kimberly Cheeseman*
Kimberly F. Cheeseman

130423342.1