United States District Court
Southern District of Texas
**ENTERED**
November 21, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BURAK POWERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-1334 |
| | § | |
| BROKEN HILL PROPRIETARY (USA), | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This lawsuit raises a question that many companies are struggling to answer: What steps can a company take to encourage the promotion of women or unrepresented minorities to managerial positions without discriminating against men or individuals outside the protected class seeking the same opportunities?

BHP Billiton Limited is a multinational mining, metals, and petroleum company headquartered in Melbourne, Australia, and the parent company of the defendant, Broken Hill Proprietary. BHP consistently communicates to its employees, and to the public, its goal of a gender-balanced global workforce. To achieve this goal, BHP tracks its progress toward gender balance and communicates that progress to its employees. BHP's goal of achieving a balanced workforce may materially affect some employees' compensation. The company considers progress toward the goal of gender balance as a metric in determining the overall annual bonus pool and in determining individual bonuses for some employees. The facts disclosed in the record, both disputed and undisputed, put front and center the tension between a corporate ambition to achieve gender balance and the corporate need to comply with laws against gender discrimination.

Burak Powers worked as a Manager of Portfolio Strategy and Development at BHP in

Houston.  As a result of a global restructuring, BHP eliminated Powers's position in November 2019.  Over the following seven months—until his official termination date—Powers applied for four other positions at BHP, but each position went to a female applicant.  BHP also hired a woman to fill a position with a title similar to Powers's former position.  Powers chose not to apply for another position because it was in Australia, but BHP ended up shifting the position to Houston and hiring a woman to fill it.

Powers filed an HR complaint, without success, then filed an EEOC charge of sex discrimination.  After his job was eliminated and he was terminated, Powers amended his EEOC charge on July 16, 2020.  Shortly after that amendment, when Powers would not sign a claims-release form, BHP refused to pay Powers what would have been his previous year's bonus under the company's bonus plan.  After the EEOC sent Powers notice of his right to sue, he filed this lawsuit, bringing three claims: sex discrimination under Title VII, post-termination retaliation under Title VII, and breach of contract.

BHP has moved for summary judgment.  (Docket Entry No. 32).  BHP argues that Powers cannot show direct evidence of discrimination, cannot make a prima facie showing of discrimination, and cannot show that its stated reasons for its promotion decisions are pretextual. BHP denies that it retaliated against Powers for filing an EEOC charge and denies that it breached any contract to pay him a bonus because it retains discretion over whether to pay any bonus at all.

Having considered the pleadings, motion, response, reply, arguments of counsel, and the applicable law, the court denies BHP's motion.  The court finds factual disputes material to determining whether BHP engaged in unlawful sex discrimination or retaliation and whether BHP breached a contract relating to Powers's annual bonus.  The reasons are stated below.

I.      **Factual Background**

A.      **BHP's Inclusion and Diversity Initiative**

In 2016 and early 2017, BHP enacted an Inclusion and Diversity Initiative that included

the goal of increasing by 3% annually the representation of women in its global workforce.  The

Initiative stated that the ultimate goal was a gender-balanced global workforce by 2025.  (Docket

Entry Nos. 32-1 (Declaration of Marius Kotze ("Kotze Dec.")), Ex. A ¶¶ 12–13; 33-62 (Deposition

Transcript of Marius Kotze ("Kotze Tr.")) at 15:12–17).  BP explained that the Initiative was

intended to provide a workforce representative of the communities in which it operated.  (Kotze

Decl. ¶ 13).  The then-CEO, Andrew Mackenzie, publicly stated the company's desire to achieve

that balanced workforce and the need to take affirmative steps to achieve that balance within the

stated timeframe.  (Docket Entry No. 33-1 at 42–44).  The current CEO, Mike Henry, has continued

to embrace the gender-balance goal and timetable.  In 2021, Henry celebrated an increase in hiring

women, from 10.4% of new hires in 2016 to more than 60% from 2019 to 2020.  (Docket Entry

No. 33-16 at 3).[1]

To monitor progress towards its diversity goal, BHP issues "scorecards . . . for the entire

Company, each function, and every group."  (Kotze Decl. ¶ 8).  The scorecards contain "Key

Performance Indicators," indicating the progress toward various company goals.  (*Id*.)  Some

company leaders also receive scorecards containing various Key Performance Indicators.  (*Id.*

¶ 16).  Key Performance Indicators measure different aspects of BHP's business, including "health

and safety, performance, portfolio, strategy, culture, risk, and social value."  (*Id.* ¶ 9).  BHP presents

this data through "dashboards" with information on all Key Performance Indicators.  (*Id.*).  BHP

evaluates annual employee performance against certain Key Performance Indicators.  (*Id.* ¶¶ 10–

---

[1]  The court cites to CM/ECF pagination when a document is unpaginated, when a document is a
compilation of multiple independently paginated documents, or when pagination is otherwise unclear.

11).

After assessing company-wide performance, BHP establishes a "Short Term Incentive" bonus pool, out of which BHP pays annual employee bonuses.  (*Id.* ¶ 11; Kotze Tr. at 18:13–16).  Achieving success on the Key Performance Indicators is a major factor in determining the overall annual bonus pool and in determining which employees receive different bonus amounts. (Kotze Tr. at 20:7–20).  BHP defines the bonus pool percentage as the "percentage of Base Salary that may be earned when the Company and the employee all fully meet expectations (or target) for the financial year." (Docket Entry No. 32-1 at 118).  "The company and/or the employee may over- or under-perform relative to expectations."  (*Id.*).

No single Key Performance Indicator is mandatory or dispositive for setting the company bonus pool or individual employee bonuses, but BHP considers progress toward the 3% increase in female employees when determining the annual bonus pool.  (Kotze Decl. ¶ 16).  BHP also tracks as a Key Performance Indicator the contributions of certain individual departments and company leaders to achieving the 3% increase in female employees.  (*Id.* ¶ 16).  During at least one fiscal year, BHP distributed Key Performance Indicators reporting the progress of departments and managers to "achieve [gender] balanced hiring and departures" to select company leaders outside the "top 400," such as "General Managers/Heads of Function and VPs."  (Docket Entry No. 33-27 at 3, 6).[2]

BHP tracks gender representation in hiring, promotion, and voluntary exits, both globally and by specific business lines, and reports these data points monthly.  (*See, e.g.*, Docket Entry No. 33-48 at 4).  A monthly "Inclusion and Diversity Dashboard" provides data on the representation

---

[2] Nothing in this document explicitly states that "General Managers/Heads of Function and VPs" are necessarily outside the "top 400," but the document does state that "[m]ost leaders at this level don't have scope in the role to achieve the 3% KPI."  (*Id.* at 6).

of women in leadership positions, the ratio of men to women hired from outside the company, the promotion rate by sex, and the voluntary turnover rate by sex.  (*Id.*)  The monthly dashboard often includes recommendations on how to improve these numbers to increase the number of women in the BHP workplace.  (*Id.*)  Half-year progress reports and fiscal year scorecards also track female representation.  (*See, e.g.*, Docket Entry Nos. 33-4 (a half-year progress report); 33-22 (a fiscal year scorecard for the petroleum division)).

BHP states to its employees that achieving the Key Performance Indicators, including the 3% goal, affect annual bonuses.  (Docket Entry Nos. 33-7 at 1–2; 33-63 at 42:18–24; Kotze Tr. at 18:17–21; 20:15–20).  For example, a 2019 email from the BHP Petroleum President, Geraldine Slattery, explained that falling short of the 3% goal for the year factored into the reduced bonus pool of 80%.  (Docket Entry Nos. 33-31 at 5).  A follow-up email from Slattery reminded recipients that, "as you know, the full-year Scorecard is used to determine the overall BHP Short Term Incentive pool for FY20."  (Docket Entry No. 33-41 at 3).  The 2020 fiscal year scorecard for the Portfolio Strategy and Development division—Powers's former division—established a Key Performance Indicator to evaluate employee contributions to increasing the number of women in the company by 4% with respect to employees paid at BHP salary grade 12 and above.  (Docket Entry No. 33-1 at 111).

In 2019 and 2020, the company did not meet its 3% goal, but those years saw an 80% bonus and a 114% bonus, respectively.  (Kotze Decl. ¶ 17).  The bonus percentage figure reflects the portion of the available bonus pool, determined as the total of all individual target bonus amounts (themselves determined as a percentage of salary), which is available to be paid in bonuses.  If the company achieves all its stated goals, the amount is 100%.  In its discretion, the company may adjust the percentage figure up or down despite the achievement or failure to achieve its stated

goals, and company leaders then have discretion to modify individual bonus outcomes within the available bonus pool.  (*See generally* Docket Entry No. 33-13 ("Short-Term Incentive (STI) Participant Plan Guide," dated June 2020)).

In 2018, BHP clarified its goal of increasing female employees in the company by 3%, apparently in response to reports of misperceptions in the workforce about what the goal meant. (Docket Entry No. 33-27 at 5).  In an information sheet distributed in June 2018 by Fiona Vines, BHP's Principal for Inclusion and Diversity, BHP acknowledged that the "unintended message sent to the business was that we only care about women, not diversity in the broader sense, and that the only way to achieve this [Key Performance Indicator] was to hire and promote women and only to exit men."  (*Id.*).  The information sheet stated that it "was not the intent of this [Key Performance Indicator]" to suggest that "the only way to achieve this [Key Performance Indicator] was to only hire and promote women and to only exit men."  (*Id.*).  Vice Presidents Niall McCormack and Todd Lee—both later involved in promotion and hiring decisions in which Powers was not selected but a woman was—received this information sheet in an email from Jason Limerick, the Leadership & Culture Manager for Petroleum.  (*Id.* at 2).

B.     **Powers's Employment with BHP**

Powers began working at BHP in 2013.  In June 2017, BHP promoted Powers to a managerial position with three direct reports.  Powers was nominated to BHP's Future Emerging Leaders Program that same year.  When Powers's employment was at risk because of BHP's restructuring—discussed in more detail below—a BHP human-resources manager stated that Powers was a "high potential talent" and asked whether another position could be found for him. (Docket Entry No. 33-45 at 3).  Despite Powers's promotion and his acknowledged talent, his supervisor, Skip York, received complaints about Powers's communication style and lack of professional etiquette.  (Docket Entry No. 32-1 at 38–39).  BHP offered Powers the opportunity to

work with an executive coach hired and paid for by BHP.  (*Id.* at 44).  Powers declined the offer and refused coaching.  (Docket Entry No. 32-3 (Deposition Transcript of Skip York ("York Tr.")) at 61:5–18).

BHP initiated a global restructuring in November of 2018, called "World Class Functions," which sought to "flatten the organization and increase the number of direct reports per supervisor." (Docket Entry No. 32 at 16; *see* York Tr. at 32:24–35:4).  Paul Perry, Vice President of Strategy, informed Powers that his job was being eliminated because of the restructuring.  (Docket Entry No. 32-5 (Deposition Transcript of Paul Perry ("Perry Tr.")) at 12:25–14:22).  A month earlier, BHP had urged its leadership via email to "leverage this transformation [that is, the restructuring] to accelerate our progress" toward the company's gender-balance goals.  (Docket Entry Nos. 33-47).  Powers was given a temporary secondment to BHP's potash group in Saskatoon, Canada, but it expired in June 2020.  Unless he secured another job within BHP, Powers's employment at BHP would end at that time.  (Docket Entry No. 33-30 (Deposition Transcript of Burak Powers ("Powers Tr.")) at 116:22–120:9).

A year after BHP eliminated Powers's position as the Manager for Portfolio Strategy and Development, it posted a position for Lead Principal for Portfolio Strategy and Development, located in Australia.  (*Id.* at 283:15–284:1).  Powers contends that this Lead Principal position was his previous position under a different name.  (*Id.*)  BHP argues that this position had a broader strategic focus than Powers's previous position.  (Docket Entry No. 32-4 (Declaration of Paul Perry) ¶ 7).  To fill the Lead Principal position, BHP hired Clare Eilbeck, a member of the Portfolio Strategy and Development group that was already based in Australia.  (*Id.* ¶¶ 5–8).

After BHP eliminated Powers's position, Powers applied to various other positions at BHP, without success.  Powers first applied for the Head of Credit and Market Risk position, which

represented a promotion from his previous position.  In March 2019, Vandita Pant, BHP's Chief Commercial Officer and hiring manager for the position, informed Powers that he had not been selected.  Instead, BHP hired Juliet Taylor.  As a member of BHP's Executive Leadership Team, (Kotze Tr. at 26:3–8), Pant earned a Key Performance Indicator for her contributions to achieving BHP's 3% goal.  (*Id.* at 20:21–21:7).

Powers next applied for the Investor Roadshow Project Manager position.  This position had been announced in July 2019 through BHP's "expression of interest" process, indicating that the hiring manager already had a candidate in mind.  (Kotze Decl. ¶¶ 18–20).  The hiring manager, Niall McCormack, then Vice President of Exploration and Appraisal for Petroleum, had already identified Jeanie Harrison as the preferred candidate.  (*Id.* ¶¶ 18, 20). Powers interviewed for the position.  In an email, McCormack informed Powers that he was not selected, noting that BHP "had quite a few applicants with fairly specialized skills in the investor relations space."   (Docket Entry No. 33-1 at 31).  BHP hired Jeanie Harrison for the position.  Todd Lee, Vice President of Transformation, Performance, and Planning, also participated in the decision to hire Jeanie Harrison for the position.  ((Kotze Decl. ¶¶ 18).  As a "top 400" leader, (Kotze Tr. at 25:11–25), McCormack received a positive Key Performance Indicator for his contribution to BHP's 3% goal. (*Id.* at 20:21–21:4).

The same month that the Investor Roadshow Project Manager position was announced, Powers designated himself as "not mobile," meaning that he could not be considered for assignments out of the country.  Powers withdrew an application for a position in Australia as a result.

In 2019, Powers applied for a position originally titled "Production Planner."  In October 2019, dissatisfied with the candidate pool for the position to which Powers had applied, Irada

Williams and her boss at the time, Todd Lee, redefined the position and renamed it "Production Planner II." (Docket Entry No. 33 at 17).  Without reposting the position, BHP hired Anna Pechatnikov to fill it.   (Docket Entry Nos. 33-61 (Deposition Transcript of Irada Williams ("Williams Tr.")) at 29:5–9).

Powers also applied to be Head of Planning.  In June 2020, Brian Sklar, Principal of Human Resources, emailed Powers to inform him that BHP would not interview him for the position. (Docket Entry No. 33 at 19).  Instead, BHP had hired Jeanie Harrison, who had previously been hired for the Investor Roadshow Project Manager position.  (*Id.*)  In an email to Powers, Sklar stated that BHP was seeking candidates for the position who had held Manager or "Head Of" positions, who had a Petroleum Leadership Team recommendation, and who were on an internal Talent List of people with management experience.  (Docket Entry No. 33-10).  Powers was not on that list.  (Kotze Decl. ¶ 27).  Todd Lee made the hiring decision for the Head of Planning position.  Niall McCormack also participated in the hiring decision.

Powers apparently contemplated applying for the Head of Financial Analysis for Transactions position, located in Australia, but he did not do so.  (*Id.*).  In June 2020, BHP announced that Irada Williams would fill this newly created position.  (*Id.*).  Rod Mainland, Vice President of Decision Evaluation, had used a headhunter to locate Williams and then convinced her to apply for the position. After Williams expressed doubts about a position in Melbourne, Australia, Mainland moved the position from Australia to Houston, where Williams took the job. (*Id.*)

On July 11, 2020, Powers's temporary secondment ended, and Powers was terminated. (Powers Tr. at 258:7–259:1).  Powers rejected a severance package of $86.474.59, which was conditioned on him signing a claims release.  (*Id.*  at 260:6–12).  BHP pays annual bonuses based

on a July 1 to June 30 fiscal year.  (Docket Entry No. 33-13 at 4).  Employees leaving the company between July 1 and September 30 and who are deemed "Good Leavers" remain eligible to receive their bonus payment for the previous fiscal year.  (*Id.* at 7).  Powers was terminated within this window, and BHP deemed him a "Good Leaver."[3] (Docket Entry No. 33-60, Deposition Transcript of Manson Kan ("Kan Tr.") at 68:3–5).  Powers's potential bonus totaled $92,050.  (Docket Entry No. 33-65 (Affidavit of Burak Powers) ¶ 26).  BHP refused to pay Powers his bonus unless he signed a release of all claims against BHP, which BHP argues is a standard policy for terminations made on the basis of redundancy.  (Kan Tr. 81:23–82:25).  Powers refused to sign the release.  He was not paid any bonus, despite his "Good Leaver" status.

### C.   Powers Complains to BHP and to the EEOC

In October 2019, before his termination, Powers submitted a complaint to Marius Kotze, head of Human Resources.  (Docket Entry No. 33-2).  In the complaint, Powers stated that he was better qualified than the two female candidates hired for the Head of Credit and Market Risk and Investor Roadshow Project Manager positions.  (*Id.*)  After an internal investigation, BHP determined Powers's complaint to be unsubstantiated and concluded that the hiring for the positions had been based on merit.  (Docket Entry No. 32-1 at 90–103).

On December 6, 2019, Powers filed a Charge of Discrimination with the EEOC.  (Docket Entry No. 33-1).  Powers alleged that BHP discriminated against him based on his sex because BHP hired women with lesser qualifications for the Head of Credit and Marketing Risk, Investor Roadshow Project Manager, and Production Planner positions.  Powers also alleged that BHP reopened his former position and filled it with a woman, and that BHP had not answered his HR complaint.

---

[3]  Employees who are terminated for redundancy and receive the approval of the relevant Vice President are typically deemed "Good Leavers."  (Docket Entry No. 33-13 at 7).

In July 2020, after his termination Powers filed an amended EEOC charge to include the Head of Planning position.  (Docket Entry No. 33-12).  Powers also added an allegation of discrimination with respect to the Head of Financial Analysis for Transactions position, for which he had not applied. After the EEOC issued a notice of right to sue, Powers timely filed this lawsuit.

## II.    The Rule 56 Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting FED. R. CIV. P. 56(a)).  "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[] and identifying" the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of material fact warranting trial."  *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted).  "However[,] the movant 'need not negate the elements of the nonmovant's case.'"  *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).  "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion."  *Sanchez v.  Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the 'precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). Of course, all reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss*, 33 F.4th 774, 779 (5th Cir. 2022). But a nonmovant "cannot defeat summary judgment with 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 369 (5th Cir. 2021) (quoting reference omitted).

## III.   Analysis

### A.   The Summary Judgment Record

#### 1.   The Motion to Strike

Powers has moved to strike certain paragraphs from the declaration of Marius Kotze, submitted in support of BHP's motion for summary judgment, because those paragraphs are not based on Kotze's personal knowledge. (Docket Entry No. 34 at 1). During the relevant period, Kotze was the head of Human Resources for Petroleum. (Docket Entry No. 36 at 2). Powers states that the paragraphs in question relate to the motivations of BHP decisionmakers for not selecting him for two of the positions for which he applied. (Docket Entry No. 34 at 2). Powers argues that, to the extent some of the paragraphs are based on an internal BHP human resources investigation containing unsworn statements, those paragraphs should be stricken as double hearsay. (*Id.*). BHP contends that Kotze had personal knowledge "based on information obtained from other persons, reasonable inquiry, and [BHP] business records." (Docket Entry No. 36 at 3). Kotze is BHP's corporate representative for this lawsuit. (*Id.*). BHP points to Fifth Circuit caselaw that, it argues,

shows that "personal knowledge" is not limited to knowledge gained directly and contemporaneously by the declarant. (*Id.* 5).

Kotze was the Head of Human Resources for Petroleum during the relevant period, and he is designated as BHP's corporate representative. Personal knowledge may include knowledge gained from other company employees and from reviewing company records. *See In re Green*, 968 F.3d 516, 524 (5th Cir. 2020). BHP has presented a sufficient predicate for the court to consider his declaration in the summary judgment analysis. The court denies the motion to strike. Powers may reassert arguments about Kotze's testimony at trial, if Kotze testifies.

### 2. Motion to Supplement the Summary Judgement Record

Powers has filed a motion to add the affidavit of Adrian Purdy to the summary judgment record. (Docket Entry No. 39). Powers submitted Purdy's affidavit on August 12, 2022, after the parties filed their briefs on the summary judgment motion. (*Id.*). Purdy was a Houston BHP employee from June 2011 through August 2018. (Docket Entry No. 39-1 ¶ 3). Powers's attorney first contacted Purdy on June 2, 2022, and Purdy attributes the delay in obtaining his affidavit to his busy schedule, the fact he contracted COVID, and his need to return to Australia for a family emergency. (*Id.* ¶ 8–10). BHP opposes the addition of Purdy's affidavit to the record, arguing that it was not timely filed, does not contain relevant evidence, and that it would unfairly prejudice BHP. (Docket Entry No. 40).

In his affidavit, Purdy recounts that he "was personally instructed . . . to hire two females for two openings." (*Id.* ¶ 5). The two positions are not those to which Powers applied, but McCormack was a decisionmaker with respect to two of the positions to which Powers did apply. (Docket Entry No. 41 at 2). Purdy states that when he objected to the instruction to hire women for the two openings, even if there were "numerous better qualified males," he was told by Niall McCormack and Paul McIntosh "that they had to hire females to meet BHP's gender balancing

13

targets." (Docket Entry No. 40 ¶ 5.). Purdy filed a company complaint about the incident and alleged that BHP discriminated based on sex. (*Id.* ¶ 7).

As the court explains below, evidence of the alleged unlawfulness of BHP's gender-balance goals is relevant evidence of direct discrimination or of pretext. Furthermore, Purdy states that he submitted the substance of his affidavit in an internal complaint to BHP. The court agrees with Powers that the fact that BHP has had the opportunity to investigate Purdy's complaint minimizes the risk of prejudice. The court grants the motion to add Purdy's affidavit to the summary judgment record.

### B.    Title VII Sex Discrimination

"A Title VII plaintiff may make out a prima-facie case of discrimination using either direct or circumstantial evidence." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018) (quoting reference omitted). BHP argues that the undisputed facts show that Powers cannot raise a triable issue as to his claim of unlawful discrimination on the basis of sex, based on either direct or circumstantial evidence.

Powers argues that BHP's use of the Key Performance Indicators and other metrics to meet the company goal of hiring a certain number of women and making bonus amounts depend in part on whether that goal was reached, is unlawful gender discrimination. Powers alleges that as a result of the gender-balance program, he suffered adverse employment decisions in the form of failures to promote or transfer that ended in his termination. Certain kinds of affirmative action programs may be direct or indirect evidence of discrimination. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003). If the plaintiff presents sufficient credible evidence that the program embodied a discriminatory animus that "motivated or was a substantial factor" in an employment decision, the burden shifts to the employer to show that the "same decision would have been made regardless of the forbidden factor." *Id.* (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d

858, 861 (5th Cir. 1993)).  Evidence that an adverse employment decision followed an affirmative action plan may be direct evidence of unlawful discrimination unless the affirmative action plan is valid.  *Id.*  (citing *Bass v.  Bd. of Cnty. Comm'rs.*, 256 F.3d 1095, 1111 (11th Cir. 2001).  The plaintiff has the burden to show an affirmative action plan's invalidity.  *Messer v. Meno*, 130 F.3d 130, 136 (5th Cir. 1997).  The plaintiff also has the burden to show "a causal nexus between the affirmative action plan and the adverse employment action" suffered by the plaintiff.  *Halupka v. Fed. Express Corp.*, No. 3-cv-350, 2005 WL 8161037, *14 (E.D. Tex. Sept. 22, 2005).  A plaintiff who merely establishes a "general pattern or practice of discrimination" does meet this burden. *Carter v. O'Neill*, 78 F. App'x 978, 980 (5th Cir. 2003) (citing *Frank,* 347 F.3d at 136) (a pattern- or-practice method of proof is not available in private, non-class action lawsuits).  The evidence must connect an affirmative action plan to an individual adverse employment action to be direct evidence of discrimination.  *Carter,* 78 F. App'x at 980.

Under Title VII, an affirmative action plan may be valid when it addresses "imbalances in traditionally segregated job categories."  *Sharkey v. Dixie Elec. Membership Corp.*, 262 F. App'x 598, 603 (5th Cir. 2008) (quoting reference omitted).  A valid plan addressing manifest gender imbalance does not "unnecessarily trammel the interests of the [male] employees" by requiring the discharge of male employees and their replacement with female hires; create "an absolute bar to the advancement of [male] employees"; or exist as more than a temporary measure, designed not only to "eliminate a manifest [gender] imbalance" but to maintain the new balance. *Johnson v. Transp. Agency, Santa Clara County*, 480 U.S. 616, 630 (1987) (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979)).

BHP argues that its Inclusion and Diversity Initiative and its gender-balance goal are not direct evidence of discrimination.  (Docket Entry No. 32 at 19).  BHP argues that the gender-

balance goal is aspirational and not an affirmative action plan.  (*Id.*).  BHP argues that Powers cannot show that he suffered specific adverse consequences because of the Initiative.  (*Id.*).  In response, Powers points to an email showing that BHP instructed McCormack and Lee that their Key Performance Indicators used to calculate their annual bonus pool included a duty to "[a]chieve balanced hiring and departures (equal % M/F exits)." (Docket Entry No. 33 at 33 (quoting Docket Entry No. 33-27 at 6)).  Powers also notes that Perry, McCormack, Lee, and Pant were within the group of leaders whose personal Key Performance Indicators tracked their contributions to the 3% goal.  (Kotze Tr. at 24:20–25:25, 26:3–8; Perry Tr. at 42:10–43:5)).  Perry, McCormack, Lee, and Pant all played roles in hiring women for roles to which Powers applied.

In *Frank,* the Fifth Circuit evaluated a plan similar to the one at issue here. In *Frank*, the employer's efforts to track and balance the racial and gender composition of its individual offices spurred its Houston office to create its own localized reports.  *Frank*, 347 F.3d at 133.  The Houston office identified race-balancing goals for each job and grade level.  *Id.* at 137.  Managers were evaluated, in part, on how well they complied with the balancing program.  *Id.*  The Fifth Circuit reversed the district court's grant of summary judgment for the employer, holding that these facts constituted direct evidence from which a jury could conclude that the employer specifically considered its balancing goals in its hiring process, adversely affecting the plaintiff's employment opportunities.  *Id.*

BHP admits that its program seeks "to achieve gender balance in the workplace . . .  in which the employee population is fairly representative and reflective of the communities in which [BHP] operate[s]." (Kotze Decl. ¶ 13).  BHP admits that it tracks and announces progress toward the 3% hiring goal and the gender composition of the workforce.  BHP admits that it considers progress toward achieving gender balance in determining the annual bonus pool. BHP further

admits that some leaders' scorecards also include the Key Performance Indicator related to achieving the 3% goal.  BHP contends that because no Key Performance Indicator is "mandatory or dispositive," Powers cannot show that the bonuses for those making the hiring decisions were "tied" to the 3% Key Performance Indicator.  (Docket Entry No. 35 at 4).  BHP also points to the testimony of some of the relevant decisionmakers denying that they were motivated to hire women over Powers because of the 3% Key Performance Indicator or because of the effect of the Indicator on their own bonuses.  (*Id.* at 5).

The record discloses factual disputes as to whether BHP's gender-balance goal, including its tie to the performance evaluation and bonuses of those making the hiring and promotion decisions at issue, amounts to an unlawful affirmative action plan that adversely affected Powers's employment.  Like the employer in *Frank*, BHP implemented a program to increase the proportion of women employees and tracked its progress towards its goal.  *Frank*, 347 F.3d at 133.  Although the program at issue in *Frank* concerned both the racial and gender makeup of the employer's workforce at a single office, BHP cites no authority for its argument that a "global aspirational goal" for gender representation is valid as a matter of law.   (Docket Entry No. 32 at 19). The record discloses factual disputes material to determining whether BHP's approach to hiring and promotion decisions was merely "aspirational" or whether it was viewed as a requirement by the employees making those decisions.  Characterizing the program as "aspirational," despite the relationship to employee bonuses, does not determine whether or not the approach goes so far in the direction of gender preference as to constitute unlawful gender discrimination.

In *Frank*, the court held that an affirmative action plan itself could be direct evidence of discrimination.  *Frank*, 347 F.3d at 137.  The Fifth Circuit noted such evidence as "[s]enior staff notes and evaluations . . .  indicat[ing] that managers were evaluated on how well they complied

with the [plan] objectives." *Id.* Under *Frank*, to raise a material factual dispute, Powers need not show that BHP's statements about the Key Performance Indicators were directed to hiring or promotion decisions involving Powers in particular. Rather, the company's statements bear on the relationship of the plan to hiring and promotion decisions in general. Modifying the language of *Frank* to fit the present dispute makes this point plain: "A jury looking at these facts could find that [BHP] considered [gender] in fashioning its employment policies and that because [Powers was] [male], [his] employment opportunities had been limited." *Id.*; *see also Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 695 (8th Cir. 2009) (characterizing *Frank* as "finding direct evidence of unlawful discrimination where the employer explicitly identified racial goals and managers were evaluated on how well they complied with the affirmative action policy's objectives").

Aside from direct evidence of discriminatory animus, Powers can raise a factual dispute as to unlawful discrimination by applying the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, a plaintiff must first make a prima facie showing that: 1) the plaintiff was a member of a protected class; 2) the plaintiff was qualified for the position; 3) the plaintiff experienced an adverse action related to that position; 4) and the person hired instead of the plaintiff was not a member of the protected class. *Frank*, 347 F.3d at 137. The burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the challenged employment actions. *Id.* The burden then shifts back to the plaintiff to point to evidence supporting an inference that the employer's reason is pretextual. *Id.*

BHP argues that Powers cannot make a prima facie showing with respect to the positions of Head of Planning & PLT Support, Head of Financial Analysis, and Lead Principal, SM&I in

Australia.  BHP argues that Powers was not qualified for the Head of Planning & PLT Support position, and that because Powers did not apply for the Head of Financial Analysis position, he suffered no adverse employment action when he was not hired for that position.  Finally, BHP argues Powers was not qualified for the position of Lead Principal, SM&I, based in Australia.

As to the Head of Planning & PLT Support position, Powers argues that whether an applicant is qualified or not is evaluated according to the requirements stated in the job posting, which he met.  The record creates factual disputes material to determining Powers's qualifications, both in terms of eligibility for the position and in terms of how his qualifications compared to the qualifications of the applicant who was selected.  *Medina v.  Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) (observing that "other circuits have concluded that a prima facie case is established once the plaintiff demonstrates that objective employment qualifications have been met" and agreeing with that conclusion).  Powers argues that he did not apply for the Head of Financial Analysis position because BHP initially placed the position in Australia, and only later moved it to Houston.  Williams testified that before she interviewed for the position, in January or February 2019, she expressed concerns to the hiring manager, Rod Mainland, about its Australian location. (Williams Tr. at 62:18–62:12; *id.* at 63:25–1).  Mainland suggested to Williams that the position might be made a "global" role and could be located in places other than Australia.  (*Id.* at 62:18–21).  Williams believes that the decision to make the position "global" was made around May 2019.  (*Id.* at 63:1–3).  She did not recall whether BHP ever posted the position as indicating a location other than Australia.  (*Id.* 63:5–16).  It is not clear whether BHP changed the location of the position before the application deadline closed.

As an initial matter, in situations involving evidence of direct discrimination, the burden-shifting framework does not apply.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121

(1985) (explaining that a prima facie case is not necessary to show discrimination when there is direct evidence). At least in some situations, a potential candidate's failure to apply does not necessarily bar a plaintiff from making a prima facie showing of discrimination. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977).  Although BHP's policies do not reflect the "most entrenched forms of discrimination" in which any application would be no more than a "vain gesture," *id.*, there are other situations in which a plaintiff need not have applied to the position in question in order to make a prima facie case., such as when an employer does not post a vacant position in which the plaintiff employee has expressed interest, or when the employer fills it without the plaintiff employee's knowledge.  *Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 818 (S.D. Tex. 1998) (collecting cases); *see also Kolpakchi v. Principi,* 113 F. App'x 633 (5th Cir. 2004) (discussing *Dupont-Lauren* without adopting or rejecting its use of out-of-circuit cases).  Powers had actively applied to jobs within BHP, establishing his interest in open positions.  Powers states that he refrained from applying for the Head of Financial Analysis position because, as posted, it was located in Australia.  (Powers Tr. at 61:1–7).  Powers states that had BHP advertised the position as located in Houston, he would have applied. (*Id.*).  Under these circumstances, the lack of an application does not bar Powers's ability to make a prima facie showing under the burden-shifting framework.

Additionally, Powers does not argue that he suffered an adverse employment action because he was not selected for the Australia-based Lead Principal position.  Instead, he argues that BHP eliminated his position in Houston in order to create a similar position and hire a woman to fill it.  Powers has made a prima facie showing of gender preference amounting to discrimination.

BHP argues that even if Powers can make a prima facie showing under *McDonnell*

*Douglas*, he cannot raise a factual dispute material to showing pretext.  BHP argues that Powers cannot show that he was clearly better qualified than the hired candidates. (Docket Entry No. 32 at 29 (citing *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 n.2 (5th Cir. 2002)).  In response, Powers points to *Messer*, in which the Fifth Circuit found that reliance on a gender-balancing plan in hiring decisions supported an inference of pretext, precluding summary judgment.  *Messer v. Meno*, 130 F.3d 130, 139 (5th Cir. 1997).  In *Messer*, the Texas Education Agency followed an approach similar to BHP's to achieve racial and gender balance.  *Id.*  The Agency stressed the importance of balanced hiring and promotional practices, reported internally on the efforts to increase racial and gender diversity in the workplace, and instructed its managers to weigh the goal of increasing racial and gender representation in hiring decisions.  *Id.*  The court held that the plaintiff had shown facts from which a jury could conclude that the Agency's professed rationale for promoting others over her was pretextual, despite the fact the promoted employees were qualified for their positions.  *Id.*  Similarly, BHP's gender balancing goal, and the evidence that Powers was qualified for at least some of the jobs he sought, creates a factual dispute as to whether BHP's hiring explanations were pretextual.

BHP's motion for summary judgment as to Powers's Title VII discrimination claims is denied.

### C.     Title VII Retaliation

To show post-termination retaliation in violation of Title VII, a plaintiff must make a prima facie showing: "1) that the plaintiff engaged in activity protected by Title VII; 2) that an adverse employment action occurred; and 3) that a causal link existed between the protected activity and the adverse action."  *Abbt v. City of Houston*, 28 F.4th 601, 610 (5th Cir. 2022) (quoting *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)). If the plaintiff makes a prima facie showing, "the burden then shifts to the employer to demonstrate a legitimate . . . non-retaliatory

reason" for the adverse employment action. *Id.* (quoting reference omitted). "The employer's burden is one of production, not persuasion, and involves no credibility assessment." *Id.* (quoting reference omitted). The plaintiff then has the burden of showing that the employer's reason is pretextual and that the plaintiff's protected activity was the but-for cause of the adverse employment action. *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 806 (5th Cir. 2007).

BHP argues that Powers cannot establish a prima facie case for retaliation because he cannot show an adverse employment action or that BHP withheld Powers's bonus because he filed an EEOC charge. BHP argues that once an employee becomes eligible for a bonus—as Powers was—the company has full discretion to pay a bonus in an amount ranging from 0% to 150% of the target, based on performance. BHP argues that because it had discretion as to whether to pay Powers any bonus at all, BHP did not have to pay a bonus when Powers refused to sign a release of all claims as a condition of payment. BHP argues that it "required *all exiting employees* to sign the same release form before they could receive an STI [bonus] payment." (Docket Entry No. 32 at 34). BHP argues that it applied this general policy to Powers, precluding a causal connection between his EEOC complaint and BHP's refusal to pay the bonus.

Powers points to the Fifth Circuit's holding that the denial of a bonus that an employee would otherwise have received qualifies as an adverse employment action. *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 170 (5th Cir. 2018). In *Davenport*, the court agreed with the D.C. Circuit's holding that "so long as a bonus is 'significant,'" refusal to pay the bonus may be an adverse employment action. *Id.* (quoting *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001)). The D.C. Circuit found the refusal to pay an $800 bonus sufficient to support a showing of retaliation. *Russell,* 257 F.3d at 819; *Davenport*, 891 F.3d at 171. The refusal to pay Powers his bonus of $92,050 qualifies as an adverse employment action. (Docket Entry No. 33 at 39).

While, as BHP notes, the bonus is discretionary, that discretionary percentage relates to performance. In *Hishon*, the Supreme Court held that even when not contractually obligated to provide a benefit, when it is "part and parcel of the employment relationship," the benefit "may not be doled out in a discriminatory fashion." *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984). In the Title VII context, the denial of Powers's bonus for reasons other than his performance, regardless of the discretionary nature of the bonus, may support a retaliation claim.

BHP's reliance on pre-*Davenport* case law does not show a basis for summary judgment denying Powers's retaliation claim. *See Salazar v. Wynne*, No. 7-cv-870, 2009 WL 10699498 (W.D. Tex. Feb. 5, 2009). Five days elapsed between Powers's termination and his amended EEOC complaint on July 16, 2020. On August 4, 2020, Kan wrote Powers that BHP would not pay his bonus without a signed release, (Docket Entry No. 33-14 at 2). The totality of the circumstances creates an inference of a causal connection between Powers's protected activity and BHP's decision to deny him his bonus. *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) ("At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action.").

BHP argues that all employees must sign release forms. But its own evidence demonstrates BHP does not require signed release forms from "all exiting employees," but only from those leaving based on "redundancy." (Docket Entry No. 32 at 34). Powers points to a recently terminated employee who received a bonus without signing a release form. (Docket Entry Nos. 33 at 40; 33-66 (Declaration of Adam Goss) ¶ 4). BHP argues that this employee received his bonus after his termination following a merger, even though the employee had been terminated for behavior or performance issues, a situation in which BHP "[t]ypically . . . does not offer the terminated employee *any* STI payment." (Docket Entry No. 35 at 16–17 (emphasis added)).

Manson Kan, a BHP HR Business Partner, testified that, with employees leaving because they were redundant, "there is a release letter tied to specific payments as part of [their] redundancy."  (Docket Entry No. 32-11 (Deposition Transcript of Manson Kan) at 88:12–15).  Kan's email to Powers stated that "BHP's consistent practice over the past few years (and with all employees who have been made redundant during that time) has been to require a signed Release in order to pay out any [bonus] payment."  (Docket Entry No. 33-14).  Powers's termination letter does not state whether the policy applies to all employees or only employees terminated for redundancy.  (Docket Entry No. 32-1 at 105–106).  Nor does the letter state the terms on which Powers might receive his bonus.  The letter states, "You *may be eligible* to receive a short-term incentive payment . . . depending on the relevant terms of the Company policy and/or incentive Plan."  (*Id.* at 105 (emphasis added)).  The same lack of certainty appears in the release agreement itself.  (*Id.* at 108 ("Employee will also receive, if applicable . . . a pro-rata short-term incentive bonus payment . . . .")).  The bonus plan materials themselves do not state that a release is required if an employee is terminated for redundancy and is a "good leaver."  (*Id.* at 121).

At this juncture, there is a factual dispute material to determining whether BHP consistently applied a policy of requiring releases from all terminated employees, from only those employees terminated for redundancy, or from only some of those employees terminated for redundancy, as a condition of paying all or part of the bonuses the employees were eligible to obtain.

BHP's motion for summary judgment as to Powers's Title VII retaliation claim is denied.

## D.    Breach of Contract

Under Texas law, the elements of a breach of contract cause of action are: 1) the existence of a valid contract; 2) that the plaintiff performed or tendered performance as contractually required; 3) that the defendant breached the contract by failing to perform or tender performance

as contractually required; and 4) that the plaintiff sustained damages resulting from the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.,* 574 S.W.3d 882, 890 (Tex. 2019).

BHP again argues that whether bonuses are paid is in the company's discretion, so that eligibility for a bonus is not the same as entitlement to a bonus.  BHP stresses that Powers cannot show that it breached the terms of any contract.  (Docket Entry No. 32 at 35).  BHP asserts that "all exiting employees" must sign a release to receive the payment.  BHP cites *Haag v. AOT Energy Am. LLC*, No. 13-20-00351-CV, 2022 WL 242750, at *4 (Tex. App.—Corpus Christi-Edinburg 2022, pet. denied) (mem. op.).  In *Haag*, the court determined that the bonus guidelines set out by the company were not themselves an enforceable contract.  BHP's bonus plan states that the employment contract itself details individual eligibility.  (Docket Entry No. 32-1 at 118 ("[E]ligibility will ordinarily be detailed in the individual contract of employment.")).  Neither party has provided that contract.

Powers points to *Toch v. Eric Schuster Corp.,* 490 S.W.2d 618, 624 (Tex. App.--Dallas 1972, writ ref'd n.r.e.), in which a Texas appeals court determined that even without a contract for incentive payments, the existence of an incentive scale "constitutes a contract for the payment of services rendered."  In *Shanklin*, the court relied on *Toch* in evaluating whether there was a contractual obligation to pay a bonus.  *Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, No. 7-cv-2690, 2008 WL 4899631 (S.D. Tex. Nov. 12, 2008).  The court found a fact question as to whether management retained discretion to pay out bonuses or, instead, whether the incentive plan contractually obligated management to pay.  *Id.* at *13.  A similar dispute exists here.  BHP's bonus plan materials do not indicate that redundant employee bonus eligibility turns on the signing of a release form.  Under Powers's reading, if a contractual obligation exists, as a "good leaver," BHP is obligated to pay his bonus according to the terms of the bonus plan.

Viewing the facts in the light most favorable to Powers, a factual dispute remains as to the existence of a contract and, if so, whether BHP breached.

## IV.  Conclusion

The court denies BHP's motion for summary judgment, (Docket Entry No. 32), and Powers's motion to strike.  (Docket Entry No. 34).

The court grants Powers's motion for leave to file the Purdy affidavit and add it to the summary-judgement record.  (Docket Entry No. 39).

The court will hold a status conference on **December 12, 2022, at 10:00 a.m.** by Zoom.  A Zoom link will be separately sent.

SIGNED on November 21, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge